U.S. DISTRICT COURT
FILED

AUG 1 0 2012

D.S.
S.D. OF N.Y.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                         :

In re REFCO INC. SECURITIES LITIGATION  :     Case No. 07-md-1902 (JSR)
                         :
------------------------------------------------------------X

This Document Relates to:


------------------------------------------------------------X
                         :
KENNETH M. KRYS, et al.,         :     Case No. 08-cv-7416 (JSR)
                         :
Plaintiffs,                  :
                         :     REPORT AND
      -against-            :     RECOMMENDATION
                         :     OF THE SPECIAL MASTER
ROBERT AARON, et al.,           :     ON  MOTION TO
                         :     DISMISS OR FOR
              Defendants.    :     SUMMARY JUDGMENT
------------------------------------------------------------X     BY THIRD-PARTY
                               DEFENDANT ANDREW FEIGHERY


Daniel J. Capra, Special Master

**I. Introduction**

    The DPM Defendants[1] have filed a claim for contribution against Third-Party Defendant Andrew Feighery.[2] The claim for contribution is based on the assertion that Feighery — as a member of the Board of SMFF — voted to return to  Refco, LLC approximately $263 million (of more than

---

    [1] The "DPM Defendants" are defined herein (and in previous R and R's) as Derivatives Portfolio Management, LLC, Derivatives Portfolio Management, Ltd., DPM-Mellon, LLC, DPM-Mellon, LTD (collectively "DPM"), and Guy Castranova. Castranova  was President, CEO and member of the Board of DPM. See Amended Complaint ¶23. While the DPM Defendants are of course third-party plaintiffs on this motion, they will be referred to here as they have been throughout the Special Master's R and Rs, and as they refer to themselves in their papers —  as the "DPM Defendants."

    [2] Contribution claims were also filed by the DPM Defendants against Patrina Farquharson and Christopher Sugrue but those claims are not before the Special Master.

$300 million) that had been distributed to SMFF after fraud was discovered at Refco.[3] That return of funds was made to settle a preference claim brought by the bankruptcy Trustee of Refco, LLC. Under the preference settlement, SMFF waived its right to participate in the Refco bankruptcy proceeding, thus preventing SMFF "from participating in what was an extremely generous recovery of a significant percentage by Refco's other creditors." DPM Defendants' Brief at 1. The DPM Defendants thus claim that Feighery, by approving the preference settlement, is a party who "truly bear[s] responsibility (or at least the lion share) for any alleged harm incurred by the Krys Plaintiffs." Id. at 2.

Feighery moves to dismiss the Third-Party Complaint under Fed.R.Civ.P. 12 or alternatively moves for summary judgment under Fed.R.Civ.P. 56. Feighery presses three arguments in favor of his motion:

1. The contribution claim is barred by New York General Obligations Law §15-108, because Feighery has entered into a settlement agreement with the Krys Plaintiffs.[4]

2. The DPM Defendants have failed to state a claim upon which relief can be granted.

3. Feighery is not subject to personal jurisdiction in New York.

*For the reasons discussed below, the Special Master recommends that the Third-Party Complaint be dismissed with prejudice, or alternatively that Summary Judgment be granted in Feighery's favor.*

Each of Feighery's arguments will be taken in turn.

_____

[3] The Special Master has written many R and Rs reviewing claims arising from the implosion of Refco. Familiarity with the prior R and Rs, and with Judge Rakoff's review of them, is assumed. In particular, the "DPM R and R" — dated July 19, 2010 and affirmed and adopted by Judge Rakoff — sets forth the substantive claims between the original parties and the disposition of the motions to dismiss brought by the defendants in this matter.

Abbreviations used in the prior R and R's will be used herein.

[4] The Plaintiffs in the underlying action here — referred to as the "Krys Plaintiffs" — are Joint Official Liquidators of the SPhinX family of Funds and the SPhinX Trust. The SPhinX Trust is the assignee of claims from the Estate of PlusFunds. PlusFunds created SPhinX and served as its investment manager.

## I. The Settlement Agreement and GOL § 15-108.

On November 30, 2011 — three months after this Third-Party Complaint was filed — the Krys Plaintiffs entered into a settlement agreement with Feighery (the "Settlement Agreement"), by which the Krys Plaintiffs released any and all claims against Feighery in exchange for 1) the sum of $10; and 2) an agreement by Feighery that he will provide "reasonable cooperation in support of the JOLs and the SPhinX Trustee" in the underlying action here. Settlement Agreement at 3 (attached to McGriff Affidavit). In particular, Feighery agrees to cooperate in the following respects: to make himself available to the Krys Plaintiffs and counsel as reasonably requested; to make himself available in New York for providing witness statements, depositions, etc; and to make himself available for trial, arbitration, and similar proceedings, including testimony at such proceedings.

Feighery relies on N.Y. General Obligations Law § 15-108, which provides in pertinent part as follows:

**Release or covenant not to sue**

**(a) Effect of release of or covenant not to sue tortfeasors.** When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury, or the same wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms expressly so provide, but it reduces the claim of the releasor against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is the greatest.

**(b) Release of tortfeasor.** A release given in good faith by the injured person to one tortfeasor as provided in subdivision (a) relieves him from liability to any other person for contribution as provided in article fourteen of the civil practice law and rules.

* * *

**(d) Releases and covenants within the scope of this section.** A release or a covenant not to sue between a plaintiff or claimant and a person who is liable or claimed to be liable in tort shall be deemed a release or covenant for the purposes of this section only if:

(1) the plaintiff or claimant receives, as part of the agreement, monetary consideration greater than one dollar;

(2) the release or covenant completely or substantially terminates the dispute

3

between the plaintiff or claimant and the person who was claimed to be liable; and

(3) such release or covenant is provided prior to entry of judgment.[5]

Feighery's contends that under the terms of GOL § 15-108(b), the Settlement Agreement relieves him from liability to pay any person for contribution. Feighery argues that the DPM Defendants have no reason to object to the enforcement of the Settlement Agreement, because it will not prejudice them and if anything it will work to the disadvantage of the Krys Plaintiffs. Under GOL § 15-108(a), the Settlement Agreement reduces the Krys Plaintiffs' claims against the other tortfeasors in the amount of Feighery's equitable share of the damages or the amount of the Settlement, whichever is greater. Thus, if Feighery is found liable for anything more than $10 of damages, it will be the Krys Plaintiffs who will have a reduced recovery.

The DPM Defendants make two arguments against Feighery's reliance on GOL § 15-108: 1) reliance on the Settlement Agreement is improper on a motion to dismiss because that Agreement was not mentioned, relied upon, or referenced in the Third-Party Complaint itself; and 2) there is at least a question of fact as to whether the Settlement Agreement was entered into in good faith, as is required to obtain the protection of GOL § 15-108. These arguments will be taken in turn.

