**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                                              :
In re REFCO INC. SECURITIES LITIGATION    :        Case No. 07-md-1902 (JSR)
                                              :
-------------------------------------------------------------X


This Document Relates to:


-------------------------------------------------------------X
KENNETH M. KRYS, et al.,                   :        Case No. 08-cv-7416 (JSR)
                                              :
Plaintiffs,                                   :
                                              :        REPORT AND
        -against-                             :        RECOMMENDATION
                                              :        OF THE SPECIAL MASTER
ROBERT AARON, et al.,                      :        ON DEFENDANTS' MOTION FOR
                                              :        PARTIAL SUMMARY JUDGMENT
                                              :
                    Defendants.             :
-------------------------------------------------------------X


Daniel J. Capra, Special Master


**I. Introduction**

        The Defendants remaining in this action — DPM[1] and Robert Aaron[2] — move for summary
judgment as to all the substantive claims brought by the Plaintiffs that have withstood a motion to
dismiss.[3]  Those claims – as to each of which a motion to dismiss was denied by Judge Rakoff's

---

        [1]  DPM is defined herein as Derivatives Portfolio Management, LLC, Derivatives
Portfolio Management, Ltd., DPM-Mellon, LLC, and DPM-Mellon, LTD.

        [2]  Robert Aaron was a director of SPhinX from 2002 to 2006 and was the founder, Chief
Executive Officer, part owner and member of the board of directors of DPM "at all times
relevant." Amended Complaint  ¶38.

        [3]  The Plaintiffs are Joint Official Liquidators of the SPhinX family of Funds and the
SPhinX Trust. The SPhinX Trust is the assignee of claims from the Estate of PlusFunds.
PlusFunds created SPhinX and served as its investment manager.

order adopting the recommendations of the Special Master in the DPM R and R dated July 19, 2010[4] — are as follows:

> ● Count I,  a claim against DPM for breach of the Service Agreements entered into between SMFF (the remaining claimant on this Count) and DPM, under which DPM agreed to act as administrator of the SMFF portfolio fund.[5]

> ● Count V, claims for breach of fiduciary duty against DPM as to both SMFF and PlusFunds, and against Aaron as to SMFF only.[6]

> ● Count VI, claims against DPM and Aaron for aiding and abetting breach of fiduciary duty.

> ● Count VIII, Fraud/Misrepresentation.

The gravamen of all the remaining claims in this action is that SMFF's excess cash was swept from segregated accounts at Refco LLC to unsegregated accounts at RCM. Because the cash was in unsegregated counts, it was at risk of an RCM bankruptcy, which in fact occurred after the Refco Fraud was disclosed. The Plaintiffs are claiming $263 million — that is the amount of money SMFF returned to the RCM Creditors' Committee to settle a Preference Action, which was brought after RCM allowed SMFF to take its $312 million in excess cash out of RCM just before RCM declared bankruptcy. The Plaintiffs are also claiming interest on the $263 million, and damages for the lost business enterprise and deepening insolvency damages suffered by PlusFunds, which served as SMFF's investment manager.

*For the reasons discussed below, the Defendants' motion for partial summary judgment*

---

[4] The Special Master has written many R and Rs reviewing claims arising from the implosion of Refco. Familiarity with the prior R and Rs is assumed.  Abbreviations in prior R and Rs are used herein.

[5] DPM entered into Service Agreements with SPhinX, Ltd. and the other SPhinX entities, including SMFF.  Under the Standing R and R, affirmed by Judge Rakoff, only SMFF among the SPhinX entities has standing to proceed in this action. Count I initially included breach of contract claims against Robert Aaron, Guy Castranova, and Mellon Bank as well, but in the DPM R and R the Special Master recommended that Count I be dismissed as to all defendants other than DPM. Judge Rakoff affirmed and adopted that R and R. Castranova and Mellon Bank are no longer defendants in this action. Robert Aaron remains a defendant as to other counts

[6] PlusFunds' claim for breach of fiduciary duty against Aaron was dismissed with prejudice by Judge Rakoff's order adopting the DPM R and R.

*should be granted.*[7]

## II. Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment may be granted only if the submissions of the parties taken together show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Defendants as moving parties here bear the burden of demonstrating the absence of a material question of fact, and they have "the initial responsibility of . . . identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which . . . demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In ruling on the summary judgment motion the court must view all facts in the light most favorable to the Plaintiffs as the nonmoving parties. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "[A]ll reasonable inferences must be drawn against the [moving] party," and summary judgment may not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.*, 277 F.3d 232, 236 (2d Cir. 2002).

If the Defendants have presented facts showing that they are entitled to summary judgment, the Plaintiffs must then set forth specific facts showing that there is a genuine issue for trial. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). But if the Defendants have not presented a sufficient showing of entitlement to summary judgment, then the Plaintiffs have no obligation to present anything at all. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 617 (2d Cir. 1998) ("Where the movant has the burden, its own submissions in support of the motion must entitle it to judgment as a matter of law.").

### B. Requirement of Admissible Evidence

In reviewing a motion for summary judgment, a court "may rely only on admissible evidence." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Rule 56(c)(1) requires a party asserting that a fact is not genuinely disputed to support that assertion by "citing to particular

---

[7] If the Special Master's recommendation is followed, it appears that the only remaining claim before the court is Count III, which is a claim for indemnity. But the Plaintiffs' claim for indemnity is grounded in the Service Agreement and if DPM has not violated the Service Agreement it would follow that there is no claim for indemnity.

parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(3) states that the court is only required to consider the materials cited pursuant to (c)(1), but it is permitted to go beyond the citations to consider other materials in the record. Finally, Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

### C. Local Rule 56.1

Judge Rakoff, writing for the Second Circuit in *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003), emphasizes that Local Rule 56.1 requires a party moving for summary judgment to provide a statement with citations to admissible evidence in order to establish its burden of showing the absence of triable facts — and that in the absence of such a showing, the non-moving party has no burden of going forward:

> Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. *See* Local Rule 56.1(a), (d). If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted. *See* Local Rule 56.1(c). However, as we held in *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001), "[t]he local rule does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." * * * Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented for the non-movant is not required to rebut an insufficient showing. (Some internal citations and quotations omitted).

### III. Prior R and R's That Determine Many of the Issues on This Motion

The Special Master has recently submitted two R and R's evaluating motions for summary judgment that have substantial bearing on the resolution of the Defendants' motion. The first is the R and R on the Plaintiffs' motion for summary judgment for breach of the Service Agreement, entered on July 10, 2013. The second is the R and R on the motions for summary judgment brought by the Grant Thornton and Mayer Brown Defendants in Krys v. Sugrue, which was entered on April 21, 2013 and affirmed in a bottom-line order by Judge Rakoff dated June 26, 2013. Some of the

relevant determinations from those R and R's are as follows:

***The Breach of Service Agreement R and R determined, among other things, that:***

> 1. As a matter of law, DPM did not violate the Service Agreement provisions regarding wire transfers because DPM did not make wire transfers of the excess cash to RCM, and DPM's role in the cash sweeps was only one of reconciliation and confirmation.

> 2. As a matter of law, DPM did not violate the Service Agreement provision regarding investment of cash because among other things DPM had no authority to invest cash that was in the brokerage account at Refco LLC.

