IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KENNETH M. KRYS, MARGOT
MACINNIS, and THE HARBOUR
TRUST CO. LTD.,

                    Plaintiffs,

        v.

ROBERT AARON, DERIVATIVE
PORTFOLIO MANAGEMENT LLC, DPM-
MELLON, LLC, DERIVATIVE
PORTFOLIO MANAGEMENT, LTD.,
DPM-MELLON, LTD, and BANK OF
NEW YORK MELLON CORPORATION,

                    Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 14-2098 (JBS/AMD)

**OPINION**

APPEARANCES:

David J. Molton, Esq.
Andrew S. Dash, Esq.
Mason C. Simpson, Esq.
BROWN RUDNICK LLP
Seven Times Square
New York, N.Y. 10036
     -and-
Leo R. Beus, Esq.
L. Richard Williams, Esq.
Malcolm Loeb, Esq.
Thomas A. Gilson, Esq.
Lee M. Andelin, Esq.
BEUS GILBERT PLLC
701 North 44th Street
Phoenix, A.Z. 85008
     Attorneys for Plaintiffs

B. John Pendleton, Jr., Esq.
Andrew O. Bunn, Esq.
Kristin A. Pacio, Esq.
Gina Trimarco, Esq.
DLA PIPER LLP (US)
51 John F. Kennedy Parkway
Short Hills, N.J. 07078
     Attorneys for Defendants

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

This lengthy multi-district securities litigation generally arises from the complex financial and brokerage relationships between, and ultimate bankruptcy proceedings of, three entities (and the multitude of affiliates associated with each): PlusFunds Group, Inc. (hereinafter, "PlusFunds"), SPhinX Funds (hereinafter, "SPhinX"), and Refco, Inc. (hereinafter, "Refco").

As relevant here, following the revelation that several of Refco's officers and directors participated in a wide-scale, fraudulent underreporting of corporate liabilities, Refco filed for bankruptcy on October 17, 2005, followed shortly thereafter by PlusFunds' bankruptcy filing on March 6, 2006, and SPhinX's initiation of voluntary liquidation proceedings under the insolvency laws of the Cayman Islands on June 30, 2006.

In connection with the administration of these insolvent estates, the restructuring officer of PlusFunds entered into an asset sale agreement with the Joint Official Liquidators (hereinafter, the "JOLs") of SPhinX, in which PlusFunds assigned its rights in the PlusFunds' Causes of Actions (hereinafter, the "Causes of Action" or "Claims") to a SPhinX liquidating trust created for the sole and exclusive benefit of the JOLs.  The SPhinX Trust Agreement (hereinafter, the "Agreement"), which effectuated the Trust's existence and the transfer of the Causes

2

of Action, formalized the SPhinX Trustee's authority, and the manner in which to administer the Causes of Action, the Trust's only asset. The SPhinX Trustee thereafter commenced its efforts to pursue the acquired Causes of Action in multiple state and federal forums.

Indeed, in the pending litigation, Plaintiffs Kenneth M. Krys and Margot Macinnis, the JOLS, and The Harbour Trust Co. Ltd., the Trustee of the SPhinX Trust (collectively, "Plaintiffs"), purport to assert such Causes of Action for the benefit of PlusFunds' principal creditors, SPhinX. Plaintiffs, for example, allege in this action that the former directors of SPhinX, Defendants Derivatives Portfolio Management, LLC, Derivatives Portfolio Management, Ltd., DPM–Mellon, LLC, DPM–Mellon, LTD, and Robert Aaron (hereinafter, "Defendants"), failed to take certain corrective steps in the face of Refco's potential insolvency— "garden variety common law claims" of the type included within the acquired Claims. See Krys v. Sugru, Nos. 08-3065, 08-3086, 08-7416, 2008 WL 4700920, at *11 (S.D.N.Y. Oct. 23, 2008) (describing the PlusFunds' Causes of Action).

Defendants, however, now move to dismiss the PlusFunds' Causes of Action, on the ground that the undisputed expiration of the Trust on September 20, 2012 automatically divested the Trustee and the Trust itself of any cognizable interest in, and

3

standing to prosecute, the Causes of Action.  (See generally
Defs.' Br at 18-21; Defs.' Reply at 2-6, 9-11.)  In addition,
Defendants submit that any distribution of the Causes of Action
to the Trust's sole beneficiaries, the JOLs, whether by
operation of law under the Trust Agreement or otherwise, would
contravene New Jersey's prohibition against pre-judgment
assignment of tort claims under New Jersey law, thereby also
depriving the JOLs of standing to prosecute the claims on their
own behalf.  (See generally Defs.' Br. at 18-19.)  Defendants
therefore argue that no party to this litigation possesses
standing to pursue the Claims, requiring that they be eliminated
and dismissed from this action as moot.[1]

Plaintiffs, however, argue that the Trust remains in
existence, because the prerequisite for its expiration, namely,
distribution, has not yet occurred. (See generally Pls.' Opp'n
at 19-20.)  Moreover, even if the Trust terminated, Plaintiffs
argue that the Trustee nevertheless retained the continuing
authority to litigate the Causes of Action and to distribute the
subsequent proceeds of the Claims to the JOLs.  (See generally
Pl.'s Opp'n at 19-22.)  In the alternative, Plaintiffs argue
that the JOLs possess the inherent authority in their own right
to step "into the shoes of the SPhinX Trustee" and to litigate
the PlusFunds Causes of Action.  (Id. at 8-18.)  Plaintiffs

---

[1] The jury trial in this action begins on June 22, 2015.

therefore insist that the PlusFunds' Claims remain ripe for adjudication, because Defendants "cannot show that *both* the Trustee and the JOLs lack standing to bring the PlusFunds claims." (Id. at 4 (emphasis in original).)