## A. *Considering the Settlement Agreement and Submissions on Good or Bad Faith on a Motion to Dismiss*

The DPM Defendants rely on the oft-stated principle that on a motion to dismiss, the court may only consider documents incorporated by reference or integral to the complaint, matters of which judicial notice may be taken, or documents that the claimant relied upon in preparing the complaint. *Arista Records LLC v. Lima Group LLC*, 532 F.Supp.2d 556, 566 (S.D.N.Y. 2007).[6] The DPM Defendants correctly point out that the Settlement Agreement was not referenced in any way in the Third-Party Complaint — which is not surprising because the Settlement Agreement was not entered into until three months after that Complaint was filed.

There are, however, at least two reasons why the Settlement Agreement should be considered on this motion. First, *if* the Settlement Agreement would dispose of this matter (that is, if it is an agreement entered into in good faith) it makes no sense to deny dismissal simply because it was not referenced in the Complaint. That argument elevates technicality over efficiency, form over substance. It would mean that a complaint could *never* be dismissed on the ground that the third-party has settled with the plaintiff — because such an agreement would as a practical matter

---

[5] This case was originally filed in New Jersey, but the DPM Defendants do not dispute that N.Y. GOL § 15-108 is applicable. Transcript of Oral Argument at 139.

[6] For a detailed discussion of what documents may be properly considered on a motion to dismiss, see the Owens and Kavanagh R and R at 6-15.

4

never be referenced in the third-party complaint.[7] But in fact there is substantial case law in which the courts have opted for efficiency and reason, and granted motions to dismiss third-party complaints because the third-party defendant had settled with the principal plaintiff. *See, e.g., Gonzalez v. Armac Industries, Ltd.,* 756 F.Supp. 165 (S.D.N.Y. 1991) (motion to dismiss or in the alternative for summary judgment granted because the third party settled with the principal plaintiff); *Mathis v. United Homes, LLC,* 607 F.Supp.2d 411, 431 (2009) (when "the Appraisers execute a settlement agreement and release from liability with the plaintiffs, the cross-claims for contribution asserted against the Appraisers by all of their co-defendants will be dismissed by the court"); *Resolution Trust Corp. v. Young,* 925 F.Supp. 164, 168 (S.D.N.Y.1996) ("Any and all claims for contribution . . . which have been or could have been, or could be asserted against [the settling third party] are barred or dismissed with prejudice."); *Minpeco, S.A. v. Conticommodity Services, Inc.,* 677 F.Supp. 151 (S.D.N.Y.1988) (motion to dismiss or in the alternative for summary judgment granted on the basis of a settlement agreement entered into after the third-party complaint was filed); *Sabater v. Lead Industries Ass'n, Inc.,* 2001 WL 1111505, at *4 (S.D.N.Y. 2001) (motion to dismiss or in the alternative for summary judgment granted on the basis of a settlement agreement between the underlying plaintiff and the third-party defendant); *Mielcarek v. Knights,* 50 A.D.2d 122, 375 N.Y.S.2d 922 (4th Dept. 1975) (motion to dismiss granted on the basis of a release entered into after the cross-claim was filed); N.Y. Jur. Contribution § 65 ("A tortfeasor who has settled with and obtained a release from the plaintiff is entitled to an order of discontinuance and is not required to attend and participate as a party defendant in the trial of the action against the remaining defendant tortfeasors."); *Boeke v. Our Lady of Pompei School,* 73 A.D.3d 825, 901 N.Y.S.2d 336 (2d Dept. 2010) (after the third-party defendant settled with the principal plaintiff, the motion to dismiss should have been granted).

Second, even if the complaint cannot be dismissed under Rule 12, Feighery has alternatively moved for dismissal under Rule 56. Both parties have submitted substantial materials on whether the Settlement Agreement has been entered into in good faith — which is the only dispute between the parties on the effect of GOL § 15-108.[8] Where both parties submit supplemental materials not contained in the pleadings, and those materials are not excluded by the court, the motion to dismiss "must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). *See also Rotter v. Leahy,* 93 F.Supp. 2d 487, 493 (S.D.N.Y. 2000) (Reviewing release agreement under GOL § 15-108: "Since both Johnston and Leahy have submitted supplemental materials not contained in the pleadings in connection with this motion [on the question of good faith] it will be treated as a

---

[7] It would also mean that a defendant who signed a stipulation of dismissal could thereafter oppose a motion to dismiss on the ground that the stipulation was not referenced in the complaint.

[8] There is no dispute, for example, on whether the requirements of §15-108(d), supra, are met. The Settlement Agreement provides "monetary consideration greater than one dollar"; it "substantially terminates the dispute" between the Krys Plaintiffs and Feighery; and it was entered into "prior to entry of judgment."

motion for summary judgment."). Not only has Feighery moved for summary judgment but the DPM Defendants have affirmatively asked for consideration of materials not contained in the pleadings — including Feighery's deposition, Owens's deposition, and Feighery's Declaration signed as part of the settlement. Under these circumstances, there is no reason for the court to exclude any of the supplemental materials introduced by the parties.

Therefore, whether treated as a motion to dismiss or for summary judgment, it is appropriate for the court to proceed to the issue of the validity of the Settlement Agreement — specifically whether the agreement was a release "given in good faith by the injured person." GOL § 15-108(b).[9]

### B. *Was the Settlement Given in Good Faith?*

The policy behind GOL § 15-108, and the inclusion of the good faith requirement, is best set forth in *Gonzalez v. Armac Indus. Ltd.*, 756 F.Supp. 165, 167–68 (S.D.N.Y.1991), where the court observed:

> The purpose of § 15–108 is to provide a defendant who is one of several tortfeasors with an incentive to settle by assuring that the settling defendant will have no further liability to the other tortfeasors. ... The quid pro quo is that the defendant is barred from seeking contribution against any of the other tortfeasors. ... The remaining tortfeasors suffer no harm, as they may offset the amount of which they are ultimately found liable by the amount of settlement between plaintiff and the first defendant.

If it is so that the non-settling party cannot suffer from the settling party's agreement, then it would seem that there should be no complaint from such a party regardless of the amount or nature of the settlement. But GOL § 15-108 requires that the "injured person" must release the alleged wrongdoer in good faith. The reason for the good faith requirement is somewhat murky. The Twentieth Annual Report of the New York Judicial Conference (1975) — specifically Comment C to the GOL at pages 225-26 — contains a cryptic explanation on which many courts have relied:

> Because a settlement by one tortfeasor always benefits the remaining tortfeasors by reducing their liability at least by the amount of the settlor's equitable share, there is no need for the remaining tortfeasors to claim contribution from the settlor. Therefore, subdivision (b) of this Section explicitly provides that a settling tortfeasor will not be subject to a claim for contribution where the release has been given in good faith. *The "good faith" requirement has been added in order to assure that the injured party will not collusively release one wrongdoer for a small amount in return for the promise of that wrongdoer to improperly*

---

[9] For the reasons expressed above, the Special Master will consider materials submitted by the parties that are outside the Complaint in assessing the arguments for and against dismissal of the Third-Party Complaint.