> 3. As a matter of law, any violation by DPM of the obligation to prepare financial statements did not cause the damages claimed in this action.

> 4. As a matter of law, DPM did not violate any obligations regarding maintaining or reporting on segregation of the excess cash at RCM, because there is no admissible evidence raising a question of fact that either Aaron or DPM knew that the cash was subject to risk of complete loss upon RCM's bankruptcy; and nothing in the Service Agreement required DPM to investigate the status of the excess cash in a brokerage account.[8]

***The R and R on the Mayer Brown/Grant Thornton Motion for Summary Judgment determined, among other things, that:***

> 1. There is a question of fact as to whether the "adverse interest" exception to the *in pari delicto* affirmative defense applies with respect to four alleged benefits obtained from the wrongdoing insiders: a) interest payment on excess cash held at RCM; b) seed money provided in the Sentinel Transaction; c) the Standby Credit Facility that was part of the Suffolk Transactions; and d) Refco's responsibility for increased assets under management.

> 2. There is a question of fact as to whether the Preference Settlement constituted a superseding act that precludes the Plaintiffs from showing that the transfers to RCM proximately caused their damages.

The Special Master will now apply these prior rulings, as well as other applicable law, to this motion for partial summary judgment.

---

[8] The Breach of Service Agreement R and R has not yet been reviewed by Judge Rakoff.

**IV. Count I, Breach of the Service Agreement**

In the Breach of Service Agreement R and R, at 2, the Special Master wrote as follows:

> As will be seen below, the Special Master's findings and recommendations lead to the conclusion not only that the Plaintiffs' motion for summary judgment should be denied, but also that DPM's motion for summary judgment on the breach of contract claim should be *granted.* But as DPM has moved for summary judgment on most of the other remaining claims, the Special Master finds it appropriate to treat DPM's motion in its entirety in a forthcoming R and R.

It is time to make clear what was implicit in the prior R and R: DPM's motion for summary judgment as to Count I should be granted.[9] There is no reasonable dispute in the evidence as to the following critical points: 1) DPM did not transfer the excess cash to RCM and did not authorize its transfer — its only role was to confirm and reconcile the transfers on the books; 2) DPM was not responsible for, and had no authority over, investment of the excess cash from one account at a broker to another; 3) DPM's failure to prepare financial statements could not possibly have caused the damages sought by the Plaintiffs; and 4) DPM did not violate any reporting obligations as to the status of the cash — most importantly because Aaron and DPM did not know that the cash was completely unprotected in the event of an RCM bankruptcy, but also because DPM had no duty to police the status of the excess cash.[10]

---

[9] The parties have recognized that the Special Master's recommendations in the Breach of Service Agreement R and R amount to a recommendation that DPM's motion as to Count I should be granted. See Joint Status Report prepared for Judge Rakoff, July 29, 2013, at 4.

[10] In their brief in opposition to this motion for summary judgment, the Plaintiffs rely heavily on the expert report of Peter Vinella, a hedge fund expert who opined, for example, that the Service Agreement gave DPM the power to invest excess cash "without limitation." See Brief in Opposition at 20. But Vinella's opinion on the meaning of the Service Agreement is not helpful, as he is doing nothing but reading the terms of the Service Agreement. See Fed.R.Evid. 702. The Plaintiffs say that the Service Agreements "speak for themselves." Controverting Statement of Facts to Defendants' Statements 58,59, etc. So why are they providing an expert to give his opinion about what the agreements say?

Moreover, Vinella's report is replete with conclusory assertions regarding the state of mind of the Defendants, e.g., "gross and willful negligence", "willfully failed in their duty", etc. See pages 7-137, *passim.* These kinds of expert opinions, about a defendant's state of mind, were struck *sua sponte* by Judge Rakoff in an Opinion and Order reviewing the proposed testimony of another of the Plaintiffs' experts. See Order dated Feb. 6, 2013 (citing *Marx & Co. v. Diners' Club, Inc.,* 505 F.2d 505 (2d Cir. 1977). They are no better here.

Vinella does provide some helpful background on the operation of hedge funds and fund

**V. Count V — Breach of Fiduciary Duty**

As stated above, the DPM R and R found that the Plaintiffs had adequately alleged that DPM had, and breached, a fiduciary duty to both SMFF and PlusFunds; and that Aaron had, and breached, a fiduciary duty to SMFF, which he served as a director. The question for this motion is whether the evidence sufficiently supports the assertions in the Plaintiffs' Amended Complaint.

"Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-5 (2d Dept. 1976). Under New York law, a fiduciary duty arises if "confidence is reposed on one side and there is resulting superiority and influence on the other."[11] *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (internal quotation omitted). *See also Daly v. Metropolitan Life Ins. Co.*, 4 Misc.3d 887, 782 N.Y.S.2d 530, 535 (Sup.Ct. N.Y. Co. 1992) ("[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied.")(internal quotation omitted).

**A. DPM**

*1. Fiduciary Duty to SMFF*

The Special Master found that the Plaintiffs had adequately alleged that DPM had fiduciary duties to SMFF largely on the basis of the role that it had taken under the terms of the Service Agreement. See DPM R and R at 19-21. The Special Master emphasized especially that the Service Agreement allegedly gave DPM authority to invest cash and to report suspicious activity. The Special Master concluded that "it is plausible to believe that DPM had an extensive role in overseeing the SMFF funds — far more extensive than the backroom, ministerial role asserted by the DPM Defendants. Accordingly, it is also plausible that the Plaintiffs reposed trust and confidence in DPM and reasonably relied on it for discretionary services." Id. at 21 (specifically

---

administrators — including the assertion at page 88 that a fund administrator generally does not operate as a "policeman" of the investment manager. But it is safe to say that there is no admissible information provided in the Vinella report that raises or even helps to raise a question of fact that is pertinent to the Defendants' motion for partial summary judgment.

[11] In the DPM R and R, the Special Master found that the breach of fiduciary duty claims were governed by New York law. DPM R and R at15.

noting the critical power to exercise "discretionary decisions over cash").

The information produced in discovery, however — outlined in detail in the Breach of Service Agreement R and R — shows that DPM's actual operations under the Service Agreement were far narrower than alleged by the Plaintiffs in the Amended Complaint. Certainly the limited scope of DPM's operations *in fact,* and under the ultimate control of PlusFunds, are critical to determining whether a fiduciary relationship actually existed. As the Plaintiffs recognize, the court must consider not just "[c]ontractual relations or formal writings" but also "the ongoing conduct between parties." *Pension Comm. of the Univ. of Montreal Pension Plan v. Bank of America Sec.,* 446 F.Supp.2d 163, 196 (S.D.N.Y. 2006). As found in the Breach of Service Agreement R and R, DPM's power to invest cash was limited to the money placed short term in the Custodial account. DPM had no control over the cash sweeps to RCM. And while the Service Agreement required DPM to *report* suspicious activity, there was nothing in the relationship that required DPM to act as a policeman to investigate whether suspicious activity was occurring.