The principal issues before the Court therefore concern the status of the SPhinX Trust and the Trustee's authority over the PlusFunds' Claims. The Court must, in particular, consider whether the Trust reached its natural expiration resulting in the automatic divestiture of its assets and the Trustee's authority, or whether the Trustee retained certain powers despite the potential termination. In the event the Trust and the Trustee's authority have terminated, the Court must then consider whether the Claims have, by operation of law, been devised to the Trust's beneficiaries, the JOLs.[2]

---

[2] The Court conducted oral argument on the pending motion on January 6, 2015, and thereafter received the parties' supplemental submissions. [See Docket Items 555 (filed January 13, 2015) & 557 (filed January 16, 2015).] Following argument, however, the Court of Appeals for the Second Circuit entered a Summary Order on January 21, 2015 remanding the parallel bankruptcy proceeding to the Southern District of New York Bankruptcy Court. [See Docket Item 558.] Because the Bankruptcy Court's consideration upon remand could, as stated below, have rendered the pending motion moot, the Court, with the parties' consent, administratively terminated Defendants' motion on January 23, 2015. [See Docket item 559.] On April 21, 2015, however, the Bankruptcy Court denied the Trustee's renewed motion to reopen the PlusFunds chapter 11 proceedings [see Docket Item 590], and the Court reinstated Defendants' motion on April 29, 2015 [see Docket Item 592], and permitted the parties to file additional supplemental submissions. [See Docket Items 593 (filed May 1, 2015) & 629 (filed May 6, 2015).] The large

For the reasons that follow, Defendants' motion to eliminate the PlusFunds' causes of action will be denied.

## II.   BACKGROUND

### A. Factual and Procedural Background

Because resolution of the pending motion relates inextricably to the procedural posture of this lengthy litigation in multiple courts, the Court will discuss the factual predicate and procedural circumstances of this litigation in unison.  For the purposes of the pending motion, however, the Court need not retrace every facet of the parties' convoluted history. Rather, the Court must only introduce the relevant background of the PlusFunds' Causes of Action, in addition to the relevant procedural circumstances giving rise to the pending motion and the arguments advanced by the parties.

### 1. Creation of the SPhinX Trust and Assignment of the PlusFunds' Causes of Action

On April 26, 2007, PlusFunds and the JOLs entered into an agreement whereby SPhinX paid PlusFunds $4 million in cash in exchange for all of PlusFunds' rights, title, and interest in the PlusFunds' Causes of Action, including, "the right to recover anything of value" with regard to any potential claim that PlusFunds may have pursued on its own against Defendants. (Pendleton Dec., Ex. B.)  The Agreement, accordingly, directed

---

record amassed by the parties, including no fewer than 7 formal and informal briefs, has all been considered in connection with the pending motion.

that the Causes of Action be assigned to and vest in the SPhinX Trust, and designated the JOLs as "the sole and exclusive beneficiaries" of "all recoveries and proceeds of the Causes of Action."  (Id.)

The PlusFunds' Fifth Amended Plan of Liquidation, which the Bankruptcy Court approved on August 7, 2007, in turn, incorporated the terms of the asset sale agreement, called for the establishment of the SPhinX Trust, and provided that the transfer of the Causes of Action would deprive the PlusFunds' estate of any continuing interest in the Claims (other than as a limited set off).  (Pendleton Dec., Exs. C & D.)

On September 20, 2007, PlusFunds and SPhinX then executed the Trust Agreement itself.  (See Pendleton Dec., Ex. E.)  The Agreement expresses the Trust's limited purpose, namely, to collect, distribute, and liquidate the Causes of Action, and specifies various provisions for the Trust's administration, including an identification of the Trustee's rights, privileges, and powers.[3]  (Id.)

As relevant here, the Agreement further specifies two circumstances upon which the Trust would terminate.  First, the Trust provides for termination upon distribution of all Trust Assets, and specifically states that:

---

[3] In addition, the Agreement provided that it should "be governed and construed in accordance with the laws of the State of New York."  (Id. at § 11.3.)

> [u]pon payment of all costs, expenses, and obligations
> (including the final distribution to Beneficiaries)
> incurred in connection with administering the SPhinX
> Trust, and distribution of Assets in accordance with
> the Plan, the Confirmation Order and this Agreement,
> the Trust shall terminate the SPhinX Trust by filing
> (a) with the Bankruptcy Court a "Notice of Termination
> of the SPhinX Trust," which references the Plan and
> Confirmation Order, and (b) a certified copy of such
> notice with the New York Secretary, upon which the
> Trustee shall have no further responsibility in
> connection with the SPhinX Trust.

(Id. at § 10.2 (hereinafter, "Section 10.2").) In the

alternative, and as relevant here, the Trust provides that,

> on the fifth anniversary of the Effective Date [that
> is, on September 20, 2012], unless otherwise extended
> for cause by the Bankruptcy Court, the Trustee shall
> distribute all of the Assets in accordance with the
> Plan and immediately thereafter, the SPhinX Trust
> shall terminate and the Trustee shall have no further
> responsibility in connection therewith[.]

(Id. at § 10.3 (hereinafter, "Section 10.3").)  Despite this

limited existence, however, section 10.3 also provides the

Trustee with the right, upon motion and approval of the

Bankruptcy Court, to successive one year extensions provided

that the Trustee sought and obtained approval for such extension

"not earlier than six months prior" to the Trust's termination.

(Id.)

Under either circumstance, the Agreement nevertheless

contemplates the post-termination continuation of the SPhinX

Trust, and specifically states that, upon

> the termination of the SPhinX Trust, the Trustee shall
> retain for a period of two (2) years the books,
> records, Beneficiary lists, and certificates and other

8

> documents and files which shall have been delivered to
> or created by the Trustee.  At the Trustee's
> discretion, all of such records and documents may, but
> need not, be destroyed at any time after two (2) years
> from the completion and winding up of the affairs of
> the SPhinX Trust.  Except as otherwise specifically
> provided herein, upon the discharge of all liabilities
> of the SPhinX Trust and final distribution of the
> SPhinX Trust, the Trustee shall have no further duties
> or obligations hereunder.

(Id.)

### 2. The JOLs and the SPhinX Trustee Commence Litigation against Defendants

Following the dissolution of SPhinX, Plaintiffs filed their initial and amended state court complaints in this litigation in early 2008, seeking more than $263 million in monetary damages from Defendants based upon the value of the "cash wrongfully deposited" at Refco, in addition to the "lost business enterprise value" purportedly associated with Defendants' asserted malfeasance.  [See Docket Item 41 in Civil Action No. 08-1902 (JBS/AMD).]