*cooperate with the injured person in an attempt to extract from the other wrongdoers more than the equitable share of the damages attributable to them.* See Uniform Contribution Among Tortfeasors Act § 4 and Commissioner's Note (rev. 1955) ("The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction was collusive, and if so there is no discharge").

Under this explanation, the settlement *itself* could never operate to extract from the other wrongdoers more than their equitable share of damages. That's not possible under the terms of GOL § 15-108. *See, e.g., Resolution Trust Corp. v. Young*, 925 F.Supp. 164, 168 (S.D.N.Y. 1996) ("Under the New York rule, there is no need for a fairness hearing because even if a plaintiff settles for too little, the non-settling defendant is still entitled to a credit equal to the settling defendant's proportionate share of fault."). No concrete examples of bad faith are given in the Judicial Conference explanation. Courts have rather unhelpfully said that the good-faith requirement "depends upon all the facts alleged, not just upon the amount of the settlement." *Ades v. Deloitte & Touche*, 1993 WL 362364, at *18 (S.D.N.Y.).

At oral argument, at the Special Master's request, the parties considered the question of why there is a good faith requirement in GOL § 15-108 when the settlement itself cannot increase the non-settling defendant's responsibility for the plaintiff's damages. Counsel for the DPM Defendants suggested that the absence of the settling party at trial would be prejudicial to the remaining parties. As he put it: "I want the jury to see Mr. Feighery . . . and to understand that we were not the responsible parties. . . . [M]y client has a right to have people in the case before the jury who it can say we didn't cause this preference settlement, we weren't parties to it, Mr. Feighery was." Transcript of Oral Argument at 105-106. This concern about the "empty chair," expressed by an experienced litigator, seems well-founded; but unfortunately for the DPM Defendants the absence of the settling party from trial is definitely not the type of prejudice, collusion, or improper cooperation that is prohibited by the GOL § 15-108 good faith requirement. Judge Cardamone, in *Mielcarek v. Knights*, 50 A.D.2d 122, 125, 375 N.Y.S.2d 922 (4th Dept. 1975), explained that GOL § 15-108 has the inevitable consequence of rendering settling parties absent at trial. The *Mielcarek* court considered whether the settling defendant could be required to remain in the action as a party before the court and be required to appear and defend until equitable shares of fault were determined by the jury. The court explained that the statute provided no authority for keeping a party in the action who had settled out — indeed it provided just the opposite, the settlement means that they cannot be a party. Judge Cardamone explained as follows:

> Defendants assert that they may be prejudiced unless the settling tort-feasor remains and participates in the trial of the action. It is their claim that permitting the settling tortfeasor not to participate "would disregard one of the basic tenets of the adversary system." It seems more reasonable to conclude, however, that the "true adversary" here is not the settling tortfeasor with no monetary interest or substantive liability, but the plaintiff who will seek to prove that the settling tortfeasor was only slightly at fault and that the greatest percentage of fault should be attributed to the nonsettling defendants. . . .

> What should be emphasized is that to the defendant interested in settling, determining

with finality the extent of his monetary liability may at times be secondary to his desire to remove himself from the lawsuit and avoid what he may consider to be the psychologically upsetting involvement. Stated otherwise, a potential defendant has a sincere and substantial interest in "buying his peace." It is pertinent to inquire on what theory the settling defendant is held in the action. That is to say, what substantive liability exists vis-a-vis the injured plaintiff or other tortfeasors. The answer in this case appears to be that he has none. Thus with no potential liability and no interest in the litigation the settling tortfeasor appears to have no place as a party in this lawsuit. Removal of the settling tortfeasor as a party encourages settlement while not prejudicing the rights of the nonsettling defendants. An order of discontinuance of the settling tortfeasor fully accords with the purpose of the statute.

Thus, GOL § 15-108 and its good faith requirement is *not* concerned with the fact that a settling party's absence from the case will be prejudicial to the remaining parties. So if it is not the settlement itself and not the risk of the empty chair, what is good faith concerned with? The case law provides no guidance beyond the boilerplate reference to improper cooperation. One possibility is that the good faith requirement must be intended to bar some side agreement or tacit understanding under which the settling party agrees to "improperly cooperate" by, perhaps, providing misleading testimony, committing perjury, hiding evidence, etc.

Given the very narrow concerns about "improper" activity that appear to be operating within the good faith requirement, it should be no surprise that courts have not often or easily found a settlement to be in bad faith under GOL § 15-108. As one court has stated, "the standard for collusion is a high one as it requires the non-settling party to show not merely that the amount of the settlement was low but that the wrongdoer was released for a small amount in return for the promise of that wrongdoer to cooperate *improperly* with the injured person in an attempt to extract from the remaining wrongdoers more than the equitable share of damages attributable to them." *Sabater v. Lead Industries Ass'n, Inc.*, 2001 WL 1111505, at *4 (S.D.N.Y. 2001) (emphasis added; internal quotation omitted). So for example, in *Ades v. Deloitte & Touche*, 1993 WL 362364, at *17-18 (S.D.N.Y.), the court concluded that there was no question of fact as to bad faith even though the settlement was for a relatively small amount and the parties began discussing a release before the lawsuit was even commenced. The *Ades* court stated as follows:

The good-faith requirement depends upon all the facts alleged, not just upon the amount of the settlement. A release even for nominal damages will not be evidence of collusion or bad faith if the record otherwise supports allegations of good faith. *Friend v. Dibble,* 124 Misc.2d 151, 475 N.Y.S.2d 765 (Sup.Ct. Sullivan Cty.1984) (settlement with product manufacturer for $1.00 not in bad faith given absence of product identification). D & T will suffer no harm by Eastlake's settlement, since D & T's potential liability under the state law claims will be reduced by the greater of the amount paid by Eastlake or Eastlake's equitable share of damages. N.Y.G.O.L. § 15–108 . . . . A "collusive" settlement is one where the injured party releases a:

wrongdoer for a small amount in return for the promise of that wrongdoer to cooperate improperly with the injured person in an attempt to extract from the

8

remaining wrongdoers more than the equitable share of the damages attributable to them.

*Friend*, 124 Misc.2d at 153, 475 N.Y.S.2d at 766. D & T has not alleged that Eastlake's settlement with the Plaintiffs prevents N.Y.G.O.L. § 15-108's limiting D & T's payment of equitable share of damages pursuant to the statute. D & T has merely alleged that communications and settlement before the lawsuit officially began together with settling for a relatively small amount indicate collusion. Given New York's official policy of encouraging settlement, these allegations do not rise to the level of bad faith. Accordingly, D & T has not alleged facts from which it can be inferred that the settlement of the state-law claims should not be respected according to New York law. Eastlake's motion to dismiss D & T's state-law claims is therefore granted.