However there at least is one factor in the evaluation of a fiduciary duty at the motion to dismiss stage that has not changed in discovery: DPM appointed Aaron to the board of SMFF. The Special Master emphasized this point in the DPM R and R at 23:

[T]he case for a fiduciary relationship is made even stronger by the fact that Aaron, the CEO and a director of DPM, was also a director of SPhinX. Under New York law, as discussed above, Aaron's actions are attributable to DPM. Therefore any breach of fiduciary duty by Aaron is attributable to DPM.[12]

It is also notable, as emphasized in the DPM R and R at 22, that under New York law the existence of a fiduciary relationship "is usually a fact-specific inquiry." (Citing *E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc.*, 770 F. Supp. 202, 205 (S.D.N.Y. 1991), *AHA Sales, Inc. v. Creative Bath Products, Inc.*, 58 A.D.3d 6, 10-12, 21-22, 867 N.Y.S.2d 169 (2d Dept. 2008), and *Manela v. Garantia Banking Ltd.*, 5 F. Supp. 2d 165, 180 (S.D.N.Y. 1998). Given that all reasonable inferences must be drawn in the Plaintiffs' favor on this motion, and given the fact that DPM had representation on the SMFF board and prepared data for SMFF on a routine basis, it cannot be said that DPM had *no* fiduciary duty to SMFF as a matter of law. [13]

---

[12] *See also* DPM R and R at 18:
Therefore, . . . the Special Master will apply New York law and recommends that DPM be found vicariously liable for the acts of Aaron and specifically for any breach of fiduciary duty on Aaron's part that the Plaintiffs have sufficiently pled.

[13] The Plaintiffs point to deposition testimony by Aaron in which he answered "yes" when asked whether it was his "understanding" that DPM had a fiduciary relationship with SphinX and PlusFunds. This testimony is not irrelevant, but it doesn't advance the ball very much because Aaron is not a lawyer and his one word opinion about a fiduciary relationship does not make it so.

But this does not mean that DPM's summary judgment motion must be denied. The Plaintiffs must establish not only the *existence* of a fiduciary duty but also a *breach* of the fiduciary duty that existed. *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec.,* 446 F.Supp.2d 163, 195 (S.D.N.Y. 2006) ("The elements of a claim for breach of fiduciary duty under New York law are breach of a fiduciary duty owed to plaintiff; defendants' knowing participation in the breach; and damages.").

In their brief, the Plaintiffs claim that "DPM breached its fiduciary duties when it knowingly approved the transfer of assets to unsegregated accounts at RCM." Memorandum in Opposition at 24. But as determined in the Breach of Service Agreement R and R, it has been shown as a matter of law that DPM did not approve the cash sweeps, and moreover it has been shown that DPM did not know that the excess cash at RCM was completely unprotected from the risk of RCM's bankruptcy. In their Amended Complaint, the Plaintiffs describe the asserted breaches of fiduciary duty more broadly: that DPM failed to ensure that the excess cash remained in segregated accounts; allowed the cash sweeps; failed to disclose that the cash was unprotected; withheld information regarding the status of the cash; and misleadingly suggested in its reports that the cash was not at risk. Amended Complaint ¶¶340-341.[14] But even these broader assertions are unavailing, because as indicated in the Breach of Service Agreement R and R, DPM had no duty to act as a policeman to assert that the excess cash remained in segregated accounts, and because it did not know the cash was unprotected, it had no duty to report that fact and did not knowingly mislead SMFF in its reports. Accordingly, whatever fiduciary duty DPM may have had, as a matter of law it cannot be said that it was breached in any way that is relevant to the Plaintiffs' claims regarding the loss of excess cash.[15]

It still remains to be determined whether Aaron breached a fiduciary duty, for which DPM would be vicariously liable. That question is discussed below in the section on Aaron.

### 2. Fiduciary Duty to PlusFunds

---

[14] The Plaintiffs also claim, in their Amended Complaint, impropriety regarding the July 31, 2002 letter signed by Aaron authorizing the opening of accounts. But the Plaintiffs have long ago abandoned the allegation that this letter had anything to do with the cash sweeps. See Plaintiffs' Memorandum in Opposition to Motion to Dismiss by DPM Defendants at 27; Transcript of Oral Argument on motion to dismiss at 114, Statement of Plaintiffs' counsel ("When you read the letter it was for margin money, it was not what would go to RCM").

[15] For example, if DPM had mishandled the short-term investments of the money in the Custodial account at Mellon Bank, that might be a breach of the fiduciary duty that existed. But there is no such allegation here.

In the DPM R and R, the Special Master found that the Plaintiffs had adequately pled that DPM owed a fiduciary duty to PlusFunds. The Special Master reasoned that "[g]iven the close relationship between SPhinX and PlusFunds, there is at least a jury question on whether the trust and confidence that developed from DPM's obligations and performance under the Service Agreement extended to the relationship between PlusFunds and DPM." DPM R and R at 24. That reasoning still holds today, as the evidence is undisputed that PlusFunds and SMFF were joined at the hip and that DPM's interactions were almost exclusively with PlusFunds. Consequently, the conclusion above that there is a question of fact as to the existence of a fiduciary relationship between DPM and SMMF also justifies the conclusion that there remains a question of fact as to whether there was a fiduciary relationship between DPM and PlusFunds.

But again, the Plaintiffs must present a question of fact not only as to the existence of a fiduciary duty but also as to its breach. The breaches alleged here are the same as those alleged with respect to SMFF. And as discussed above and determined in the Breach of Service Agreement R and R, the Plaintiffs have failed, as a matter of law, to establish that DPM had a fiduciary duty regarding the cash sweeps, and have failed to show that DPM knew that the cash was completely unprotected at RCM. Accordingly, the Plaintiffs have not presented evidence sufficient to raise a question of fact as to whether DPM committed the acts that the Plaintiffs claim to be breaches of fiduciary duty.

## B. Aaron

As indicated in the DPM R and R at 27, Aaron has not contested that, as a director, he owed a fiduciary duty to SMFF.[16] The question is whether the Plaintiffs have presented enough evidence for a jury to determine that Aaron breached his fiduciary duty.

Aaron argues that Cayman law controls the scope of a fiduciary duty owed by a director to a corporation and that Cayman law is more protective of directors than the law of New York. Specifically he asserts that the fiduciary duty under Cayman law is not breached unless the director acts disloyally and profits personally at the expense of the company. Aaron relies on *Bristol & West Bldg. Soc'y v. Mothew,* [1998] Ch 1 at 18B-C (C.A.), and *Boardman v. Phipps,* [1967] 2 A[1]C 46, 47F (U.K.). The Plaintiffs are correct, however, that at least with regard to the *allegations* of misconduct in this case, any difference between Cayman and New York law is irrelevant. The allegation of breach here is that "Aaron provided false, incomplete, and misleading information to PlusFunds management and the SphinX board" and that he *knowingly* did so and profited from doing so. Brief in Opposition at 30. *See also* Amended Complaint at ¶337 (alleging an "intentional" breach of fiduciary duties). If those facts could be proved it would indicate a breach of fiduciary duty under both New York and Cayman law. The problem for the Plaintiffs is not Cayman law but

---

[16] Aaron did contest that he owed a fiduciary duty to PlusFunds and the Plaintiffs, having not responded on the point, conceded it. Therefore the motion to dismiss the claim by PlusFunds against Aaron for breach of fiduciary duty was granted. DPM R and R at 27.