On April 17, 2008, Defendants removed the action to this Court. [See id.] Following removal, however, the Judicial Panel on Multi-District Litigation issued an order conditionally transferring the Action to the Southern District of New York (hereinafter, the "MDL District Court") "for inclusion in MDL No. 1902," in light of the fact that it arose from a "factual core" common to Refco's insolvency proceeding.  [See Docket Item 41 in Civil Action No. 08-1902 (JBS/AMD).]

This action thereafter proceeded on somewhat parallel tracks before the Bankruptcy Court and the MDL District Court.

### 3. Closure of PlusFunds' Chapter 11 Bankruptcy Proceeding and the SPhinX's Trustee's Motions to Extend the Trust's Term and to Reopen the PlusFunds' Bankruptcy Proceeding

Specifically, as a result of the PlusFunds' Trustee's final implementation of the PlusFunds' Fifth Amended Plan of Liquidation, the PlusFunds' Trustee moved to close the PlusFunds' bankruptcy case on December 3, 2010. (Pendleton Dec., Ex. H.)  In connection with the closure motion, the PlusFunds' Trustee represented that the PlusFunds' "estate had been fully administered," and asserted that the SPhinX Trustee likewise confirmed that it did "not anticipate any need for [PlusFunds'] Chapter 11 Case to remain open."  (Id.)  In light of these representations, the Bankruptcy Court entered an order closing the Chapter 11 proceeding on December 22, 2010. (Pendleton Dec., Ex. I.)

Despite the Trustee's asserted involvement in ongoing litigation relative to the PlusFunds' Claims, on September 20, 2012, the Trust's default distribution date, the Trustee had neither distributed the Trust's assets, nor requested an extension of the Trust's existence.  (Pendleton Dec., Ex. J at ¶ 19 (acknowledging the occurrence of the default distribution date).)  Rather, in a belated attempt to cure the potential

10

lapse in the Trust's existence, the Trustee executed "the Second Amendment to [the] SPhinX Trust Agreement" on February 7, 2013. (Pendleton Dec., Ex. K at ¶ 5.)  The Amendment, if approved, sought to modify the express deadlines set forth in Section 10.3 of the Trust Agreement (which required any request for an extension to be filed no later than 6 months prior to the Trust's then-stated expiration), by enabling the Trustee to request, nunc pro tunc, "to extend the existence of the SPhinX Trust within 150 days of September 20, 2012."[4]  (Id.)

The Trustee subsequently moved, in separate motions, to extend the Trust's existence and to reopen the PlusFunds' bankruptcy proceeding.  (Pendleton Dec., Exs. J & K.)  In connection with the Trustee's initial extension, the Trustee specifically sought:

> an order that (i) extends the existence of the SPhinX Trust by one year from the Default Distribution Date pursuant to Section 10.3 of the Trust Agreement, and in an abundance of caution, approves the Second Amendment to the Trust Agreement relating to the Trustee's initial extension request, [and/or] (ii) . . . [an order that] reestablishes the SPhinX Trust under the terms of the Plan and the Trust Agreement nunc pro tunc to the Default Distribution Date [in the event the Bankruptcy Court deemed the SPhinX Trust terminated on or after the Default Distribution Date]

(Pendleton Dec., Ex. K.)  Because consideration of the relief requested in such motion required the reopening of the

_____

[4] Despite this request, the Trustee maintained its position, as here, concerning the Trust's continued existence.

11

PlusFunds' Chapter 11 case, however, the Trustee then filed a motion to reopen the closed PlusFunds' bankruptcy proceeding, asking the Bankruptcy Court to reinstate its jurisdiction in order to consider "the Trust Extension Motion as well as any further requests for an extension of the SPhinX Trust that may subsequently be made."  (Pendleton Dec., Ex. K at ¶ 7.)

In connection with both submissions, the Trustee expressly acknowledged that it had no requested an extension in accordance with section 10.3. (Pendleton Dec., Ex. J at ¶ 23.) Nevertheless, the Trustee argued that its untimely request for an extension should be granted, particularly given the Trustee's "exhaustive" pursuit of the PlusFunds' Claims in various multi-district proceedings.  (Id. at ¶¶ 10-22.)  In the alternative, the Trustee argued, as here, that the occurrence of the Trust's default distribution date did not, in any event, effectuate the automatic termination of its existence.  Rather, because the Trustee continued "to pursue realization and monetization" of the Causes of Action, the Trustee asserted that the Trust remained active pending final distribution by the Trustee of the Trust assets.  (Id. at ¶¶ 23-25.)

### 4. The Bankruptcy Court's Denial of the SPhinX Trustee's Motion to Reopen PlusFunds' Chapter 11 Bankruptcy Proceeding

On May 13, 2013, however, the Bankruptcy Court found the Trustee's "inattention," "unexplained errors and omissions," and

"negligence" in complying with "the strict requirements stated in Section 10.3 for extending the five year term" insufficient to constitute "good cause" for the reopening of the PlusFunds' bankruptcy case.  (Molton Dec., Ex. B at 4, 12, 14.)  The Bankruptcy Court, accordingly, denied the motion to reopen, but took no action with respect to the Trustee's motion for an extension of the Trust's existence, in light of the MDL District Court's "unquestioned authority" to resolve the contractual issue regarding the Trust's existence in connection with the cross-motions for summary judgment then pending before it.  (Id. at 13-14.)  The Bankruptcy Court, however, denied the Trustee's motion "without prejudice to a further request for relief by any party in interest seeking to reopen [PlusFunds'] case for cause shown."  (Id. at 14.)

### 5. Affirmance of the Bankruptcy Court and the SPhinX Trustee's Appeal to the Court of Appeals

The District Court for the Southern District of New York affirmed the Bankruptcy Court's decision on February 2, 2014. (Defs.' Br. at 8-9.)  On March 13, 2014, the Trustee appealed both determinations to the Court of Appeals,[5] followed by

---

[5] In an effort to preserve its rights during the pendency of those appeals, the Trustee filed a second motion to extend the Trust on September 19, 2013 (see Pendleton Dec., Ex. M), followed by a third motion on September 17, 2014.  (See Defs.' Br. at 9 n.8.)  Defendants filed "an objection and reservation of rights pending appeal" in connection with both motions. (Id.)