So the DPM Defendants have a difficult case to make in trying to show a jury question on bad faith in this case. The DPM Defendants cite cases for the proposition that good faith is a question for the factfinder and that a simple allegation of bad faith is enough to defeat a motion to dismiss based on a release. But the cases cited, and the case law in general, do not support these broad propositions. For example, in *Glaceau Water Co., v. Systems Bio-Industries,* 2000 WL 1891045, at *2 (E.D.N.Y.), cited by the DPM Defendants, Judge Gleeson did write that "[w]hether a party gives a release in good faith is an issue of fact for the factfinder." But immediately after that, he assessed the non-settling party's allegations of bad faith — quite similar to those made here by the DPM Defendants — and had this to say:

SBI contends that "questions regarding the timing of the general release, and the consideration given certainly cast suspicion over whether the plaintiff gave the release in good faith." SBI's Opp. at 5. Without more, however, this assertion is insufficient to survive a motion for summary judgment. See *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996) ("[C]onclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."). Under General Obligations Law § 15-108(b), therefore, any claim by SBI for contribution from Crystal Rock is barred.

Id.

Similarly, in *Sabater v. Lead Indus. Ass'n,* 2001 WL 111505, at *4 (S.D.N.Y. 2001) — which the DPM Defendants cite for the proposition that an allegation of bad faith is sufficient to defeat a motion to dismiss — the court in fact dismissed the third-party claim because the third-party defendant had settled. It stated as follows:

Where there are allegations of fraud or collusion, an issue of fact *may* exist as to the "good faith" of the settling parties. But the standard for collusion is a high one as it requires the non-settling party to show not merely that the amount of the settlement was low but that the wrongdoer was released "for a small amount in return for the promise of that wrongdoer to cooperate improperly with the injured person in an attempt to extract from the remaining wrongdoers more than the equitable share of damages attributable to them." *Ades,* 1993 WL

362364, at *18 (quoting *Friend v. Dibble*, 475 N.Y.S.2d 765, 766 (N.Y.Sup.Ct.1984)). In *Ades*, for example, the Court concluded that the small size of settlement combined with discussions between the settling parties before the lawsuit was even commenced, did not rise to the level of bad faith. Id.

Similarly, there is no evidence of collusion here. Rather, both Centeno plaintiffs and Freddie Mac have independently concluded that it is within their best interests to enter into a $10,000 settlement. Defendants make much of the fact that Centeno plaintiffs are suing other defendants in state court for millions of dollars and thus, the $10,000 settlement cannot be in good faith. However, it is not bad faith for the plaintiffs to have decided that they have weaker claims against Freddie Mac compared to other defendants whom they have sued for higher sums. Thus, the Court will not disturb the parties' decision to settle because the agreement is fair and reasonable and found not to have been made in bad faith.[10] (emphasis added).

It is clear then that a simple allegation of bad faith is insufficient to defeat a motion to dismiss based on a release that is otherwise subject to GOL § 15-108. The non-settling party, as *Sabater* indicates, has the burden of showing that the wrongdoer was given a discount in exchange for an agreement to cooperate *improperly* with the plaintiff. *See also Torres v. State*, 67 A.D.2d 814, 814, 413 N.Y.S.2d 262 (4th Dept. 1979) ("The State has shown no fact to support its assertion that this release was given in bad faith and there is no evidence of collusion. Therefore, no triable issue of fact is presented as to the good faith of the release."); *SSDW Co. v. Feldman-Misthopoulos Assoc.*, 151 A.D.2d 293, 296, 542 N.Y.S.2d 565 (1st Dept. 1989) (non-settling party's contention that a release was not issued in good faith "is merely conclusory and insufficient to oppose the respective motions for summary judgment on that ground. . . . and, in any event, release of a potentially culpable party is not inconsistent with the concept of joint and several liability. Therefore, the [non-settling party] has not been prejudiced by the release granted to the [settling defendant].").

The DPM Defendants do provide more than a simple allegation that the release of Feighery was in bad faith. They basically rely on the following factual allegations:

- The Krys Plaintiffs allege damages for hundreds of millions of dollars and released

_____

[10] The DPM Defendants also cite *Steen v. Bump*, 233 A.D.2d 583, 584, 649 N.Y.S.2d 731 (3d Dept. 1996), but that case is of little help to their position that an allegation of bad faith is sufficient to defeat a motion to dismiss based on a release. *Steen* did not involve GOL § 15-108 at all. The release at issue was signed by the plaintiff in favor of the defendant, and the court held that the plaintiff's factual allegations that it was defrauded into signing the release were sufficient to defeat a motion to dismiss based on the release. That fact situation is a far cry from this case, where there is of course no allegation that either of the parties to the release were defrauded into signing it.

10

Feighery for a mere ten dollars.

● The release was executed only after the Third-Party Complaint was filed and Feighery's counsel received an extension of time to respond to it.

 ● Feighery had a prior relationship with the Krys Plaintiffs, which according to the DPM Defendants makes it "likely that the settlement agreement is nothing more than a ruse to force DPM to pay more than its fair share of any damage award." Brief in Opposition at 10;

 ● Feighery's deposition testimony indicates that there "was never any negotiation" over the relevant terms of the settlement agreement (including the amount of payment). Letter to Special Master dated April 13, 2012, at 1.

 ● Feighery's deposition indicates that the Declaration signed by Feighery and appended to the Settlement Agreement "was negotiated line-by-line to be as misleading as possible in support of the JOL's claims on the merits." Id. at 2.

These allegations will now be analyzed to determine whether they individually or collectively create at least a question of fact as to whether the release was "given in good faith by the injured person." GOL § 15-108(b). [11]

---

[11] It should be noted that this case does not involve a so-called "Mary Carter" agreement. Judge Sweet, in *Wausau Business Ins. Co. v. Turner Const. Co.*, 2001 WL 604188, at *1 (S.D.N.Y.), provided this definition of a Mary Carter agreement:

> A Mary Carter agreement is "an arrangement between a plaintiff and a defendant whereby the exposure of liability of the settling defendant is limited, 'usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non-settling defendant or defendants.' " *American Medical Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 244 F.3d 715 & n. 1 (quoting Black's Law Dictionary 974 (6th ed.1990)). A Mary Carter agreement has several elements: (1) *it is kept secret from the nonsettling defendants*; (2) *the settling defendant remains in the case and defends itself at trial*; and, most importantly, (3) the settling parties structure the settlement in such a way as to give the settling defendant a financial incentive to assist the plaintiff in increasing the liability of the nonsettling defendant. (Emphases added)

Under New York law, Mary Carter agreements are void as against public policy, because they secretly realign the parties, may confuse juries if not disclosed, and may affect the settling defendant's presentation of evidence in a way that prejudices the nonsettling defendants (with the nonsettling defendants being bushwacked because they don't know about the agreement). *See, e.g., Sierra Rutile Ltd v. Katz*, 1994 WL 577888 (S.D.N.Y.) (citing *Stiles v. Batavia Atomic Horseshoes, Inc.*, 174 A.D.2d 287, 579 N.Y.S.2d 790, 793 (4th Dept.1992)).