the fact that there is no factual support for their allegations of Aaron's knowing misconduct. As determined in the Breach of Service Agreement R and R, the evidence indicates as a matter of law that Aaron did *not* know that the excess cash at RCM was completely at risk — any more than any of the PlusFunds and SMFF innocents knew. Accordingly, there can be no breach of fiduciary duty under either New York or Cayman law where the alleged breach is based on Aaron's bad knowledge.[17]

There is another fiduciary-based allegation regarding Aaron that can be teased out of the papers, however: that Aaron breached a fiduciary duty of care and skill by failing to act to protect the excess cash. *See* Plaintiffs' Brief in Opposition at 30-31. As to this duty, the parties again argue about what law applies and whether the standard is one of negligence or gross negligence. Yet even if, under either New York or Cayman law, a breach of the fiduciary duty of care can be found upon a showing of simple negligence, that will not help the Plaintiffs here. This is because Article 194 of the SPhinX Articles of Association provides that "[n]o member of the Board of Directors will be liable to the Company for any cost or expense arising from the mistakes of judgment or any action or inaction that such person reasonably believed to be in the best interest of the Company. In addition, in the absence of gross negligence or willful misconduct, the members of the Board of Directors . . . will be indemnified by the Company against legal liability and expenses." Under Cayman law, such exculpation clauses "relieve the directors who acted honestly from liability for damages occasioned even by their negligence where such negligence is not dishonest." *Brazilian Rubber Plantations and Estates Ltd.* [1910] 1 Ch. at 437. *See also Viscount of the Royal Court of Jersey v. Barry Shelton and Another* [1986] 1WLR at 985 (indemnity and exculpation clause provided protection to directors even where they acted outside the authority granted by the Articles of Association).[18]

Aaron relied on the Articles of Association at the motion to dismiss stage, and the Special Master reviewed that argument in the following passage:

The Plaintiffs do not disagree with the effect of the Articles of Association, but do claim that they have indeed alleged *intentional* wrongdoing with sufficient particularity. As discussed above, the Plaintiffs have clearly stated a litany of *intentional* actions by Aaron, including

---

[17] The Plaintiffs rely on the conclusion of their expert, Timothy Ridley, that Aaron "understood very well his fiduciary and other obligations to . . . SMFF" and that "he breached his duties under the legally mandated standards." It goes without saying that these assertions of state of mind, and legal conclusions, are not helpful under Fed. R. Evid. 702. *See F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250 (2d Cir. 1987) (testimony on violation of legal standards was properly excluded as unhelpful).

[18] The Plaintiffs in their brief in opposition do not respond to Aaron's reliance on the exculpation under the Articles of Association and so any argument about the applicability of the Articles — and to Cayman law construction of such provisions — can be deemed waived. *Leka v. United States,* 2008 WL 686797, at *1 (N.D.N.Y.).

concealing the fact that customer assets were at risk and misstating information in the weekly risk reports. Therefore, the protection afforded by the Articles of Association does not support a motion to dismiss the claim for breach of fiduciary duty.

DPM R and R at 28 (emphases added).

Discovery has shown that Aaron did *not* know the cash was completely unprotected, so the Plaintiffs no longer have an argument against application of the exculpatory provision of the Articles of Association. Even if a claim can be teased out of the papers regarding a duty of care, the Articles of Association remain protective, and preclude a claim for breach of fiduciary duty. As recounted in the R and R on the Breach of the Service Agreement, Aaron had a good faith reason to believe that the cash sweeps were properly authorized by PlusFunds and were beneficial to PlusFunds. At most, Aaron (as well as everyone else at PlusFunds and SphinX) was asleep at the switch. That is negligence, and the Plaintiffs have never contested and do not now contest that acts of negligence are covered by the exculpatory provision in the Articles of Association.

Accordingly, the Plaintiffs have not raised a question of fact in the admissible evidence on whether Aaron can be liable for breach of fiduciary duty to SMFF. It of course follows that DPM cannot be liable vicariously for breach of fiduciary duty.


## VI. Count VI — Aiding and Abetting Breach of Fiduciary Duty.

Count VI alleges that the Defendants aided and abetted two sets of fiduciary-based wrongdoers: 1) Refco LLC and RCM in the scheme to transfer SMFF excess cash to unprotected accounts; and 2) Sugrue, Owens, Kavanagh and Aaron, who allegedly owed fiduciary duties based on their relationships with either SPhinX or PlusFunds or both.[19]

The elements for a valid claim of aiding and abetting a breach of fiduciary duty are "(1) the existence of a violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer." *Chemtex, LLC v. St. Anthony Enterprises, Inc.,* 490 F.Supp.2d 536, 546 (S.D.N.Y.,2007). In the DPM R and R, the Special Master found that the Plaintiffs had adequately pled 1) the breach of a fiduciary duty as to all the wrongdoers named (i.e., primary wrongdoing); 2) that Aaron and DPM knew about the breaches; and  3) that Aaron and DPM substantially assisted the breaches by engineering the cash sweeps and misreporting the status of the cash.

Of course the Special Master was reviewing allegations at the motion to dismiss stage. As it turns out, many of those allegations are wanting in evidentiary support. First, as stated above, the

---

[19] As noted in the DPM R and R, the claim that Aaron aided and abetted *his own* breach of fiduciary duty was nonsensical. It was dismissed by Order of Judge Rakoff affirming and adopting the DPM R and R.

evidence shows, as a matter of law, that neither Aaron or DPM breached their fiduciary duties in any way relevant to this action.

Second, and more important, the evidence shows as a matter of law that neither Aaron nor DPM knew that any of the other alleged wrongdoers were actually violating any fiduciary duty. An aiding and abetting claim requires that the defendant had knowledge of the wrongfulness of the underlying conduct, a standard that is not satisfied by a mere allegation of constructive knowledge. *See Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability"). The alleged breach that is aided and abetted here is "the movement of SMFF assets out of regulated, customer segregated accounts." Amended Complaint ¶357. But the evidence reviewed in detail in the Breach of Service Agreements R and R establishes as a matter of law that neither Aaron nor DPM knew that there was anything wrong about the cash sweeps; and that is because neither knew that the cash swept into RCM was completely unprotected from the risk of an RCM bankruptcy. Because neither knew that there was wrongdoing, it follows of course that neither Aaron nor DPM can be liable for aiding and abetting the wrongdoing.[20]

In the DPM R and R, the Special Master relied on allegations that Aaron had an economic motive to promote and hide the cash sweeps, and also that he attempted to remove the provisions in the Service Agreement regarding cash segregation, as allegations relevant to scienter. But these allegations are only relevant if (as the Plaintiffs alleged) Aaron knew that the cash was being swept into accounts that provided no protection from RCM's bankruptcy. And as stated in the Breach of Service Agreement R and R, there is no evidence raising a question of fact that Aaron had such knowledge. All the motive in the world to assist the SphinX Fraud comes to nothing if you don't know that a SphinX fraud exists.