Defendants cross-appeal concerning Defendants' standing to object to the reopening of PlusFunds' bankruptcy proceeding.[6] (Id.)  As further explained below, on January 21, 2015, the Court of Appeals vacated the Southern District of New York's February 13, 2014 judgment, and remanded the matter to the Bankruptcy Court.  See In re Plusfunds Grp., Inc., 589 F. App'x 41, 42 (2d Cir. 2015).

> **6. The MLD District Court's Denial of the Parties' Cross-Motions for Summary Judgment and Remand of this Action**

Slightly prior to the Trustee's submissions before the Bankruptcy Court, on December 31, 2012, Defendants moved for partial summary judgment on the grounds that the "non-assignable" Causes of Action were extinguished upon the Trust's expiration.  (See Defs.' Br. [Docket Item 388], 34-36.)

The Special Master subsequently issued a Report and Recommendation on August 7, 2013, recommending that the MDL District Court grant Defendants' motion.  [See Docket Item 473.] As relevant here, the Special Master addressed the parties' positions concerning the assignability of the PlusFunds' claims and Plaintiffs' authority to pursue the PlusFunds' claims had

---

[6] Defendants filed objections before the Bankruptcy Court to the Trustee's various extension motions.  In the Bankruptcy Court's May 13, 2013 decision, however, the court found that Defendants lacked standing in the bankruptcy proceeding to object to the reopening of PlusFunds' Chapter 11 proceeding. (See Molton Dec., Ex. B at 9.) Defendants' cross-appeal flowed from that determination.  (See Defs.' Br. at 8-9.)

expired. [See id. at 20-23.] With respect to assignability, the Special Master specifically rejected Defendants' position that the potential assignment of the Claims to the JOLs would contravene New Jersey law. [See id.] Moreover, even if it did, the Special Master found that section 1123(a) of the Bankruptcy Code would preempt any applicable prohibition against assignment of the Claims under New Jersey law. [See id. at 21-22.] With respect to Plaintiffs' continuing authority to pursue the PlusFunds' claims, the Special Master concluded that Defendants made "a creditable argument that the JOLs no longer have standing to prosecute the claims of PlusFunds." [Id. at 22.] Nevertheless, because Plaintiffs' appeals of the Bankruptcy Court's initial denial of Plaintiffs' motion to reopen PlusFunds' Chapter 11 proceeding remained pending at that time, the Special Master found it "prudent" to defer resolution of "issues regarding the status of the SPhinX Trust." [Id. at 23.]

On December 2, 2013, however, the MDL District Court rejected the Special Master's Recommendation that summary judgment be entered in Defendants' favor on certain claims, choosing instead to deny Defendants' motion for partial summary judgment in its entirety. In re Refco Inc. Sec. Litig., MDL No. 1902, 2013 WL 6334303 (S.D.N.Y. Dec. 2, 2013).

On March 24, 2014, the MDL District Court thereafter transferred this action back to this Court for all further

15

proceedings [Docket Item 505], and this litigation has, accordingly, proceeded before this Court, with a jury trial scheduled to begin on June 22, 2015.

**7. The Court of Appeals' Remand Order and the Bankruptcy Court's decision on Plaintiffs' renewed upon remand to Reopen the PlusFunds' Bankruptcy Proceeding**

Shortly after oral argument upon the pending motion, the Court of Appeals determined that the record failed to demonstrate "whether the Bankruptcy Court fully considered whether any of the parties would suffer prejudice if it granted the Trustee's motion to reopen."  In re Plusfunds Grp., Inc., 589 F. App'x at 42.  Rather, the Bankruptcy Court noted that no prejudice would result "'from *denial* of the Trustee's request to reopen the case,'" but remained "silent as to whether any prejudice would result from *granting* the Trustee's request." Id. (emphasis in original).  Therefore, the Court of Appeals remanded the matter to the Bankruptcy Court for purposes of specifically explaining "what prejudice, if any, would result from reopening" the PlusFunds' bankruptcy.  Id. at 43.

Upon remand, the Bankruptcy Court found that no party would be prejudiced by reopening the PlusFunds' bankruptcy case.  See In re PlusFunds Grp., Inc., 2015 WL 1842224, at *4 (S.D.N.Y. Bankr. Apr. 21, 2015).  Nevertheless, the Bankruptcy Court found "insufficient cause to reopen" the case, because there had been

no showing of prejudice resulting from denial of the Trustee's request to reopen the case, nor any clearly articulated benefit to the Trustee in reopening the case, and based upon the existence of "a non-bankruptcy forum capable of addressing issues related to the SPhinX Trust," i.e., this Court.  See id. at *6-*7.  The Bankruptcy Court, accordingly, concluded that the PlusFunds' case would remain closed, and declined to reach Plaintiffs' initial and subsequent requests to extend the SPhinX Trust.[7]  See id. at *7.

Plaintiffs advised this Court of the Bankruptcy Court's decision on April 27, 2015 [see Docket Item 588], and the parties subsequently requested during the Court's April 28, 2015

---

[7] On May 1, 2015, the Trustee appealed the Bankruptcy Court's decision upon remand. (See Defs.' Supplemental Letter at 3.) As a result, Defendants assert that an adjournment of the long scheduled trial in this action may be necessary. (See id. at 4.) Shortly after Defendants' filed the pending motion in October 2014, the Court the Court invited the parties to consider whether this action should be stayed pending appellate review of the Bankruptcy Court's first denial of the Trustee's motion to reopen. [See Docket Item 542.]  In response, both parties strenuously objected to any continued delay of this protracted litigation, and consistently asserted that this motion, and indeed this action, could proceed despite the pendency of that initial round of appellate proceedings. [See Docket Items 546 & 547.]  At the request of the parties, the Court, accordingly, conducted oral argument. Nevertheless, on the eve of issuing a decision, the Court confronted the Second Circuit's summary order remanding the matter to the Bankruptcy Court, and deferred its own decision, all while continuing to press this litigation towards trial. [See Docket item 559.] Those appellate proceedings and the subsequent remand have now concluded, and the Court believes that this action should go forward despite the Trustee's initiation of a recent appeal.

trial logistics conference that this Court resolve Defendants'
motion.  [See generally Docket Item 591.]  The Court,
accordingly, reinstated Defendants' motion on April 29, 2015
[see Docket Item 592], and received the parties' supplemental
submissions shortly thereafter.  [See Docket Items 592 & 629.]