*Amount of Settlement:*

It is absolutely clear that the low amount of the settlement is not itself sufficient to show bad faith/collusion. Case after case so holds. *See, e.g., Friend v. Dibble*, 124 Misc.2d 151, 475 N.Y.S.2d 765, 766 (Sup. Ct. Sullivan Cty. 1984), where the court found that a release for one dollar justified dismissal of the claims against the settling party:

> At first blush the release of a potential joint tort-feasor for the sum of $1.00 would seem to evidence a lack of good faith. The good faith requirement, though, is to assure that the injured party will not collusively release one wrongdoer for a small amount in return for the promise of that wrongdoer to cooperate improperly with the injured person in an attempt to extract from the remaining wrongdoers more than the equitable share of the damages attributable to them. The requirement permits the Court to determine whether the transaction was collusive (Twentieth Annual Report of the New York State Judicial Conference, 1975, p. 226). Keeping in mind the purpose of the good faith requirement, the Court notes that there is no evidence in the record before it, other than the $1.00 consideration itself, to indicate any collusive intent between plaintiffs and John-Mansville.[12]

Indeed the Statute itself contemplates that releases are enforceable even if only nominal consideration has been provided. Section (d)(1)  provides that a release will be enforceable under § 15-108 if, among other things,  the plaintiff receives, as part of the agreement, "monetary consideration greater than one dollar."[13]

Not only is the low amount of the settlement insufficient in itself to indicate bad faith, it is not, in the context of this case, suspicious at all. Rather it is consistent with the position taken by the Krys Plaintiffs throughout this litigation.  In this case, the Krys Plaintiffs have asserted all along that

---

The difference between the Settlement Agreement here and a  Mary Carter agreement is that the latter raise an *obvious* risk of collusion and prejudice — they are secret, and the settling defendant remains in the litigation to create a misleading presentation and jury confusion in a way unbeknownst to the non-settling defendants. Such a risk is substantially minimized when, as here,  the settling defendant is out of the case and the agreement is public and can be used to impeach the settling defendant, or as a basis for court relief,  if he tries anything funny.

[12] *See also Ades v. Deloitte & Touche*, *supra* 1993 WL 362364, at *18 (S.D.N.Y.) ("The good-faith requirement depends upon all the facts alleged, not just upon the amount of the settlement. A release even for nominal damages will not be evidence of collusion or bad faith if the record otherwise supports allegations of good faith.")

[13] This provision was added to the statute in 2007. Note that the court in *Friend, supra,* upheld a release that was for one dollar, but that case was decided before the addition of subsection (d) to § 15-108.

12

Feighery and others were innocents that were unaware of the unauthorized transfers to RCM or of Refco's participation in the Suffolk loans, and that SMFF was unaware that settling the Preference Action would result in an inability to participate in the Refco Bankruptcy. Indeed that assessment on the Plaintiffs' part — that Feighery was an innocent — is critical to their case against other defendants. *See, e.g.,* Primary Wrongs R and R at 22-24; Complaint in *Krys v. Schulte Roth.* So it is not at all surprising that the Krys Plaintiffs would release Feighery for a nominal sum.

Courts have consistently found that where a Plaintiff could assess the case against the settling party to be weak, a low settlement figure is not indicative of bad faith. *See, e.g., Sabater v. Lead Industries Ass'n, Inc.*, 2001 WL 1111505, at *4 (S.D.N.Y.) ("it is not bad faith for the plaintiffs to have decided that they have weaker claims against Freddie Mac compared to other defendants whom they have sued for higher sums."); *SSDW Co. v. Feldman-Misthopoulos Assoc.*, 151 A.D.2d 293, 296, 542 N.Y.S.2d 565 (1st Dept. 1989) ("The mere fact that nominal consideration was paid for the release is insufficient to establish collusion since such documents normally recite a nominal sum. The [released party] is not asserted by plaintiff to have had any responsibility for defects in the windows.").[14] Here the Krys Plaintiffs, especially in light of other arguments they have made in this MDL, could reasonably conclude that the claims against Feighery were weak.

Finally, the Krys Plaintiffs had another good faith reason to release Feighery. Under GOL § 15-108, a released party cannot be sued for contribution by any other tortfeasor. If other tortfeasors sued Feighery, he would have a claim against the SPhinX Estate for indemnity, and that could have added to the indemnity reserve that is being set aside in the Cayman Islands proceedings — which would further stall the liquidation of the SPhinX Estate. See Oral Argument at 127-128. Thus settling with Feighery for a small sum brought benefits to the Krys Plaintiffs. So for all these reasons, the nominal amount of the settlement adds little or nothing to DPM's contention that the Krys Plaintiffs released Feighery in bad faith.

***Timing***

---

[14] Of course the DPM Defendants contend that Feighery is liable for wrongdoing — that's the basis of the Third-Party Complaint. But if other defendants' assessments were enough to indicate that the plaintiff released a party in bad faith, then no defendant in a Third-Party Complaint could ever be released. That result is clearly contrary to the policy of GOL § 15-108, which is to encourage settlement. *See Mitchell v. New York Hosp.*, 61 N.Y.2d 208, 215, 473 N.Y.S.2d 148 (1984) (Section 15-108 was enacted "in an effort to strike a better balance between the often competing policies of encouraging settlement and providing for equitable sharing of liability among tort-feasors."); *Whalen v. Kawasaki Motors Corp.*, 92 N.Y.2d 288, 292, 680 N.Y.S.2d 435 (1998) ("The purpose of [GOL § 15-108] is to encourage settlement, although the statute is also concerned with ensuring equity. Plaintiffs should be fairly compensated, but nonsettling defendants should not bear more than their fair share of a plaintiff's loss.").

The fact that the release was entered into after the Third-Party Complaint was filed does not plausibly indicate that Feighery was released in bad faith. The Krys Plaintiffs have submitted detailed information indicating that the process of negotiating a settlement with Feighery was started long before the Third-Party Complaint was filed. But even if that were not so, cases abound in which arguments of bad faith were rejected even though the settlement was entered into after a claim was filed against a settling party. *See, e.g., Ades v. Deloitte & Touche*, 1993 WL 362364 (S.D.N.Y.) (no bad faith even though settlement occurred after third-party claim brought); *Minpeco, S.A. v. Conticommodity Services, Inc.*, 677 F.Supp. 151, 160 (S.D.N.Y. 1988) (contribution claims were barred due to a release entered into after the action against the settling party was brought; the court rejects the argument that the motion must be denied because it requires the court to decide "issues of fact and law in advance of trial"); *Hanna v. Ford Motor Co.*, 252 A.D.2d 478, 675 N.Y.S.2d 125 (2d Dept. 1998) (summary judgment should have been granted on the basis of a release entered into after the third-party claim was brought); *Ziviello v. O'Boyle*, 90 A.D.3d 916, 935 N.Y.S.2d 89, 90 (2d Dept. 2011) ("After the commencement of the third-party action, the plaintiffs reached a settlement with the Punzi defendants and executed a release in favor of the Punzi defendants . . . There is no allegation that the release was not executed in good faith, and there is no evidence to support such a claim.").