Moreover it turns out that the asserted effort by Aaron to delete from the Service Agreement DPM's duty to provide treasury functions and invest SMFF's cash was not as nefarious as the Plaintiffs imply in the allegations of their Amended Complaint. See ¶122. Because DPM *never had* the authority to invest cash other than that in the Custodial account, any attempt to alter that provision had no effect on the cash sweeps. Moreover, the attempt was to amend the *2006* Service Agreement. The Refco Fraud was revealed in October, 2005 and Sugrue got the cash out from RCM

---

[20] As noted in the DPM R and R, there is some dispute over whether the scienter requirement for aiding and abetting is knowledge or conscious avoidance. *See* DPM R and R at 34-35. But at any rate the difference between actual knowledge and conscious avoidance is "at most minuscule" because "consciously avoiding something is tantamount to knowing it." *In re Jeweled Objects LLC,* 2012 WL 3638006, at *9 (Bankr. S.D.N.Y.). Any difference between the two standards is immaterial here because, as indicated in the Breach of Service Agreement R and R, there is no evidence to indicate that Aaron was in a different position from anyone else at SMFF or PlusFunds with regard to knowledge of the risk to the cash at RCM — and the Plaintiffs strenuously assert that those innocents neither knew or suspected that the cash was at risk of complete loss.

just days after that. There were no cash sweeps that would have been affected by an amendment to the 2006 Service Agreement and thus no reason to think there was anything suspicious about any attempt to amend that agreement.

Because the required knowledge for aiding and abetting is lacking, Count VI should be dismissed. However, if the Court disagrees with the Special Master's assessment and finds a question of fact as to knowledge, then it should be said that there would also be a question of fact as to substantial assistance. As stated in the Breach of Service Agreement R and R at 28-29, the Plaintiffs have shown at least that DPM prepared data for the risk reports used by PlusFunds, and there are questions of fact as to who characterized the status of the cash and whether the data sent to PlusFunds properly characterized the excess cash as cash. And the Plaintiffs have shown enough to raise a jury question on whether, if the data had shown that the excess cash was completely unprotected, PlusFunds would have withdrawn it from Refco. *See* Rose Dep. Andelin Ex. 36 at 473-73 (if the risk had been reported the PlusFunds Risk Committee would have been "jumping through the roof"); Counterstatement of Facts ¶ 322 (deposition testimony of PlusFunds' "innocent decisionmakers" indicating that they were not aware that the excess cash was at risk of complete loss at RCM).

In sum, the Defendants' motion for summary judgment as to Count VI should be granted, most importantly because there is no question of fact as to scienter.


## VII. Count VIII — Fraud/Misrepresentation

With regard to fraud, the Plaintiffs claim that: 1) the SphinX Offering Memoranda and marketing materials were fraudulent because they failed to disclose that SMFF's cash was unprotected at RCM, and that DPM and Aaron participated in the drafting of, reviewed and signed off on these materials; 2) the audited financial statements for SMFF for 2002, 2003, and 2004 and the unaudited quarterly financial statements for SMFF for those same years and the 2005 financial statements allegedly asserted that excess cash would be segregated to control market risk exposure, and Aaron and DPM participated in the drafting of, reviewed and signed off on these statements; and 3) the weekly risk management summaries given to PlusFunds' risk committee by DPM routinely reflected SPhinX's total exposure to Refco in the $15 to $25 million range at any given time, when in reality, SMFF had hundreds of millions of dollars at risk in unprotected RCM accounts. (FAC ¶¶ 379-393).

In the DPM R and R, the Special Master found that these allegations were sufficient to survive the motion to dismiss the fraud claim. But once again, discovery has shown the most important of these allegations to be without sufficient evidentiary basis.

The elements for a claim of fraudulent misrepresentation are: 1) the defendant made a material misrepresentation of fact; 2) the misrepresentation was made intentionally in order to defraud the plaintiff; 3) the plaintiff reasonably relied on the misrepresentation; and 4) the plaintiff suffered damage as a result of its reliance. *Blank v. Baronowski*, 959 F. Supp. 172, 177 (S.D.N.Y.

1997). A plaintiff must prove each element of fraud by clear and convincing evidence. *Crigger v. Fahnestock and Co., Inc.,* 443 F.3d 230, 234 (2d Cir. 2006). This is true even at the summary judgment stage. *Laugh Factory, Inc. v. Basciano,* 608 F.Supp.2d 549, 558 (S.D.N.Y. 2009) (Rakoff, J.).

The fraud claims here fail most importantly because, as stated a number of times above, the Plaintiffs have not presented sufficient evidence to raise a jury question on whether DPM and Aaron knew that the excess cash at RCM was subject to a risk of total loss. See the extensive discussion in the Breach of Service Agreement R and R at 17-26. Without that knowledge, *none* of the statements allegedly made by Aaron or DPM — from the offering memoranda to the financial statements to the risk reports — was *knowingly* false, and therefore there is no way that the statements could have been made with the intent to defraud SMFF or PlusFunds. It is true that in the DPM R and R the Special Master relied on the Plaintiffs' assertions about a possible economic motive to defraud. But that motive, as stated above in the discussion of Count VI, comes to nothing if the Defendants did not even know that what they were saying was false. Because there is no knowing misstatement, the obligation to show fraud by clear and convincing evidence surely means that the Plaintiffs have not established a question of fact as to intent to defraud. *See, e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC.,* 479 F.Supp.2d 349, 60 (S.D.N.Y.2007) (to succeed on a cause of action for fraud, the plaintiffs must explain "why the statements were fraudulent.").

It should also be noted that even if there is a question of fact as to intent to defraud, the fraudulent statements in play must be narrowed. There is no evidence that DPM or Aaron had anything to do with the statements regarding segregation in the Offering Memoranda or related materials. On the other hand, as stated in the Breach of Service Agreement R and R, the Plaintiffs have shown enough to create a question of fact as to the Defendants' input into the financial statements and the weekly risk reports.[21]

In sum, the motion for summary judgment on Count VIII should be granted, as there is no triable question of fact on the Defendants' scienter.

---

[21] The Defendants argue that PlusFunds and SMFF did not *reasonably* rely on the defendants' input because PlusFunds had its own access to information by which it could have found out that the cash was completely unprotected at RCM. But assuming that DPM made material misrepresentations in their data with the intent to defraud, there is at least a jury question as to the reasonableness of reliance on that data, because after all DPM was hired to provide the data. *See DDJ Management, LLC v. Rhone Group LLC,* 15 N.Y.3d 147, 905 N.Y.S.2d 118, 122 (2010) ("where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry"). Moreover, reasonable reliance is "ordinarily a question of fact to be determined at trial." *Computech Intern., Inc. v. Compaq Computer Corp.*, 2004 WL 1126320, at *9 (S.D.N.Y.).

## VIII. Other Arguments by the Defendants

The Special Master has found that the Defendants' motion for partial summary judgment should be granted in its entirety, largely though not completely because the Plaintiffs have failed to present evidence sufficient to create a question of fact on Aaron's and DPM's knowledge that the excess cash at RCM was at risk of a complete loss. The Defendants have propounded a number of other reasons for granting summary judgment as to all or some of the claims remaining in this action, and the Special Master will address these additional arguments briefly.