## III. STANDARD OF REVIEW

The pending motion turns, in its entirety, upon mootness.
Therefore, the Court notes that, in order to qualify as a case
fit for federal-court adjudication, "'an actual controversy must
be extant at all stages of [a court's] review, not merely'" at
the filing of the complaint. Camesi v. Univ. of Pittsburgh Med.
Ctr., 729 F.3d 239, 247 (3d Cir. 2013) (quoting Genesis
Healthcare Corp. v. Symczyk, ___ U.S. ____, 133 S.Ct. 1523, 1528
(2013)).  In this context, mootness serves as "'the doctrine of
standing set in a time frame: [t]he requisite personal interest
that must exist at the commencement of the litigation (standing)
must continue throughout its existence (mootness).'" Arizonans
for Official English v. Arizona, 520 U.S. 43, 68 (1997) (quoting
U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)).  A
controversy becomes mooted when an intervening circumstance
deprives the adverse parties of sufficient legal interests to
maintain the litigation.  See Camesi, 729 F.3d at 247 (citation
omitted).  Under such circumstances, the case or dispute claim
presents no Article III case or controversy, and "a federal

court lacks jurisdiction to hear it." Mollett v. Leicth, 511 F. App'x 172, 173 (3d Cir. 2013) (citation omitted); Weiss v. Regal Collections, 385 F.3d 337, 340 (3d Cir. 2004) (noting that a district court no longer has subject-matter jurisdiction under the "cases and controversy" required of Article III of the Constitution when a claim becomes moot).  Indeed, a court becomes "powerless to do anything but dismiss" the relevant claim(s).  Moravian Sch. Advisory Bd. of Stomas, V.I. v. Rawlins, 70 F.3d 270, 276 (3d Cir. 1995).

## IV.  DISCUSSION

### A. The Trustee has Standing to Prosecute the PlusFunds' Causes of Action

Plaintiffs argue that the Trustee has ongoing standing to pursue the PlusFunds' Causes on Action on two independent grounds.  (See generally Pls.' Supplemental Letter at 3.) First, because the Trust Agreement provides "that the Trust does not terminate until the Trustee 'distribute[s] all of the Assets,'" Plaintiffs assert that no termination has occurred because the Trustee "has not distributed" the PlusFunds' claims to the JOLs.  (Id.)  Second, even if the Trust has terminated, Plaintiffs argue that the Trustee's wind-up powers under "settled trust law" include the authority to retain and continue to prosecute the PlusFunds' Claims.  (Id.)  The Court will address each issue in turn.

### 1. The Trust Only Expires upon Distribution

Despite the parties' lengthy submissions concerning Trust's interpretation, the Trust Agreement itself imposes simple obligations upon the Trustee. (See generally Pls.' Opp'n.)

At the outset, the Agreement provides for the creation of the SPhinX Trust for the purposes of "collecting, distributing and liquidating" the Causes of Action for the sole and exclusive benefit of the Trust beneficiaries, the JOLs. (Pendleton Dec., Ex. E at § 2.2.) To that end, the Agreement confers wide-ranging powers upon the Trustee, including "the exclusive power to investigate, pursue or not pursue, prosecute or settle any and all of the Causes of Action (in the name of the Trustee) as the Trustee determines to be in the best interest of the [b]eneficiaries." (Id. at § 3.1(C).)

Critically, however, the Trust provides two clear paths for the Trust's termination, and one express mechanism for the Trustee to obtain an extension of the Trust's limited term. First, upon payment of all "costs, expenses, and obligations (including the final distribution to Beneficiaries) in connection with administering the SPhinX Trust," and upon distribution of all assets, the Trustee could move to terminate the Trust before the Bankruptcy Court. (Id. at § 10.2.) Otherwise, "on the fifth anniversary of the Effective Date, unless otherwise extended for cause by the Bankruptcy Court, the

20

Trustee <u>shall</u> distribute all of the Assets in accordance" with
the Trust Agreement, after which the Trust, and the Trustee's
responsibilities with regard to the Trust, shall "immediately"
terminate. (<u>Id.</u> at § 10.3 (emphases added).) Moreover, in the
event the Trustee required an extension beyond this five-year
period, the Trustee could, consistent with "the liquidating
purposes of the SPhinX Trust," seek Bankruptcy Court approval
for an extension within the "six months prior to the SPhinX
Trust's then stated termination." (<u>Id.</u>) In other words, the
Agreement required the Trustee to seek an extension no earlier
than March 20, 2012, and no later than September 19, 2012.[8]
(<u>Id.</u>)

        Here, it is undisputed that the Bankruptcy Court did not
extend the Trust's term prior to September 20, 2012, the fifth
anniversary of the Trust's existence. (<u>See</u> Pendleton Dec., Ex.
J at ¶ 11 (setting forth the Trustee's acknowledgment that it
had "failed to seek an extension of the SPhinX Trust prior to
the Default Distribution Date").) Nor did the Trustee
distribute the PlusFunds' Causes of Action on that date.
Nevertheless, because termination hinges upon distribution, and
indeed only results "<u>after</u> the Causes of Action have been
distributed," Plaintiffs argue that no termination has occurred

---

[8] As stated above, the second termination provision triggered "<u>on</u>
the fifth anniversary" of the Trust's effective date.

in this instance. (Defs.' Br. at 19-23; see also Defs.'
Supplemental Letter at 3.)  Defendants, however, take the
position that the language "shall distribute" permits no
"discretionary flexibility," thereby requiring, under equitable
principles, that the distribution be deemed made, despite the
Trustee's inaction.  (Defs.' Reply at 13-15.)