Thus New York courts have seen nothing suspicious about releases that are entered into only after a third-party complaint is filed. For one thing, it is perfectly plausible that a plaintiff might not be considering whether to release a possible party until a later point in the case — and it is only after the third-party gets sued that the parties find it important to consider a release.

It is notable that the DPM Defendants have not cited a case in which the court relies on the timing of the settlement as relevant to a finding of bad faith. Given all these considerations, the timing of Feighery's release adds virtually nothing to the DPM Defendants' argument that the release was given by the Krys Plaintiffs in bad faith.

### *Feighery and Krys Plaintiffs' Prior Relationship*

The DPM Defendants imply that there is something sinister in the fact that Feighery and the Krys Plaintiffs had a relationship that preceded this lawsuit. Given the Krys Plaintiffs' consistent position that Feighery was an innocent, that relationship hardly seems sinister. In any case, courts evaluating good faith have not found pre-lawsuit communications or relationships between the parties to a release to be indicative of bad faith. *See, e.g., Ades v. Deloitte & Touche*, 1993 WL 362364, at *18 ("D & T has merely alleged that communications and settlement before the lawsuit officially began together with settling for a relatively small amount indicate collusion. Given New York's official policy of encouraging settlement, these allegations do not rise to the level of bad faith."); *Torres v. State*, 67 A.D.2d 814, 814, 413 N.Y.S.2d 262 (4th Dept. 1979) (representative of the state releases himself individually; no triable issue of fact is presented as to the good faith of the release). The DPM Defendants have not cited a case in which a prior relationship between the plaintiff and the settling party has been found relevant to a finding of bad faith under GOL § 15-108.

14

### *Asserted Lack of Negotiation*

The DPM Defendants complain that the settling parties did not negotiate over the $10 figure. But given the fact that the Krys Plaintiffs considered Feighery to be one of the innocents, and given that the case law fully supports releases for nominal consideration in such instances, it is hardly remarkable that there was no negotiation over the figure. As to negotiating other parts of the agreement, first, the DPM Defendants concede that some provisions were subject to negotiation, but more importantly, they do not cite any case law to support the proposition that lack of negotiation over the terms of a release is somehow indicative of bad faith. It is to be recalled that the DPM Defendants have the burden of showing that the Krys Plaintiffs released Feighery in bad faith. A bare allegation of prior familiarity is insufficient to meet that burden.

### *Asserted Discrepancy Between Feighery's Declaration and His Deposition*

The DPM Defendants allege that Feighery's declaration indicates collusion because, when compared to his deposition, it was misleading and so designed to be as prejudicial as possible to the DPM Defendants. Theoretically the issuance of a misleading or fraudulent statement by the settling party for use at trial, after entering a settlement agreement, could be thought to be the kind of "improper" cooperation proscribed by GOL § 15-108. But that is not the case here. For one thing, the Feighery Declaration could not be used at trial by the Krys Plaintiffs, as it is clearly hearsay. See Fed. R. Evid. 801. It doesn't come close to qualifying under any of the Federal Rules hearsay exceptions. (It is probably for this reason that the Krys Plaintiffs require Feighery's cooperation at trial as part of his obligations under the Settlement Agreement). Therefore the DPM Defendants will not suffer any prejudice at trial from the declaration. For another thing, even if Feighery was engaged in some chicanery in preparing the Declaration, it is not *his* bad faith that counts. The statute gives the settling defendant protection if the release is made "by the injured person" (here the Krys Plaintiffs) in good faith. GOL § 15-108(b). While DPM's counsel's letter to the Special Master, dated April 13, 2012, could be read to imply that the Krys Plaintiffs' counsel was operating in bad faith in preparing the Settlement Agreement and particularly the Feighery Declaration, at oral argument DPM's counsel stated clearly and for the record that DPM was not alleging that Krys Plaintiffs' counsel had acted in bad faith — but rather that it was *Feighery's* bad faith that led to him entering into the settlement in order to avoid liability. Transcript of Oral Argument at 134-35. *See also* Id. at 137 (Feighery's deposition and its alleged variances from the Declaration should be "considered for the purpose of determining whether Mr. Feighery entered into this settlement in good faith."). Thus, because the DPM Defendants make no allegation that any variance found in the Declaration was the result of the Krys Plaintiffs' bad faith, any such variances are irrelevant to bad faith under the terms of GOL § 15-108.

Finally, the DPM Defendants vastly overstate the alleged inconsistencies between the Feighery Declaration and his deposition. To take just one example, in his declaration Feighery

asserts that in 2005, he had no knowledge that SPhinX assets deposited at Refco were used to fund the Suffolk Loans. Feighery Declaration ¶ 16. The DPM Defendants allege that this statement of lack of knowledge at the time of the transactions is at variance with his deposition in which he testified that he had no knowledge of such a fact even at the time of the deposition. Tr. 186-187. But how is continuing not to know something inconsistent with the fact that you didn't know it before?

Most of the other examples of inconsistency could easily be explained by failure to remember complex details about complicated transactions. There are certainly inconsistencies between the Declaration and the deposition, but it is a long stretch to say that individually or collectively they amount to evidence of improper collusion between Feighery and the Krys Plaintiffs.

———

In sum, none of the circumstances raised by the DPM Defendants, individually or collectively, is sufficient to raise a jury question as to whether the Krys Plaintiffs colluded with Feighery to obtain improper cooperation. [15] Nor have the DPM Defendants pointed to any other information that could be obtained that would be pertinent to a showing of bad faith.

**_Therefore, the Third-Party action against Feighery should be dismissed with prejudice under N.Y. G.O.L. § 15-108, or in the alternative, summary judgment should be granted in Feighery's favor._**

## II. Have the DPM Defendants Adequately Alleged a Cause of Action in Contribution?

Feighery argues that the DPM Defendants have not sufficiently pled a cause of action for contribution. New York provides for a statutory right of contribution under N.Y. C.P.L.R. § 1401, which states in relevant part:

---

[15] It should be noted that the circumstances presented here are nothing like the only two cases found by the Special Master in which courts have found a question of fact as to good faith under GOL § 15-108. In *Rotter v. Leahy,* 93 F.Supp. 2d 487, 493 (S.D.N.Y. 2000), a case involving complicated facts, a question of fact as to good faith was raised because the settling party, at the time he negotiated the release, was arranging to undermine a related arbitration, thus setting up others to take the fall. And *Barrett v. United States*, 668 F.Supp. 339, 341 (S.D.N.Y.1987), was not a case involving collusion between the settling party and the plaintiff; rather the contention was that the settling party defrauded the plaintiff into signing the release. The court concluded "that where, as here, a third party alleges that a release was procured by fraud, the releasee should not be permitted to rely upon the release as a bar to an action for contribution."