### A. No Proximate Cause

The Defendants contend that even assuming DPM and Aaron acting wrongfully, the Plaintiffs "cannot prove that DPM and Mr. Aaron's conduct caused their alleged injuries." Opening Brief at 32. They contend that the alleged injuries were caused by "PlusFunds authorizing the sweeps of excess cash to RCM, the Refco Fraud that left RCM insolvent, and SMFF's decision to settle the Preference Action on terms it now considers unfavorable." Id.

The Defendants are arguing that even if they committed wrongdoing, the presence of other sources of wrongdoing absolves them as a matter of law. But that argument has already been rejected a number of times in this MDL — including in the DPM R and R, where the Special Master addressed the acts of PlusFunds and Refco on the question of proximate cause:

> The Defendants argue that the claimed damages were proximately caused by the combination of wrongdoing of Refco insiders that left RCM insolvent, and the actions of PlusFunds in selecting RCM, causing the account to be opened, and delegating authority to RAI to transfer the funds from Refco LLC to unprotected accounts at RCM. But the Defendants' argument of alternative cause is not persuasive. The Plaintiffs specifically allege that DPM's and Aaron's failure to maintain the excess cash in segregated accounts bore directly on the loss of excess cash because if it had remained in segregated accounts, Refco's insolvency would have had little effect. Similarly, the Plaintiffs specifically allege that DPM's and Aaron's failure to provide accurate risk reports was causative because if innocents at PlusFunds had known the risk, they would have got the money out of RCM. See FAC ¶¶ 253-254, 280. These are statements attributing direct causation to DPM and Aaron.

> The Defendants' proximate cause argument is essentially that because there were other wrongdoers involved, DPM and Aaron cannot be found to have proximately caused the losses to SMFF and PlusFunds. But it cannot be the case that when multiple wrongdoers act separately, a plaintiff cannot plead proximate cause as to any particular one. The question is whether the injuries were the "natural and probable consequence" of the actions or inactions of a particular defendant. *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1985). And despite all the actions of others, the Plaintiffs plausibly and with sufficient particularity assert that if DPM and Aaron had acted to prevent the transfers, or to disclose the fact that they were made, the probable result would have been that the transfers would not have been effectuated or would have been discovered and undone.

DPM R and R at 31.

Nothing produced in discovery affects the above ruling in the DPM R and R, affirmed by Judge Rakoff. Therefore, the Defendants' arguments that acts of PlusFunds and Refco cut the chain of causation must be rejected.

It is true that the Defendants here rely on a new act as a possible superseding cause: the Preference Settlement. But the Special Master, affirmed by Judge Rakoff in a bottom-line order, has already found that the Preference Settlement does not, as a matter of law, constitute a superseding cause of the Plaintiffs' damages. (And the Special Master, affirmed by Judge Rakoff, applied the same analysis and rejected the same argument in the Owens and Kavanagh R and R). *See* the R and R on the Grant Thornton/Mayer Brown Motion for Summary Judgment at 31-36, which is incorporate in full herein by reference.[22]

It is fair to state that the Defendants here make more of Farquharson's (and to a lesser extent Feighery's) alleged misconduct than did Grant Thornton and Mayer Brown. They argue in some detail that Farquharson especially was a wrongdoer and that her wrongdoing raised a risk of equitable subordination that was the real reason for entering into the Preference Settlement. But that does not change the analysis of the Grant Thornton/Mayer Brown R and R at 35:

> Drawing inferences in favor of the Plaintiffs, there remains a jury question on whether SPhinX would have or should have settled the Preference Action regardless of Farquharson's situation. After all, the Special Master and the Court found SMFF's constructive trust argument to be sufficiently questionable on its own — thus plausibly justifying the Preference Settlement — without considering Farquharson's situation.

For all these reasons, the Defendants' motion for summary judgment should be denied insofar as it is based on the actions of PlusFunds, or Refco, or the Preference Settlement as constituting a superseding cause for the Plaintiffs' damages.

**B. *In Pari Delicto***

---

[22] The Defendants here, like Grant Thornton and Mayer Brown, also rely on a "continued-segregation theory" — i.e., the Plaintiffs are bound by their argument that the cash never lost the right to segregation and so PlusFunds/SMFF should never have given what amounted to its own money back to RCM. That argument was rejected as a basis for granting summary judgment in the Grant Thornton/Mayer Brown R and R at 32. It is rejected here as well and the noted passage from the Grant Thornton/ Mayer Brown R and R is incorporated here by reference.

The Defendants argue that the Plaintiffs' claims are barred by the *in pari delicto* doctrine. The Defendants point to two sets of internal wrongdoing as triggering the *in pari delicto* affirmative defense: 1) wrongdoing mainly by Sugrue, in regard to the cash sweeps and efforts to keep the SMFF excess cash at Refco; and 2) wrongdoing by Farquharson and, to a lesser extent, Feighery, in entering into the Preference Settlement.

In the *in pari delicto* R and R, dated December 6, 2010, the Special Master made the following determinations, both of which were affirmed by Judge Rakoff:

● Aaron and DPM could not invoke *in pari delicto* against the claims brought by SMFF, because Aaron was on the board of SMFF and DPM appointed him to the board — and the "the *in pari delicto/Wagoner* bar does not apply to claims against defendants who were corporate insiders." IPD R and R at 40.

● Aaron and DPM were not insiders to PlusFunds, so the "insider" limitation on *in pari delicto* did not apply to claims brought on behalf of PlusFunds.

The Special Master further found that the "adverse interest" exception to the *in pari delicto* doctrine did not apply.[23] The defendants had argued that SMFF and PlusFunds benefited from the relationship with Refco in a number of respects. Specifically the allegations were that: 1) Interest was paid on the excess cash at RCM; 2) SMFF received seed money from the Sentinel investment, which was engineered by Refco; 3) As part of the Suffolk Transaction, Refco extended a $25 million credit facility to PlusFunds to provide SPhinX investors interim secondary market liquidity; and 4) SMFF benefited from Refco's efforts to solicit investors to the SPhinX funds. However, in his Opinion and Order dated April 25, 2011, Judge Rakoff concluded that "contrary to the Special Master's interpretation, plaintiffs have adequately pleaded the adverse interest exception." Id. at 9. But Judge Rakoff "in all other respects adopts the findings and conclusions of the December 6, 2010 Report and Recommendation to the extent they are not inconsistent with the Court's determination regarding the adverse interest exception." Id.

As applied to the claims against Aaron and DPM, the bottom line of Judge Rakoff's order was that the motion to dismiss on grounds of *in pari delicto* was denied in all respects: as to the claims on behalf of SMFF, this was because DPM and Aaron were insiders; as to the claims on behalf of PlusFunds, this was because the Plaintiffs had adequately pled the adverse interest exception.[24]

---

[23] Under the "adverse interest" exception, the *in pari delicto* doctrine is inapplicable because the wrongdoing of the insiders provided no benefit at all to the corporation. *Kirschner v. KPMG,* 15 N.Y.3d 446, 912 N.Y.S.2d 508 (2010).

[24] The Plaintiffs argue that Count I is not barred by *in pari delicto* because it is a breach of contract action. They contend that the Special Master — and Judge Rakoff — erred in finding

On this motion, the Defendants renew and to some extent revise their *in pari delicto* arguments.[25] The part that is renewal argues that PlusFunds received benefits from the actions of the wrongdoing insiders and the ties to Refco, and that Judge Rakoff's ruling regarding the adverse interest exception on the motion to dismiss is not dispositive. Specifically, "now that the parties are no longer constrained by the JOL's version of events but can rather focus on the evidence, it is clear that PlusFunds received many benefits from the wrongdoing of its principals and as a result, the adverse interest exception does not apply." Opening Brief at 30.