Though not the model of clarify, the Court finds that the
Trust Agreement envisions, on its face, a two-step process:
first, "on the fifth anniversary of the Effective Date," the
Trustee "shall distribute all of the Assets in accordance with
the Plan[;]" second, and "immediately thereafter, the SPhinX
Trust shall terminate and the Trustee shall have no further
responsibility in connection therewith, except as provided in
Section 10.4 below."  (Pendleton Dec., Ex. E at § 10.3 (emphasis
added).)  In that respect, distribution constitutes the clear
precondition to the Trust's termination.  Indeed, the Trust
Agreement's use of the phrase "immediately thereafter" lends
itself to no other reasonable interpretation.  However, because
no distributions have been made in this instance, the
precondition to termination has not been satisfied, and the
Trust would therefore appear viable.

Nevertheless, the Court cannot ignore that the obligation
that the Trustee "shall distribute" permits no flexibility, see
also Bell Atl.-N.J., Inc. v. Tate, 962 F. Supp. 608, 616 n.6

(D.N.J. 1997) (citation omitted) (noting that "[t]he word 'shall,' when utilized in laws, directives, and the like, means 'must' or 'is or are obligated to'"), and in that respect, Defendants make a creditable argument that the Trustee's continued retention of the PlusFunds' claims contravenes the strict and mandatory requirements of Section 10.3.  (See, e.g., Defs.' Reply at 13 ("Simply put, there is nothing in Section 10.3 that allows the Trustee to circumvent its distribution requirement and instead pursue or prosecute the Causes of Action").)  Based upon that position, Defendants specifically ask the Court to deem the Claims "distributed" under equitable principles for purposes of the pending motion.  (Defs.' Reply at 15.)  That request, however, seeks, in essence, to enforce the Trust Agreement—a request for which Defendants lack standing.  Indeed, as neither a signatory to the Agreement nor a third-party beneficiary, Defendants lack legal standing to challenge the Trust Agreement or to compel its enforcement.  See, e.g., Parker v. Waichman v. Napoli, 815 N.Y.S.2d 71, 74 (N.Y. App. Div. 2006) (citations omitted) (noting that in order to have standing to challenge or enforce a contract, an entity must be a party thereto or a third-party beneficiary), appeal dismissed, 857 N.E.2d 68 (N.Y. 2006); Broadway Maint. Corp. v. Rutgers, State Univ., 447 A.2d 906, 909 (N.J. 1982) (same).  Rather, that power belongs to the JOLs alone.

Nevertheless, the Court need not definitively decide this issue, because even if the Court concluded that the Trust terminated, the Trustee's post-termination wind up authority would in any event include, for the reasons stated below, the right to retain and liquidate the PlusFunds' Claims.[9]

### 2. Under the Trust Agreement, the Trustee's Post-Termination Wind-Up Authority Enables the Trustee to Liquidate the PlusFunds' Claims

Plaintiffs alternatively argue that "well settled trust law" demonstrates that the trustee retains, even upon termination, continuing authority to take all actions necessary to wind up the trust, "'*including litigation of the trust's claims*.'" (Pls.' Opp'n at 20-21 (emphasis in original) (citation omitted).) Defendants do not dispute the law relied upon Plaintiffs, but instead argue that the default provisions of "extrinsic authorities" cannot be used "to expand or rewrite" the Trustee's authority, particularly because the Trust Agreement states that the "'Trustee shall **have only** the rights, powers, and privileges **expressly provided in [the Trust] Agreement and Plan**.'" (Defs.' Reply at 6 (emphasis in original)

---

[9] For that reason, the Court rejects Defendants' position that it would be inequitable to permit the Trustee "to thwart its own obligations under Section 10.3." (Defs.' Br. at 4; see also Defs.' Reply at 14-15.) Indeed, there can be no inequity in the Trustee exercising authority it would possess, even in the event of the Trust's termination.

(citation omitted).)  Nevertheless, the Court finds Defendants'
position without merit.

Critically, the Restatement of Trusts, the distillation of
trust law routinely cited by courts throughout New Jersey and
New York,[10] has long recognized that the "powers of a trustee do
not end on the trust's termination date but may be exercised as
appropriate to the performance of the trustee's duties in
winding up administration, including making distribution, in a
manner consistent with the purposes of the trust and the
interests of the beneficiaries."  RESTATEMENT (THIRD) OF TRUSTS § 89
(2007); see also RESTATEMENT (SECOND) OF TRUSTS § 344 (1959) (noting
that the trustee retains, upon termination, "such powers and
duties as are appropriate for the winding up of the trust").  In
other words, upon termination of the trust, the trustee retains
authority to "exercise [the] powers of the trusteeship" to the
extent necessary for "the winding up of the trust," namely, the
power to "continue holding and administering the trust estate,"
to take steps necessary to ensure "the preservation of the trust
property," and "to distribute trust property."  RESTATEMENT (THIRD)
OF TRUSTS § 89, cmts. b, c, d, & e.

---

[10] See, e.g., Tannen v. Tannen, 3 A.3d 1229, 1239 (N.J. Super.
Ct. App. Div. 2010) (noting that New Jersey courts have
"repeatedly" adopted the Restatement of Trusts), aff'd, 31 A.3d
621 (N.J. 2011); In re Bank of N.Y. Mellon, 986 N.Y.S.2d 864, at
*9 (N.Y. Sup. Ct. 2014) (relying upon the Restatement of
Trusts), aff'd, 4 N.Y.S. 3d 204 (N.Y. App. Div. 2015) (replying
upon the Restatement of Trusts).

Courts have, in turn, recognized that, upon termination of a trust, it remains "the trustee's duty to take those actions necessary to wind up the trust, including the liquidation of the trust's claims." Hennessy v. Conn. Gen. Life Ins. Co., No. 84-10582, 1985 WL 3943, at *7 (N.D. Ill. Nov. 14, 1985). In that respect, the Court finds Goldin v. Bartholow, 166 F.3d 710 (5th Cir. 1999) instructive.