Except as provided in section[ ] 15-108 ... of the general obligations law, ... two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death, may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought.

Although contribution is most commonly sought between joint tortfeasors, section 1401 is "intentionally open-ended" and only requires that there be "two or more persons who are subject to liability for damages for the same personal injury, injury to property or wrongful death." Weinstein, Jack B., Harold L. Korn & Arthur R. Miller, CPLR Manual § 10.02(a) (2008). "In recommending the adoption of the section, the Judicial Conference indicated its intent that the language be construed as broadly as it read." Id. "Accordingly, in addition to tort, breach of warranty actions, actions based on statutory violations, a variety of negligence actions, professional malpractice actions, strict products liability actions, and misrepresentation (fraud) actions are all actions in which contribution could be claimed under section 1401." *Mathis v. United Homes, LLC,* 607 F.Supp.2d 411, 429-30 (2009).

Feighery argues that the DPM Defendants have failed to state a cause of action in contribution because there is 1) no allegation of any duty owed by Feighery to DPM or Castranova; 2) no allegation that Feighery breached a duty to SphinX or knew about any wrongdoing.

The first of these arguments is easily rejected. There is no requirement that a party against whom contribution is sought must have breached a duty to the party seeking contribution. "The right of contribution requires only that the party seeking contribution and the party from whom contribution is sought be liable, in whole or in part, for the same injury." *Oursler v Brennan,* 67 A.D.3d 36, 44-45, 884 N.Y.S.2d 534 (4th Dept. 2009). *See also Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.,* 71 N.Y.2d 599, 602, 528 N.Y.S.2d 516 (1988) (a third party is liable for contribution if shown to have "had a part in causing or augmenting the injury for which contribution is sought."). Thus the fact that Feighery owed no duty to the DPM Defendants is irrelevant if Feighery owed a duty to SPhinX/PlusFunds and breached that duty in a way that contributed to the damages sought by the Krys Plaintiffs.

Feighery's second argument has significantly more weight. "The source of a right of contribution under state law must be an obligation imposed by state law."*Crews v. County of Nassau,* 612 F.Supp.2d 199, 214 (E.D.N.Y. 2009). But nothing in the third-party complaint specifically alleges that Feighery breached any duty owed to SPhinX or PlusFunds or violated any obligation under New York law. The only allegation of any action concerning Feighery is that as a director of the SPhinX Funds he "voted to approve of the preference settlement in behalf of SMFF." Third- Party Complaint ¶4. There is no allegation that agreeing to the preference settlement was a breach of any duty owed to SPhinX, or was wrongful in any way. There is an allegation that the agreement to the preference settlement contributed to SMFF's damages (Id. at ¶15), and the DPM Defendants state that "[a]ll the DPM Defendants need to state a plausible claim for contribution is to allege that Feighery's actions contributed to Plaintiffs' alleged harm." Brief in Opposition at 12. But causation in the absence of breach of duty is not sufficient to support a claim

for contribution. "In determining whether a valid third-party claim for contribution exists, the critical issue is whether the third-party defendant *owed a duty to the plaintiff which was breached* and which contributed to or aggravated plaintiff's damages." *Rosner v. Paley*, 65 N.Y.2d 736, 738, 492 N.Y.S.2d 13 (N.Y.1985) (emphasis added). None of the cases cited by the DPM Defendants stand for the proposition that a contribution claim can lie in the absence of breach of duty or other tortious conduct. *See, e.g., Trustees of Columbia Univ. v. Mitchell/Giurgola Assoc.*, 109 A.D.2d 449, 454, 492 N.Y.S.2d 371 (1st Dept. 1995) (cited by the DPM Defendants) ("The right to contribution and apportionment of liability among alleged multiple wrongdoers arises when they each owe a duty to plaintiff or to each other and by breaching their respective duties they contribute to plaintiff's ultimate injuries. This is so regardless of whether the parties are joint tort-feasors, or whether they are liable under different theories, so long as their wrongdoing contributes to the damage or injury involved.").[16]

Because the DPM Defendants have alleged only contributory causation and not breach of any duty or tortious conduct, the third-party complaint against Feighery should be dismissed. However, if failure to plead tortious conduct were the only ground for dismissal, the Special Master would recommend that the dismissal be entered without prejudice. The DPM Defendants move in the alternative for leave to amend, and in this Circuit, a party is generally afforded leave to amend its pleadings "in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993). There is no showing of prejudice or bad faith here, and the DPM Defendants have not heretofore sought to amend the Third-Party Complaint. *See, e.g., Cohen v. Citibank*, 1997 WL 88378, at *2 (S.D.N.Y.) ("it is the usual practice upon granting a motion to dismiss to allow leave to replead"). Nor is it clear that leave to amend would be futile, as Feighery unquestionably owed *some* duty to SMFF in his role as a member of the board of directors. *See, e.g., Absolute Activist Value Master Fund Ltd. v. Ficeto*, 672 F.3d 143 (2d Cir. 2012) (Leave to amend not futile where it appears that representations can be made that would provide more particularized allegations).

But of course, leave to amend in this case to allege wrongful conduct would be an academic exercise because the claim should be found in any event to be barred by GOL § 15-108, as discussed above. And on the GOL claim, leave to amend should be denied because 1) the DPM Defendants have already submitted supplementary materials on the only disputed question, i.e., whether the Krys Plaintiffs entered into the release in good faith, and leave to amend to provide any further information would be futile; and 2) Feighery's motion insofar as based on GOL § 15-108 can and should be treated as a motion for summary judgment and dismissal granted on that ground.

---

[16] The Third-Party Complaint does allege upon information and belief that Feighery knew that RCM was an unregulated offshore entity and that SMFF's funds were not segregated at RCM. But nothing in the Complaint connects that knowledge to any tortious act that contributed to the loss of the SMFF funds. The only act alleged is the approval of the preference settlement; the Complaint does not explain how knowledge about RCM and lack of segregation has any bearing on approval of the preference settlement.

18

### III. Is Feighery Subject to Personal Jurisdiction in New York?

Feighery — in five short paragraphs in two briefs — claims that he has insufficient contacts with New York to be subject to personal jurisdiction there. Feighery is an Irish citizen residing in Dublin. The DPM Defendants argue that Feighery is subject to personal jurisdiction in New York because: 1) he consented to jurisdiction in this case by signing the release conditioned on his cooperation, which includes making himself available in New York for the purposes of deposition and trial testimony; 2) he transacted business within the state—within the meaning of N.Y. C.P.L.R. § 302(a)(1) — by appearing for board meetings, both in person and by telephone, in New York City, and those meetings were related to approving the preference settlement; and 3) he committed tortious acts outside the state causing injury to persons in New York, within the meaning of C.P.L.R. § 302(a)(3)(i).[17] In light of the recommendation above that the third-party complaint should be dismissed under GOL § 15-108, and the fact that the parties (especially Feighery) devote little time to the question of jurisdiction, the Special Master will treat these arguments briefly.