The Defendants' attempt to revisit the adverse interest exception regarding ties to Refco is, however, foreclosed. The Special Master has already ruled — in the Grant Thornton/Mayer Brown Motion for Summary Judgment R and R — that there remain questions of fact on whether any of the asserted benefits of being tied to Refco were either actually beneficial or were conditioned on the wrongful transfers. See Id. at 22-31. That discussion in the Grant Thornton/Mayer Brown R and R is incorporated here in full by reference. Essentially the Special Master found that there was nothing in discovery that changed Judge Rakoff's determination that there was a question of fact as to the applicability of the adverse interest exception to the *in pari delicto* doctrine. As stated above, the Special Master's recommendation was adopted by Judge Rakoff in a bottom-line order.

Consequently, nothing has changed with respect to the *in pari delicto* rulings regarding the claims brought on behalf of PlusFunds: the Defendants' motion for summary judgment on PlusFunds claims should be denied insofar as they are based on the affirmative defense of *in pari delicto*.

As to the claims brought on behalf of SMFF, the Defendants argue something new: the insider exception previously applied by the Special Master and Judge Rakoff is not applicable because "[t]he true proximate (and superseding) cause of SphinX's damages was the Preference

_____

in the DPM R and R that the *in pari delicto* doctrine was applicable to breach of contract actions. Brief in Opposition at 43, n.28. Puzzlingly, the first case the Plaintiffs cite to support their objection says it plainly: "*In pari delicto* is applicable to claims of breach of contract." *Globaltex Group, Ltd v. Trends Sportswear Ltd.,* 2010 WL 1633438, at *4 (S.D.N.Y.). The other cases the Plaintiffs cite are off point and say nothing about whether *in pari delicto* applies to claims for breach of contract.

[25] The defendants raise an issue in their brief about whether the doctrine of *in pari delicto* is more plaintiff-friendly under New Jersey law. That was the case at the time of the IPD R and R — *see* Id. at 11 — but the Defendants argue that intervening case law in New Jersey has lessened or eradicated any difference between New Jersey and New York law on *in pari delicto*. The state of New Jersey law on *in pari delicto* need not be addressed, however. The Special Master, in the IPD R and R at 39-40, found that New York law governs the applicability of *in pari delicto* to the Plaintiffs' claims against DPM and Aaron; and that ruling was affirmed by Judge Rakoff. The Plaintiffs do not contest that the New York law of *in pari delicto* applies to this motion.

Settlement, which was approved by directors Feighery and Farquharson, well after they removed Robert Aaron from the SphinX board." Opening Brief at 30. The problem with the Defendants' argument is that it is premised on the assumption that the Preference Settlement was in fact a superseding cause of SMFF's damages. As stated above, and previously in multiple R and Rs, there remains a question of fact as to whether the Preference Settlement was a superseding cause. Accordingly, the Preference Settlement is insufficient on this motion to overcome the application of the insider exception to the *in pari delicto* defense.

Moreover, the Defendants' invocation of the Preference Settlement is unavailing for two additional reasons. First, the *in pari delicto* defense is triggered by the *wrongdoing* of corporate insiders (such as the allegedly unauthorized transfers of excess cash to RCM) — but it cannot be said, as a matter of law, that entering into the Preference Settlement was a wrongful act. *See* Owens and Kavanagh R and R at 22; Grant Thornton/Mayer Brown Summary Judgment R and R at 32 — both affirmed by Judge Rakoff and both concluding that there is at the very least a question of fact as to whether the Preference Settlement was wrongful as opposed to a reasonable determination under the circumstances. Second, assuming the Preference Settlement *was* a wrong that injured SphinX for the benefit of Farquharson and Feighery, there would then be a question of fact as to whether the adverse interest exception applied to that wrongdoing. The Defendants argue that SMFF did benefit from the Preference Settlement, to the tune of keeping $49 million of the $312 million it had taken back from RCM. But here the Defendants seek to have it both ways. They argue that if not for the Preference Settlement, SMFF could have kept the entirety of the $312 million, as did the Rogers Fund. If that is the case, how can losing $262 million in the Preference Settlement be a benefit? That is like saying if a corporate insider sets fire to corporate headquarters, the adverse interest exception is not applicable so long as some part of the building remains standing. The adverse interest exception is not about whether the wrongdoing insider has taken every penny left in a corporation. It is about whether the corporation got any benefit from the wrongdoing. *Kirschner v KPMG LLP*, 15 N.Y.3d 446, 467 912 N.Y.S.2d 508 (2010) (the question is whether "the fraud is committed against a corporation rather than on its behalf"). Here, under the Defendants' own argument, the Preference Settlement was not beneficial to SMFF in any way.

Accordingly, the Defendants' motion for summary judgment on the claims brought on behalf of SMFF should be denied insofar as it is based on the affirmative defense of *in pari delicto*.


### C. PlusFunds' Claims Not Assignable

The SPhinX Trust is the assignee of claims from the Estate of PlusFunds. Under the Chapter 11 Asset Sale Agreement, SphinX Funds purchased all of PlusFunds' causes of action. Defendants' Rule 56.1 Statement ¶126. The Asset Sale Agreement contained a New York choice of law provision. The parties agree that New York law permits the assignment of tort claims. But the Defendants claim that the assignment of PlusFunds' tort claims to the SphinX Trust was prohibited by New Jersey law, and that this prohibition overrides the choice of law clause in the Asset Sale Agreement.

The Defendants rely on NJSA 2A:25-1, which provides that contract claims are generally assignable — omitting any explicit reference to the assignability of tort claims. That omission has led New Jersey courts to conclude that tort claims are not assignable prior to the entry of judgment. *See Ridgewood v. Shell Oil Co.,* 289 N.J. Super. 181, 195, 673 A.D.2d 300 (App. Div. 1996) ("A tort claim cannot be assigned prior to judgment. This rule has been consistently reaffirmed.") (citations omitted). See also *Costanzo v. Costanzo,* 248 N.J.Super. 116, 121, 590 A.2d 268 (Law Div.1991) (public policy precludes assignment of tort claims).