Goldin originated from the Chapter 11 proceeding of the "MCORP banking group," and the subsequent establishment of the MCORP trust, a liquidation trust designed specifically "to effectuate the rapid liquidation of the MCORP assets and distribution of them to the creditors." Id. at 713, 715. In administering the trust, Harrison J. Goldin, the MCORP trustee, initiated various adversary proceedings against former officers and directors of MCORP that allegedly "misused assets of the estate for their own personal benefit" and engaged "in a variety of prohibited transactions" at MCORP's expense. Id. at 714. Faced with the prospect of the trust's termination date, Mr. Goldin requested an extension of the trust's limited duration. Id. The district court, however, denied the extension request on July 14, 1997, and deemed the trust terminated on July 15, 1997. Id. at 714-15. The district court then entered "a series of final orders" that required Mr. Goldin, in relevant part, "to

26

immediately turn over" all assets of the then-terminated trust.
Id.

On appeal, the Court of Appeals for the Fifth Circuit
specifically confronted the issue of whether, despite the
trust's termination, Mr. Goldin could invoke "winding-up" powers
to continue as trustee for a reasonable time.  Id. at 715-16.
In so considering, the Court identified a distinction between
trusts designed "to insure preservation and growth of the
corpus" and to "provide for immediate distribution upon a set
distribution date" and those that exist solely for the purpose
of "rapid liquidation and distribution of trust assets."  Id. at
716.

In connection with trusts that call for distribution upon a
specified termination date, the Goldin court concluded that the
"process of distribution" could not, in practical terms, be
"instantaneous."  Id.  Therefore, in the event "the obligation
to distribute [did] not begin until termination," the court
found "some residual power ... clearly" inferable.  Id.
(emphasis in original).  Indeed, the Goldin court found that
these trusts present an "obvious" need for post-termination
"winding-up power," in order "to effect distribution."  Id. at
716-717 (citations omitted).

In the case of a trust designed entirely "to effect
liquidation and distribution as soon as practical," however, the

27

<u>Gildon</u> court found "the imposition of further time for liquidation," i.e., winding-up, "inconsistent" with the trust's nature.  <u>Id.</u> at 717.  Indeed, because a liquidating trust exists entirely for the purpose of "winding-up" and contemplates continual distributions, the court found no basis to confer "additional winding-up powers after its stated termination." <u>Id.</u> at 716-17.

Having identified this distinction, the court turned to the terms of the MCORP trust, which "contemplated [a] complete liquidation prior to [the] set termination date," and specifically required that the trust "'terminate on the earlier of (1) the third anniversary of the Effective Date or (2) the date <u>as of which</u> substantially all of its assets have been reduced to Cash and distributed.'"  <u>Id.</u> at 715 (emphasis added). The <u>Gildon</u> court found that this termination language, particularly the "as of which," amounted "to a clear and express statement that the trust would terminate on the third anniversary of its effective date—i.e. on July 14, 1997— *notwithstanding* that by that time substantially all of its assets had not been reduced to cash or distributed."  <u>Id.</u> at 715 (emphasis in original).  As a result, the MCORP trust termination date set "the outer limit of the trustee's powers," and foreclosed "any residual grant of powers to the trustee after its time had expired."  <u>Id.</u> at 717.

28

Here, the Court finds that the facts and legal analysis of
_Gildon_ closely resemble the issues implicated in the pending
motion.[11]  Critically, the Trust Agreement in this instance

---

[11] The fact that _Gildon_ specifically arose under Texas law does
not diminish its relevance to the pending motion, particularly
because _Gildon_ relied upon legal principles that apply equally
under either New Jersey or New York law.  In that respect, the
Court notes that the parties dispute the choice of law
applicable to the Trust Agreement.  (_Compare_ Pls.' Opp'n at 8-10
(arguing that New York law should apply under the law of the
case doctrine), _with_ Defs.' Reply at 9-10 (arguing that the MDL
District Court reached no definitive conclusion on the choice of
law applicable to the PlusFunds' claims, and therefore arguing
that New Jersey law should apply).)  The parties, however, have
not addressed the relevant choice-of-law standard, _see, e.g._,
_Maniscalco v. Brother Int'l (USA) Corp._, 709 F.3d 202, 206 (3d
Cir. 2013) (citation omitted) (describing New Jersey's two-part
conflicts of law test), nor have the parties identified any
conflict between New Jersey and New York law on the issue of
wind up authority.  Nevertheless, the Court need not reach this
issue, because New Jersey and New York law appear in harmony.
_Compare_ _Kaufman v. 53 Duncan Investors, L.P._, 847 A.2d 35, 39
(N.J. Super. Ct. App. Div. 2004) (generally noting that, under
New Jersey law, the powers of a fiduciary survive termination,
and "continue[] for whatever time it may take to wind down the
affairs"); _Wiedenmayer v. Johnson_, 254 A.2d 534, 538 (N.J.
Super. A.D. 1969), _aff'd_, 259 A.2d 465 (N.J. 1969); _In re
Ransom's Estate_, 214 A.2d 521, 526 (N.J. Super. Ct. App. Div.
1965) (implicitly recognizing the trustee's power to make post-
termination distributions of trust assets), _with_ _U.S. Trust Co.
of N.Y. v. Alpert_, 10 F. Supp. 2d 290, 293 n.1 (S.D.N.Y. 1998)
(noting that, under New York law, "there is a 'winding up'
period during which final accounting and conveyance of property
occurs") (citing _In Re Estate of Townsend_, 198 N.Y.S.2d 868, 870
(N.Y. Surr. Ct. 1960) (finding that the duties of the trustee
did not terminate upon termination of the overall trust, but
instead "continued until division and distribution of the income
and corpus"); _Neary v. City Bank Farmers Trust Co._, 24 N.Y.S.2d
264, 267 (N.Y. App. Div. 1940) ("When the time for the
termination of an express trust has arrived, it does not follow
that the trustee is immediately divested of all duties and
responsibilities, for until the trust is closed out it has the
duties and powers appropriate for a complete winding up.")).

provides that the Trust was "established for the purpose of
collecting, distributing and liquidating the Assets for the sole
and exclusive benefit of the Beneficiaries in accordance with
the terms of [the Trust] Agreement and the Plan." (Ex. E to
Pendleton Dec. (emphasis added).)  The Trust Agreement,
accordingly, directs the Trustee to "[p]rotect and enforce the
rights to the Assets," "to investigate, pursue or not pursue,
prosecute or settle any and all of the Causes of Action," to
"[r]etain and pay third parties" as necessary for these
purposes, and to annually distribute portions of the Trust's net
income. (Id. at §§ 3.1, 4.1.)  Nevertheless, the Trust only
obligates a complete distribution of the Trust assets upon
termination, and requires intermediate distributions (other than
net income) only if in "the best interests of all parties are
determined by the Trustee in the exercise of the Trustee's
business judgment." (Id. at §§ 4.1, 10.4.)