*Consent:*

"Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). The Special Master finds that by signing the settlement agreement with the Krys Plaintiffs — and agreeing to perform the obligations thereunder related to this action — Feighery has consented to jurisdiction in this matter. A court obtains, through implied consent, personal jurisdiction over a defendant if "[t]he actions of the defendant [during the litigation] ... amount to a legal submission to the jurisdiction of the court, whether voluntary or not." Id. at 704–05. The Settlement Agreement with the Krys Plaintiffs imposes substantial duties of cooperation in this litigation and contemplates that many of those obligations will be met by personal appearance in New York. It is true that the agreement does not contain a forum selection clause in which the party specifically agrees to a lawsuit in New York. *Compare Dine-A-Mate v. J.B. Noble's Rest.*, 240 A.D.2d 802, 658 N.Y.S.2d 510 (3d Dept. 1997) (personal jurisdiction

---

[17] On this motion to dismiss, the DPM Defendants have the burden of demonstrating that the court has jurisdiction over Feighery. *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526 (S.D.N.Y. 2008). However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith ... legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir.1998) (quotations and citation omitted). Plaintiff "can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited ... would suffice to establish jurisdiction over the defendant." *Whitaker v. American Telecasting Inc.*, 261 F.3d 196, 208 (2d Cir.2001) (quotations and citations omitted). Thus, a court may consider materials outside the pleadings, and must credit the plaintiff's averments of jurisdictional facts as true. *See Hsin Ten Enter. USA, Inc. v. Clark Enter.*, 138 F.Supp.2d 449, 452 (S.D.N.Y. 2000).

objection found waived due to a forum selection clause). But the Settlement Agreement is obviously targeted toward this matter and there is a clear intent to perform substantial obligations related to it in New York. It is disingenuous for Feighery to argue that he 1) agreed to appear for deposition and trial in this action; 2) agreed to make himself available to assist the Trustee's preparation for trial in this matter; and 3) arranged for reimbursement of travel expenses incurred in traveling to New York to cooperate — and yet did not submit to the jurisdiction of the court in this very matter.

### *Transacting Business:*

CPLR § 302(a)(1) authorizes a court to exercise personal jurisdiction over an out-of-state party if that party "transacts business within the state" and if the claim "aris[es] from" those business contacts. Here the allegation is that Feighery acted within the state as a director, and those very decisions made while a director — specifically to approve the preference settlement — contributed to the damages suffered by SMFF.[18] Personal jurisdiction has been found under CPLR § 302(a)(1) when corporate officers make decisions in New York that are the gravamen of the complaint. *See, e.g., Bradley v. Staubach*, 2004 WL 830066, at * 6 (S.D.N.Y.) ("transacting business" jurisdiction found where a corporate official was a "key figure" in a corporate transaction in the state that was the gravamen of the plaintiff's claim). Such contacts need not be pervasive or systematic — so long as they are related to the cause of action, as here, even contacts that are limited and sporadic are sufficient to establish jurisdiction under CPLR § 302(a)(1). *See, e.g., Round One Productions, Inc. v. Greg Page Enterprises, Inc.,* 566 F.Supp. 934 (E.D.N.Y. 1982) (two dinner meetings, partly social in nature, found sufficient to constitute transacting business under CPLR § 302(a)(1)); *American Contract Designers, Inc. v. Cliffside, Inc.,* 458 F.Supp. 735, 739 (S.D.N.Y.1978) ("There were two visits to New York City by high-level officers of the defendant Cliffside, which, taken together, do amount to sufficiently 'purposeful acts in relation to the contract'").[19]

---

[18] The fact that Feighery participated in some meetings by phone rather than personally does not detract from a finding of personal jurisdiction. See, e.g., *Corporate Campaign, Inc. v. Local 7837, United Paperworkers International Union,* 265 A.D.2d 274, 697 N.Y.S.2d 37 (1st Dept. 1999) (defendant's phone, mail and electronic communications to New York, especially when augmented by personal visits to the state, found to constitute transaction of business under CPLR 302(a)(1)); *Empire Beef Company v. Meyners-Robinson Co.,* 248 A.D.2d 1012, 669 N.Y.S.2d 998 (4th Dept. 1998) (same).

[19] Exercising jurisdiction over Feighery based on participation in board meetings related to this matter would not violate the requirements of due process. As Judge Scheindlin has stated, "[c]ontacts sufficient to establish jurisdiction under C.P.L.R. § 302(a)(1) are sufficient to meet the minimum contacts requirements of the Due Process clause." *Bradley v. Staubach,* at *6 (citing *Stone v. Chung Pei Chemicals Indus.*, 790 F.2d 20, 21-22 (2d Cir.1986), and *Stroock & Stroock & Lavan v. Valley Sys.*, 1996 WL 11249, at *4 n. 3 (S.D.N.Y.). Where a plaintiff makes the threshold showing of minimum contacts — as DPM has done here — the defendant must present "a compelling case that the presence of some other considerations would render

In sum, DPM has sufficiently established that Feighery is subject to personal jurisdiction under CPLR § 302(a)(1).

### Tortious Act

The DPM Defendants argue briefly that personal jurisdiction is established under CPLR § 302(a)(3)(i) because Feighery committed a tortious act outside the state causing injury within the state. The problem with this argument, as discussed above, is that the DPM Defendants have not sufficiently alleged that Feighery has committed any tortious conduct at all. If the DPM Defendants could provide such allegations in an amended complaint, then it may be that jurisdiction could be established under CPLR § 302(a)(3)(i). But that would be an academic exercise for two reasons: first and most important because the Third-Party Complaint should be dismissed with prejudice under GOL § 15-108 (or summary judgment should be granted), as discussed above; and second, because if that is not so and personal jurisdiction remains a relevant issue, it is established through both consent and transacting business, as discussed above.

## IV. Conclusion and Recommendation

The Third-Party Complaint should be dismissed with prejudice — or alternatively Summary Judgment be granted in Feighery's favor — on the ground that GOL § 15-108 bars the DPM Defendants' claims for contribution.

---

jurisdiction unreasonable" in order to establish a due process violation. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (internal quotation and citation omitted). Feighery has made no showing of unreasonableness here. There is nothing that offends traditional notions of fair play and substantial justice in requiring Feighery to submit to jurisdiction in New York, when his decisions in New York constituted the gravamen of the Third-Party Complaint and he has already agreed to participate in the proceedings in an important role. *See Bradley v. Staubach, supra* at *6 (applying reasonableness inquiry). Certainly Feighery cannot complain about substantial burdens as he has been to New York a number of times and any expenses he incurs for trips to New York in this matter are to be reimbursed under the Settlement Agreement.

Daniel J. Capra
Special Master

Dated: August 7, 2012
New York, New York