The Defendants' argument — that the assignment of PlusFunds' tort claims was invalid — should be rejected. As stated above, the Asset Sale Agreement calls for application of New York law. "Ordinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice if it does not violate New Jersey's public policy." *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 614 A.2d 124, 133 (1992). In this case, the assignment of PlusFunds' claims does not violate the public policy supporting the non-assignability rule as it is expressed by New Jersey's courts. New Jersey's rule against assignment is "to prevent unscrupulous strangers to an occurrence from preying on the deprived circumstances of an injured person." *Kimball Intern., Inc. v. Northfield Metal Products*, 334 N.J.Super. 596, 760 A.2d 794, 802 (2000). That policy is surely not offended here, where the assignment was made between sophisticated, well-represented entities under the auspices of a court. Moreover, New Jersey courts have recently indicated that "the non-assignability rule applies only to tort claims for personal injuries." Id. at 512, n.6 (citing *Di Tolvo v. Di Tolvo*, 131 N.J.Super. 72, 328 A.2d 625 (1974), and *Berkowitz v. Haigood*, 256 N.J.Super. 342, 346, 606 A.2d 1157 (1992)). Obviously the claims assigned by PlusFunds were not for personal injuries.[26]

Finally, it must be remembered that in the Bankruptcy Court, the JOLs were permitted to classify PlusFunds' tort claims as property of the debtors' estate. The Defendants argue that the U.S. Bankruptcy Code does not preempt the New Jersey law prohibiting assignment of tort claims. But that argument is belied by the Third Circuit's recent opinion in *In re Federal-Mogul Global Inc.*, 684 F.3d 355 (3rd Cir. 2012). There the court held that section 1123(a)(5)(B) of the Code authorized assignment of claims of a bankruptcy estate, and explicitly pre-empted state laws that would prohibit the assignment. Section 1123(a) provides that

(a) Notwithstanding any otherwise applicable nonbankruptcy law, a plan shall–

* * *

(5) provide adequate means for the plan's implementation, such as--

---

[26] The Defendants argue that New Jersey courts will not apply contractual choice of law provisions to tort claims unless the contract language is broad enough to encompass common-law tort claims. Opening Brief at 36 (citing *Palladin Partners v. Gaon,* 2006 WL 2460650, at *16). But here the contract language *is* broad enough to cover tort claims as it assigns "all of PlusFunds' legal and equitable interest in any claim . . ."

> (B) transfer of all or any part of the property of the estate to one or more
> entities, whether organized before or after the confirmation of such plan;

The Defendants rely on *Integrated Solutions, Inc. v. Service Support Specialties, Inc.,* 124 F.3d 487 (3d Cir.1997), in which the Third Circuit held the Bankruptcy Code did not preempt state law restrictions on the transfer of tort claims, when the transfer was from the Estate to a private entity. But as the *Federal-Mogul* Court noted, the issue in *Integrated* was preemption under § 363(b)(1), involving sale of assets outside the plan of reorganization. That provision did not contain a preemption clause. The transfer here was approved by Judge Peck as part of a reorganization, and accordingly, under *Federal-Mogul,* the preemption provision of § 1123(a) applies.[27]

Accordingly, the motion for summary judgment as to PlusFunds' claims should be denied insofar as it is based on their non-assignability.

### D. Authority to Pursue PlusFunds' Claims Has Expired.

The Defendants argue that the claims of PlusFunds should be dismissed because the authority of the JOLs to pursue those claims has expired. The expiration occurred because the Plaintiffs failed to timely move for an extension of the Trust in the Bankruptcy Court. After the time to extend had expired, The JOLs moved to reopen the PlusFunds' chapter 11 case in order to obtain an extension of the SphinX Trust. Judge Peck denied the motion to reopen in a Memorandum Opinion and Order dated May 13, 2013. In that Memorandum and Opinion, Judge Peck stated that "issues relating to the Trust may be decided by a non-bankruptcy court" and that the PlusFunds causes of action "are pending in the District Court for the Southern District of New York and that court should be in a good position to determine the status of the Trust within the context of that litigation." Memorandum Opinion at 12. Judge Peck also found that the JOLs' explanation for failing to take timely action to extend the term of the Trust — distraction caused by the demands of litigation — was "an inadequate excuse." Id at 12, n.8. The Plaintiffs filed a notice of appeal from Judge Peck's ruling.

The Defendants make a creditable argument that the JOLs no longer have standing to prosecute the claims of PlusFunds. Section 10.3 of the Trust provides that if it is not extended, the Trustee "shall distribute" the assets. Section 10.4 grants the Trustee certain powers of winding up but does not refer to or explicitly authorize continued pursuance of claims. And if winding up

---

[27] It should also be noted that the Defendants have in this action strenuously argued that New York law governs the tort claims in this case due to the broad choice of law clause in the Service Agreement. That argument was accepted by the Special Master and the Court. See DPM R and R at 15. Under these circumstances, the new argument that "New Jersey law governs the tort claims" (Opening Brief at page 36) should be rejected.

powers included pursuing causes of action, it is difficult to see the point of a termination date for the Trust. And yet there was a termination date, and the JOLs failed to seek a timely extension. It is possible, as the Plaintiffs assert, that the unliquidated causes of action would be distributed to the JOLs as the sole beneficiaries of the Trust, and that the only consequence would be a substitution of parties. But the Defendants point up that there are at least some possible difficulties in the fact that the JOLs have not been appointed by the Bankruptcy Court as representatives of the Estate as is required under Section 1123(b)(3)(B) of the Bankruptcy Code in order to pursue the claims of the Estate.

It is evident that the question of continuing authority to pursue PlusFunds' claims, resulting from the Plaintiffs' failure to seek a timely extension and Judge Peck's denial of the motion to reopen the chapter 11 case, is one of considerable complexity. And the Defendants recognize that because of the appeal "the consequences of Judge Peck's Order are now likely to be addressed by the District Court." Letter to the Special Master dated June 7, 2013. Given the Plaintiffs' appeal of Judge Peck's Order and the fact that this R and R recommends in any case that PlusFunds' claims be dismissed on the merits, the Special Master finds it prudent not to try to determine (at this point) the issues attendant to Judge Peck's Order, including issues regarding the status of the SphinX Trust.

### E. Liquidated Damages Clause.

The Defendants claim that the Liquidate Damages Clause of the Service Agreement caps SMFF's damages at $30,000 — $1,000 a day for thirty days. The merits of this argument have already been addressed in the Breach of Service Agreement R and R at 31-32. The Special Master found in that R and R as follows:

> The Liquidated Damages Clause is by its terms limited to compensation for "the cost of injuries to [SMFF's] operations." The damages sought here are not for the cost to "operations" such as, for example, costs due to a delayed filing, or missed reporting deadlines. The costs here are for the loss of millions of dollars of assets that are not tied to "operations." Courts must construe clauses in a contract so that none are "superfluous." *Luna v. American Airlines*, 769 F.Supp.2d 231, 243 (S.D.N.Y.2011). Construing the Liquidated Damages Clause to cover every loss that SMFF could suffer would render the Indemnification Clause superfluous. *See Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc.,* 495 F.Supp.2d 353, 359 (S.D.N.Y. 2007) ("[T]he award of liquidated damages will not preclude recovery of actual damages when the former does not subsume the latter."). Consequently, if the Plaintiffs were to prove their cause of action for breach of contract, they would be entitled to a legal ruling that the Liquidated Damages Clause does not limit the recovery to which they would be entitled under the Indemnity Clause.

The above analysis was in review of the claim for breach of contract but of course the same analysis applies to the claims for breach of fiduciary duty, aiding and abetting, and fraud considered herein. None of these claims are for injuries to SMFF's "operations." Accordingly, the motion for summary judgment should be denied insofar as it is based on the Liquidated Damages Clause of the Service

Agreement.

## IX. Conclusion and Recommendation

*The Defendants' motion for partial summary judgment (on Counts I, V, VI and VIII) should be granted.*

Daniel J. Capra
Special Master

Dated: August 7, 2013
New York, New York