Moreover, unlike the MCORPO trust in Gildon, the Trust's
termination provisions do not reflect an intention that the bulk
of the trust assets must necessarily be distributed as of the
termination date.  Rather, the Trust encourages distributions as
soon as practicable (see, e.g., id. at §§ 4.1, 10.3), but only
requires the Trustee to begin distribution upon termination, and
specifically permits the Trustee to seek serial extensions of
the Trust's existence upon a timely request.  (Id. at §§ 10.3,

30

10.4.)  In these respects, although the Trust identifies the
Trustee as a "liquidating trustee," the Trust itself falls short
of being the sort of solely liquidating trust identified in
Goldin.  Rather, the Trust constitutes one of sort necessarily
requiring post-termination authority, because the process of
post-termination distribution cannot, in practical terms, be
"instantaneous."  Goldin, 166 F.3d at 716-17.

     Even more, the Trust expressly provides for the
"Continuance of [the] SPhinX Trust for Winding-Up." (Ex. E to
Pendleton Dec.)  Section 10.4 of the Trust Agreement, in
particular, requires the Trustee, after "termination of the
SPhinX Trust," to "retain for a period of two (2) years the
books, records, Beneficiary lists, and certificates and other
documents and files [that have] been delivered to or created by
the Trustee."  (Id.) Section 10.4 further provides that, "[a]t
the Trustee's discretion, all of such records and documents may,
but need not, be destroyed at any time after two (2) years from
completion and winding up of the affairs of the SPhinX Trust."
(Id. (emphasis added).)  In the same provision, the Agreement
states that the Trustee is only relieved of its duties "upon the
discharge of all liabilities of the SPhinX Trust and final
distribution of the SPhinX Trust."  (Id. (emphases added).)

     This language makes plain, on its face, that the Trustee's
post-termination obligation to retain Trust papers expires, at

31

the earliest, "two (2) years from the completion and winding up

of the Trust's affairs," and therefore implicitly recognizes the

Trustee's post-termination authority to wind down the Trust and

to make any necessary final distributions.[12]  (Id. (emphases

added).)

      For all of these reasons, the Court finds that the Trust

Agreement contemplates and specifically recognizes that the

Trustee would, upon termination, be required to continue to

administer the Trust assets to the extent necessary to enable

the final distribution of assets and to fully wind down the

affairs of the Trust.[13]  Moreover, because the Trust assets in

_____

[12] For that reason, the Court rejects Defendants' position that a
finding of wind up authority would be tantamount to "rewrit[ing]
the Trust Agreement or reliev[ing] the Trustee of its
obligations under Section 10.3" in contravention of the
provisions of the Trust Agreement and based upon "extrinsic
authorities" and "distinguishable cases."  (Pls.' Opp'n at 6.)
To the contrary, the provision of post-termination wind up
authority finds actual support in the language of the Trust
Agreement itself, irrespective of any secondary authority.
[13] Nor does the requirement that the Trustee "distribute all of
the Assets" on the "fifth anniversary" of the Trust compel any
different result. (Pendleton Dec., Ex. E (emphasis added).)
Indeed, section 10.4 explicitly recognizes that, after
termination, the Trustee maintains an obligation to "discharge"
all of the Trust's liabilities, and to make "final distribution
of the SPhinX Trust."  (Id.)  In order to give effect to both
provisions, as this Court must, the Court finds that these
provisions, taken together, contemplate staggered distribution.
See Durrans v. Harrison & Burrowes Bridge Constructors, Inc.,
___ N.Y.S.3d ____, 2015 WL 2097546, at *2 (N.Y. App. Div. May 7,
2015) (citations omitted) (noting that "well-settled
construction principles [require] that a contract [] be read as
a whole and that such a reading "should not render any portion
meaningless"); Int'l Ass'n of Machinists & Aerospace Workers v.

this instance constitute inchoate causes of action, the post-termination authority necessarily includes the Trustee's continued latitude to prosecute the PlusFunds' Causes of Action. Indeed, in the absence of the claims' liquidation (or, prosecution), little would be achieved by distribution. Therefore, even if the Trust terminated, the Court finds that the Trustee's post-termination wind up authority permits it to prosecute the PlusFunds' claims.[14]  See RESTATEMENT (THIRD) OF TRUSTS § 89 (2007) (describing a trustee's continuing post-termination authority); Hennessy, 1985 WL 3943, at *7 (finding post-termination authority to prosecute claims).  In other words, the Court finds that the Trustee has standing to pursue these claims in this litigation.[15]

## V.   CONCLUSION

For all of these reasons, Defendants' motion will be denied.  An accompanying Order will be entered.


__  May 22, 2015  __                    __ s/ Jerome B. Simandle  __
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge

---

U.S. Airways, Inc., 358 F.3d 255, 266 (3d Cir. 2004) (citation omitted) (noting that it is a "fundamental canon that a contract must be read so as to give effect to all of its parts").
[14] Defendants have cited no contrary authority, and rely instead upon cases describing general contract principles. (See Defs.' Br. at 9-10 (citations omitted); see also Defs.' Reply at 5-7 (citations omitted).)
[15] As a result, the Court need not reach the parties' positions concerning the standing of the JOLs to prosecute the PlusFunds' Causes of Action.