IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KENNETH M. KRYS, MARGOT
MACINNIS, and THE HARBOUR
TRUST CO. LTD.,

           Plaintiffs,

      v.

ROBERT AARON, DERIVATIVE
PORTFOLIO MANAGEMENT LLC, DPM-
MELLON, LLC, DERIVATIVE
PORTFOLIO MANAGEMENT, LTD.,
DPM-MELLON, LTD, and BANK OF
NEW YORK MELLON CORPORATION,

           Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 14-2098 (JBS/AMD)

**OPINION**

APPEARANCES:

David J. Molton, Esq.
Mason C. Simpson, Esq.
BROWN RUDNICK LLP
Seven Times Square
New York, N.Y. 10036
    -and-
Leo R. Beus, Esq.
L. Richard Williams, Esq.
Thomas A. Gilson, Esq.
Lee M. Andelin, Esq.
BEUS GILBERT PLLC
701 North 44th Street
Phoenix, A.Z. 85008
     Attorney for Plaintiffs

B. John Pendleton, Jr., Esq.
Andrew O. Bunn, Esq.
Kristin A. Pacio, Esq.
Gina Trimarco, Esq.
DLA PIPER LLP (US)
51 John F. Kennedy Parkway
Short Hills, N.J. 07078
     Attorney for Defendants

**SIMANDLE, Chief Judge:**

Contents

I.   INTRODUCTION ............................................. 2

II.  BACKGROUND .............................................. 4

III. STANDARD OF REVIEW ...................................... 6

IV.  DISCUSSION ............................................. 10

  A.   The Parties' Experts on Segregation Issues ............ 10

    1.   Defendants' Motion to Exclude I. Michael Greenberger .. 11

    2.   Plaintiffs' Motion to Exclude Anthony J. Leitner ...... 22

  B.   The Parties' Experts on Damages/Valuation Issues ....... 26

    1.   Defendants' Motion to Strike Joan A. Lipton, CPA/ABV/CFF, Ph.D. ..................................................... 27

    2.   Plaintiffs' Motion to Strike Avram S. Tucker .......... 32

  C.   The Parties' Experts on Industry Practices ............ 38

    1.   Defendants' Motion to Exclude Peter U. Vinella ........ 38

    2.   Plaintiffs' Motion to Exclude Certain Testimony by Raymond O'Neill ........................................... 46

  D.   Defendants' Motion to Exclude R. David Wallace, CPA, CFF 49

V.   REDACTIONS TO EXPERTS' REPORTS ......................... 54

VI.  CONCLUSION ............................................. 54

**I.   INTRODUCTION**

    In this lengthy multi-district securities litigation, the parties move to exclude in whole or in part the following experts:[1]

    1.   **I. Michael Greenberger,** Plaintiffs' expert on Commodity Futures Trading Commission (hereinafter, "CFTC") and Commodities Exchange Act (hereinafter, "CEA") issues [see Docket Item 580];

---

[1] The Court conducted oral argument on the pending motions on June 4, 2015.

2

2.  **R. David Wallace**, **CPA, CFF**, Plaintiffs' expert on the audit and advisory services rendered to Refco [see Docket Item 581];

3.  **Peter Vinella**, Plaintiffs' expert concerning Defendants' alleged knowledge of Refco's failure to segregate SMFF's excess cash [see Docket Item 582];

4.  **Joan Lipton**, **CPA/ABV/CFF, Ph.D.**, Plaintiffs' expert on PlusFunds' valuation [see Docket Item 583];

5.  **Raymond O'Neill**, Defendants' expert on the practices of fund administrators [see Docket Item 584];

6.  **Anthony Travers**, Defendants' expert on the standards for directors under Cayman Islands' Law [see id.];[2]

7.  **Anthony J. Leitner**, Defendants' expert (in rebuttal to I. Michael Greenberger) on segregation issues under the CEA and the CFTC [see Docket Item 585]; and

8.  **Avram S. Tucker**, Defendants' damages expert [see Docket Item 586]

The principal issue before the Court concerns whether the proposed testimony of these expert witnesses meets the qualification, reliability, and fit requirements under Federal Rule of Evidence 702.

For the reasons that follow, Defendants' motions will be granted in part and denied in part with respect to Mr. Greenberger, granted in part and denied in part with respect to Mr. Wallace, granted in part and denied in part with respect to Mr. Vinella, and denied with respect to Dr. Lipton.

---

[2] The parties requested on the oral argument record that resolution of Plaintiffs' motion to exclude Mr. Travers be reserved pending the parties' informal discussions to resolve the issues with respect to Mr. Travers. (See Hr'g Tr. At 101:16.) Plaintiffs' motion will, accordingly, be deferred to the extent it seeks to exclude Mr. Travers.

Plaintiffs' motions will be denied with respect to Mr. O'Neill, deferred with respect to Mr. Travers, granted in part and denied in part with respect to Mr. Leitner, and denied with respect to Mr. Tucker.

## II.   BACKGROUND

For purposes of the pending motions, the Court need not retrace the parties' complex history.[3]

Rather, the Court notes that this action generally arises from the complex financial and brokerage relationships between, and ultimate dissolutions of, three entities (and the multitude of affiliates associated with each): PlusFunds Group, Inc. (hereinafter, "PlusFunds"), SPhinX Funds (hereinafter, "SPhinX"), and Refco, Inc. (hereinafter, "Refco").

As relevant here, in 2002, PlusFunds created SPhinX, a global hedge fund consisting of approximately seventy Cayman Islands funds, as an investment vehicle to track the Standard & Poor's hedge fund index.  One of the seventy SPhinX funds, SPhinX Managed Futures Fund (hereinafter, "SMFF"), in turn, maintained brokerage accounts with the onshore and offshore affiliates of Refco, a then-existing financial services and

---

[3] For a more detailed discussion of the factual predicate and procedural history of this action, the Court refers any interested readers to the Court's prior Opinions: Krys v. Aaron, No. 14-2098, 2015 WL 3452324 (D.N.J. May 29, 2015); Krys, ___ F. Supp. 3d ____, No. 14-2098, 2015 WL 2453720 (D.N.J. May 22, 2015); Krys, ___ F. Supp. 3d ____, No. 14-2098, 2015 WL 2412448 (D.N.J. May 20, 2015).

4

brokerage firm.  In connection with such accounts, PlusFunds
agreed to sweep any of SMFF's excess cash on deposit with Refco,
LLC, the onshore affiliate in New York, to Refco Capital
Markets, Ltd, the offshore affiliate in the Cayman Islands.

     After the revelation that several of Refco's officers and
directors participated in a wide-scale, fraudulent
underreporting of corporate liabilities, however, Refco filed
for bankruptcy on October 17, 2005.  At that time, Refco held
$312 million of SMFF's excess cash in unsegregated accounts, all
of which the bankruptcy proceeding placed beyond the reach of
PlusFunds or SPhinX, and ultimately caused these entities to
file their own bankruptcy proceedings.

     In this action, Plaintiffs Kenneth M. Krys and Margot
Macinnis, the Joint Official Liquidators of the SPhinX Trust,
and The Harbour Trust Co. Ltd., the Trustee of the SPhinX Trust
(collectively, "Plaintiffs"), allege that Defendants,[4] all SPhinX
Funds' and PlusFunds' agents and fiduciaries, allowed and/or
facilitated the unauthorized diversion of SMFF's excess cash
from protected, customer-segregated accounts to non-regulated
and unsegregated offshore accounts with Refco and failed to take

---

[4] Defendants in this action specifically consist of Robert Aaron,
Derivatives Portfolio Management, LLC, Derivatives Portfolio
Management, Ltd., DPM–Mellon, LLC, DPM–Mellon, LTD, and Bank of
New York Mellon Corporation (collectively, "Defendants").

certain corrective steps in the face of Refco's potential insolvency.[5] (See generally Joint Final Pretrial Order.)

## III. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and specifically permits a witness qualified as an expert to testify in the form of an opinion if: (1) the expert's knowledge will assist the factfinder in understanding the evidence or an issue of fact; (2) the testimony relies upon sufficient facts or data; (3) the testimony resulted from "reliable principles and methods; and (4) the expert "reliably applied the principles and methods to the facts of the case." See FED. R. EVID. 702. In other words, Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir. 1994)).

---

[5] Following the filing of Plaintiffs' initial and amended state court complaints in early 2008, Defendants removed this action to this federal Court on April 17, 2008. [See Docket Item 41 in Civil Action No. 08-1902 (JBS/AMD).] Shortly thereafter, however, the Judicial Panel on Multi-District Litigation transferred this action to the Southern District of New York (hereinafter, the "MDL District Court") for inclusion in MDL No. 1902. [See Docket Item 41 in Civil Action No. 08-1902 (JBS/AMD).] Following six years of litigation before the MDL District Court, the exchange of tens of thousands of documents (if not substantially more), and the completion of hundreds of depositions, the MDL District Court transferred this action back to this Court for all further proceedings on March 24, 2014. [See Docket Item 505.]

Qualification refers to the requirement that the witness possess specialized knowledge, skills, training, or expertise. See id. at 404 (citation omitted).  The requirement, however, encompasses "'a broad range of knowledge, skills, and training.'"  Id. (citation omitted).  Indeed, the Court of Appeals eschews "overly rigorous requirements of expertise" and therefore permits witnesses to testify as experts even in the absence of formal qualifications (as opposed to simply specialized knowledge and training).  In re Paoli, 35 F.3d at 741.

The reliability restriction requires that the testimony be based upon "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'" and that the expert have "'good grounds' for his or her belief." Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).  In that respect, reliability requires, in essence, an examination "'into the expert's conclusions in order to determine whether [the conclusions] could reliably flow from the facts known to the expert and [the] methodology used.'"  In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig., 706 F.3d 217, 225 n.7 (3d Cir. 2013) (quoting Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000) (internal

quotation marks omitted)).[6]  The rule does not, however, require the party proffering the expert to demonstrate the "correctness" of their expert's opinion.  In re Paoli, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness").  Rather, the party need only demonstrate "by a preponderance of the evidence" that the expert's opinion bears adequate indicia of reliability.  Id.  Indeed, "[a] judge will often think" that an expert "has good grounds to hold the opinion," even if the judge finds the opinion otherwise "incorrect."  Id.

The third requirement, whether the expert testimony would assist the trier of fact, "goes primarily to relevance,"

---

[6] In evaluating reliability, Daubert (and its progeny) directs courts to take into account an array of nonexclusive factors, including: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put."  In re Paoli, 35 F.3d at 742 n.8. These factors, however, "are neither exhaustive nor applicable in every case," Kannakeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997), and "[t]he District Court has broad discretion in determining the admissibility of evidence, and 'considerable leeway' in determining the reliability of particular expert testimony under Daubert." Simmons v. Ford Motor Co., 132 F. App'x. 950, 952 (3d Cir. 2005) (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152–53 (1999)).

Daubert, 509 U.S. at 591, and specifically requires that the testimony "'fit'" the disputed issues in the case.  Schneider, 320 F.3d at 404 (citation omitted).  "In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  Id. (citation omitted). This "'helpfulness' standard," accordingly, requires "as a precondition to admissibility" that that the expert testimony possess a valid and specialized connection to the pertinent inquiries in the litigation.

In applying these considerations, "the district court must act as a gatekeeper," preventing the admission of opinion testimony that does not meet these three requirements.  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 294 (3d Cir. 2012) (citation omitted).  Nevertheless, Rule 702 prescribes "'a liberal policy of admissibility.'"  Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.2d 802, 806 (3d Cir. 1997)). Indeed, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" serve as "the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 595.

IV.  **DISCUSSION**

**A. The Parties' Experts on Segregation Issues**

This action will turn, in large part, upon the jury's assessment of various parties' involvement in, knowledge of, and/or responsibility for the unsegregated manner in which Refco held SMFF's excess cash.  As a result, the parties intend to proffer competing experts on the regulatory requirements and industry practices with respect to segregation.

As set forth in greater detail below, I. Michael Greenberger and Anthony J. Leitner, specifically produced lengthy reports, for Plaintiffs and Defendants respectively, discussing the laws and industry practices relevant to segregation and their opinions concerning the propriety of various parties' conduct.

Following submission of the briefing associated with the pending motion, however, the parties acknowledged at oral argument that Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) precludes either expert (and indeed any expert) from testifying on questions of law or from stating ultimate conclusions of law, particularly with respect to whether any individual and/or entity (including, Defendants) violated and/or complied with applicable legal requirements. (See Hr'g Tr. at 7:8-19.)  The parties further conceded that their experts' reports run afoul of this preclusion in certain

10

respects, and confirmed that the experts would not be called to proffer those opinions.

The remaining inquiry presented by the parties' motions therefore concerns whether these experts have the qualifications necessary to offer helpful testimony on segregation issues. Despite the parties' concessions (and because this issue presents a common thread throughout several of the disputed expert reports), however, the Court will first address, with greater specificity, the prohibited areas of conclusory legal testimony, prior to turning to the issue of qualifications.

**1. Defendants' Motion to Exclude I. Michael Greenberger**

Mr. Greenberger, a law professor and a former Director of Trading and Markets at the CFTC from September 1997 through September 1999, produced a 96-page expert report on June 29, 2012, in which he generally discusses the CFTC and CEA segregation requirements as they pertained to SMFF's excess cash held on deposit with Refco. [See generally Docket Item 580-3.]

In moving to exclude Mr. Greenberger, Defendants argue that his Report amounts to an "impermissible opinion on governing law," because he offers little more than legal opinions concerning the meaning and application of the CEA and CFTC regulations regarding segregation of customer cash. [Docket Item 580-1 at 1, 5-7; see also Docket Item 651 at 1-2.] Moreover, even if certain select sentences constitute "helpful

11

expert opinion" regarding industry customs, practices, and segregation, Defendants assert that Mr. Greenberger lacks the qualifications necessary to discuss these issues, because he was not employed in the futures' industry during the relevant period. [Docket Item 651 at 2-3.]

Plaintiffs counter, however, that Mr. Greenberger's Report provides admissible "'background information'" on segregation, including the relevant "industry standards and the regulatory regime," that supports Plaintiffs' position that SPhinX and PlusFunds had "reason to expect" that the SPhinX assets on deposit with Refco remained "protected."[7] [Docket Item 634 at 2-4.] Plaintiffs further argue that excluding Mr. Greenberger's testimony "would be patently unfair," given the fact that Defendants have proffered a rebuttal expert (Mr. Leitner, discussed below) who opines on substantively identical issues. [Id. at 6-8.]

The Court "has discretion to determine whether expert testimony" will prove helpful to the trier of fact. Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006) (citation omitted). In utilizing that discretion, however, the Court "must ensure that an expert does not testify as to the

---

[7] Plaintiffs further state that the "Report will not be entered [into] evidence, and [that] Mr. Greenberger will offer only non-legal opinions," if permitted to testify at trial. [Docket Item 634 at 9.] As stated above, counsel for Plaintiffs reiterated this position on the oral argument record.

governing law of the case." Id. Indeed, although Federal Rule
of Evidence 704 permits an expert to provide testimony that
"embraces an ultimate issue to be decided by the trier of fact,"
an expert may not "usurp" a court's "pivotal role in explaining
the law to the jury" by "rendering a legal opinion." Id.
(citations omitted).

Here, Mr. Greenberger states, at the outset (and as his
ultimate conclusion), that "SMFF was statutorily, regulatorily,
and contractually entitled by a series of related, but also
separate and independent, Commodity Exchange Act provisions,
CFTC Regulations, and contract clauses to have its excess cash
segregated at a futures commission merchant such as Refco LLC or
wherever Refco LLC unlawfully deposited those funds," and that
Defendants' "many" segregation violations, "especially when
viewed in their totality in the circumstances of this case
constitute a knowing fraud, breach of fiduciary duty and trust,
and conversion." [Docket Item 580-3 at 2, 69.]

In support of this ultimate opinion, Mr. Greenberger
provides a lengthy recitation of the CFTC and CEA segregation
and auditing requirements pertaining to customer funds on
deposit [id. at 12-35],[8] the purposes of such requirements, and

---

[8] An expert witness usurps the Court's function by defining the
applicable law.  If the applicable law is in dispute, it is for
the judge and not the jury (or the expert witness) to make that
determination and to instruct the jury appropriately.  It is

13

why these segregation protections applied to the SMFF funds yet were violated by a series of actions and/or inaction. [Id. at 36-75.] Indeed, Mr. Greenberger specifically concludes that the various entities and individuals involved in the transfer of SMFF's excess cash committed fraud, breaches of their fiduciary duties, and conversion.[9] [Id. at 76-78.]

In these respects, Mr. Greenberger unquestionably invades the Court's province by rendering a legal opinion concerning whether various agents of Refco, SPhinX, and PlusFunds complied with their obligations under federal securities law.[10] See Berckeley Inv. Grp., 455 F.3d at 218 (finding that an expert could not testify concerning whether the plaintiff "complied with legal duties" under the securities law). Indeed, in related litigation before the MDL District Court, the MDL District Court found that this very Report "appears on its face

_____

further the judge's function to assure that evidence at trial, by experts or otherwise, does not undermine the clarity of actual legal requirements.

[9] The remainder of Mr. Greenberger's Report contains, in primary part, Mr. Greenberger's criticism of various rulings by the MDL District Court and Daniel J. Capra, the Special Master appointed by the MDL District Court to issue Report and Recommendations concerning various pre-trial issues (hereinafter, the "Special Master"). [See, e.g., Docket Item 580-3 at 63-66.] Efforts to relitigate determinations of the MDL District Court in related litigation hardly provides "helpful" information to the jury in this action, particularly to the extent those determinations have no application to this litigation.

[10] Indeed, counsel for Plaintiffs conceded on the oral argument record that Mr. Greenberger's opinions in these respects exceed that permitted under the Federal Rules of Evidence.

14

to be an opinion of law, in substantial part, if not almost entirely." [Docket Item 580-6 at 3:7-8.] The MDL District Court therefore struck the Report *sua sponte* in its entirety. [See id.] This Court agrees that Mr. Greenberger's Report contains many impermissible legal conclusions. Nevertheless, the Court will not strike Mr. Greenberger's Report in its entirety. Rather, the Court will endeavor to better define the line between permissible testimony on ultimate issues and an impermissible legal opinion.

Critically, Federal Rule of Evidence 704(a) specifically permits an expert to proffer testimony that "embraces an ultimate issue to be decided by the trier of fact." FED. R. EVID. 704(a). Indeed, "if a witness (especially an expert) provides a solid foundation and explanation on an issue for which the factfinder needs assistance, the factfinder might be left hanging if the witness cannot cap off the testimony with a conclusion about the ultimate issue to which the expert is testifying." 3 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 704.02[1] (9th ed. 2006). Indeed, testimony that amounts to "less than a full narrative ... is like the joke without the punchline, the mystery without the last page," particularly with respect to experts, where "a conclusion on the ultimate issue often ties the witness' testimony together into a coherent whole." Id. Nevertheless,

15

the ultimate issue rule does not enable an expert to "merely tell the jury what result to reach." FED. R. EVID. 704 advisory committee's notes (1972). Thus, an expert may not render any ultimate opinion concerning, for example, whether a specific party had "'capacity to make a will,'" but may offer an opinion concerning whether that party had "'sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution.'" Id. (citation omitted). In other words, under Rule 704, an expert may not make a conclusory statement on a party's capacity, but may provide testimony that touches the underlying issues relevant to a determination of capacity.

This guidepost must then be viewed through the lens of the Court of Appeals for the Third Circuit's guidance in Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 217 (3d Cir. 2006). In Berckeley, the Court of Appeals acknowledged that "the line between admissible and inadmissible expert testimony as to the customs and practices of a particular industry often becomes blurred when the testimony concerns a party's compliance with customs and practices that implicate legal duties." Id. at 218. Nevertheless, the Court of Appeals concluded that an opinion on the issue of whether a party complied with and/or violated "legal duties" constitutes an impermissible legal opinion, even if offered by a well-qualified expert. Id. at 217-218

16

(precluding an "experienced" former Securities and Exchange Commission attorney from offering these types of opinions).

Taken together, these authorities therefore instruct that any qualified expert, including Mr. Greenberger, may provide an opinion on whether a party's conduct or actions meet the underlying bases for an ultimate issue in a case (by, for example, testifying concerning whether certain acts would in the abstract be improper and/or inconsistent with a party's legal duties), but may not merely instruct the jury on the result to reach based upon a party's specific conduct or actions (by, for example, stating that a party did indeed violate an applicable duty through certain actions).[11]  This distinction, albeit a fine one, saves Mr. Greenberger's Report from being struck in its entirety.  With appropriate redactions, Greenberger's proposed testimony will be helpful to the jury in assessing the underlying conduct in this case.  Nevertheless, the Court will exclude Mr. Greenberger's Report to the extent he reaches the specific conclusion that any Defendant acted in compliance with and/or in violation of applicable legal duties or segregation requirements.

When stripped of these improper and ultimate legal conclusions, however, the Court cannot ignore that Mr.

---

[11] This distinction applies equally to all testimony discussed within this Opinion that will be excluded on these bases.

Greenberger's Report provides contextual information on
segregation issues and on common customs and practices in the
securities industry during the relevant period.  [See generally
Docket Item 580-3.]  These issues remain plainly relevant and
this background information may prove infinitely helpful to the
jury in unpacking the intricacies of this complex litigation.
See Berckeley Inv. Grp., 455 F.3d at 218.  Indeed, Defendants do
not dispute the helpfulness of this testimony.  [Docket Item 651
at 2.]  Rather, Defendants challenge Mr. Greenberger's
qualifications on these industry issues, because he "was working
as a law professor," rather than in the futures industry during
the relevant timeframe.  [Id.]

     In order to provide testimony concerning the "customs and
business practices in the securities industry," a proffered
expert, like Mr. Greenberger, must generally have expertise "in
the securities industry at the time" relevant to the litigation.
Berckeley Inv. Grp., Ltd., 455 F.3d at 218.  Nevertheless, an
expert need only possess "specialized knowledge" regarding the
area of testimony.  Leonard v. Stemtech Health Scis., Inc., 981
F. Supp. 2d 273 (D. Del. 2013) (quoting Elcock v. Kmart Corp.,
233 F.3d 734, 741 (3d Cir. 2000)).  In other words, the
testimony must be, "at a minimum," greater than that of "'the
average layman'" at the relevant time, a standard liberally
applied within this Circuit.  Id. (citation omitted).

18

In applying this standard to Mr. Greenberger, an introduction to his general professional background prior to the issues implicated in this litigation proves critical.  From September 1997 through September 1999, Mr. Greenberger served as the Director of the Division of Trading & Markets at the CFTC. [Docket Item 580-3 at 3.]  In that capacity, he "engaged" in the regulation and oversight of the futures industry on a wide array of issues, including "the statutorily and regulatory required segregation of customer funds" and the "reporting and auditing" requirements related to those customer funds.  [Id. at 4.] During this period, Mr. Greenberger also served on "the Steering Committee of the President's Working Ground on Financial Markets," a committee that specifically addressed "issues pertaining to the proper segregation of customer funds as required by statute and regulation."  [Id.]  In these respects, Mr. Greenberger spent much of this two-year period developing an expertise specifically on the issue of segregation.  Indeed, counsel for Plaintiffs asserted during oral argument that Mr. Greenberger spent "two full years [at the CFTC] working on just ... the issue of segregation."[12]  (Hr'g Tr. At 13:21-24.)

Then, following a brief but prominent stint with the United States Department of Justice (serving directly under the

---

[12] Mr. Greenberger's report further reflects that he supervised the issuance and implementation of over 50 CFTC regulations and interpretative letters.  [See Ex. 4 to Docket Item 580-3.]

Attorney General),[13] Mr. Greenberger joined the faculty of the University of Maryland Law School as a Professor in July 2001. [Docket Item 580-3 at 3.]  In this academic capacity, Mr. Greenberger's professorial duties have, since the beginning of his academic career, specifically included course work on "Futures, Options & Derivatives" and lectures on "derivatives regulation" in classes "focusing on securities regulation, business concepts, and advanced corporate finance." [Docket Item 580-3 at 5; see also Ex. 2 to Docket Item 580-3.]  In addition to these core academic duties, Mr. Greenberger has made "66 academic presentations on commodity, futures and derivatives regulation," has written "11 articles" on these subjects, and has briefed and/or testified before House and Senate Congressional Committees on at least 12 different occasions. [Docket Item 580-3 at 5; see also Exs. 2 & 3 to Docket Item 580-3.]  Thus, although Mr. Greenberger no longer worked directly in the futures' industry during the timeframe specifically implicated in this litigation, i.e., 2002 to 2005, the industry expertise that he developed during his tenure at the CFTC

---

[13] Immediately following his tenure with the CFTC, Mr. Greenberger acted as "Counselor to the United States Attorney General and then as Principal Deputy Associate Attorney General." [Docket Item 580-3 at 5.]  In these roles, he supervised five of the Department of Justice's "six litigating divisions," again on a wide range of issues, including fraud. [Id.]

continued to be relied upon and augmented during and after this period.  [See Exs. 2 & 3 to Docket Item 580-3.]

In these respects, Mr. Greenberger's knowledge and professional experience regarding the futures' industry through the relevant time period plainly exceeds that of the average layman.  See Kannankeril, 128 F.3d at 809 ("If [an] expert meets [the] liberal minimum qualifications, then the level of [an] expert's expertise goes to credibility and weight, not admissibility.").  Moreover, even in the absence of Mr. Greenberger's academic experience, Defendants have not identified any relevant change in law that might have diminished the expertise that Mr. Greenberger gained from his time with CFTC.[14]  And, in light of Mr. Greenberger's relevant academic pursuits, Plaintiffs have sufficiently demonstrated that Mr. Greenberger will offer "background testimony [that] could be helpful to the jury." Berckeley Inv. Grp., Ltd., 455 F.3d at 218 (finding a "former counsel for the SEC" qualified to offer background testimony on "offshore securities transactions"); Leonard, 981 F. Supp. 2d at 281 (finding a professor met the minimal qualifications to testify as an expert).

Therefore, the Court will not exclude Mr. Greenberger from providing background testimony relevant to the futures'

---

[14] To the contrary, counsel for Defendants conceded on the oral argument record that changes in the relevant law occurred only after the time frame implicated in this litigation.

industry, and specifically concerning the customs and business practices with regard to issues of segregation and/or sweeps of customer funds.

For all of these reasons, Defendants' motion will be granted in part and denied in part, without prejudice to Defendants' right to voice any appropriate objections (on relevance grounds or otherwise) during Mr. Greenberger's testimony.  The Court therefore turns to Plaintiffs' challenges to Defendants' expert on segregation issues.

### 2. Plaintiffs' Motion to Exclude Anthony J. Leitner

Mr. Leitner, the former Managing Director and Co-General Counsel of the Equities Division of Goldman, Sachs & Co. and a current consultant on securities' and derivatives' regulations, prepared a rebuttal to Mr. Greenberger's report on September 14, 2012, in which he similarly discusses the regulations and common industry practices relative to the segregation of customer funds.  [See generally Docket Item 585-3.]

In moving to exclude Mr. Leitner, Plaintiffs argue, in essence, that if Mr. Greenberger's Report fails, so too must Mr. Leitner's, because the Reports reach ultimate conclusions on the same substantive issues and therefore suffer from the same

deficiencies.[15]  [See Docket Item 585-1 at 1-6; Docket Item 655 at 2-4.]

The Court, however, need not belabor Plaintiffs' positions, because counsel for Defendants conceded on the oral argument record that the disputed portions of Mr. Leitner's Report exceed the permissible scope of expert opinion (and concern portions distinct from those for which he will be called to testify). (See Hr'g Tr. at 18:11-12.)  Nevertheless, for the sake of the

---

[15] Plaintiffs further argue that Mr. Leitner's opinions should be excluded because "they include improper findings of fact," and therefore "invad[e] the province of the jury." [Docket Item 585-1.]  The Court, however, finds Plaintiffs' position without merit.  Indeed, in support of their position, Plaintiffs rely entirely upon Mr. Leitner's inclusion of a section of "Relevant Facts" within this Report. [Docket Item 585-3 at ¶¶ 26-31.] Critically, although experts "are generally precluded from disclosing inadmissible evidence to a jury," Williams v. Illinois, 132 S. Ct. 2221, 2241 (2012), there is no indication at this stage that Defendants will rely upon Mr. Leitner for a factual narrative relative to the disputed transfers of SMFF's excess cash (i.e., to explain to the jury Plaintiffs' version of the dispute events).  Indeed, counsel for Defendants expressly disclaimed any such intention on the oral argument record (see Hr'g Tr. At 18:19-21), and the factual assertions themselves appear to do little more than disclose the bases of his opinion. See FED. R. EVID. 703.  Moreover, an expert may "'base his opinion on a particular version of disputed facts and the weight to be accorded to that opinion'" rests with the jury, and presents "'proper subject for cross-examination.'"  Johnson v. Duffy, 855 F. Supp. 2d 311, 320 (M.D. Pa. 2012) (quoting Walker v. Gordon, 46 F. App'x 691, 694-96 (3d Cir. 2002)).  Indeed, "Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination." Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002). Finally, because the Court will instruct the jury on the use and weight of expert testimony, the Court finds no incurable risk of jury confusion.

clarity, the Court will briefly highlight the improper portions as examples of the proffered testimony which must be eliminated.

Critically, in his Report, Mr. Leitner essentially concludes that PlusFunds (rather than Defendants) "authorized" the transfer of SMFF's excess cash (thereby rendering PlusFunds accountable for any resulting losses) and that these transfers, in any event, comported with regulatory requirements and industry practices. [Docket Item 585-3 at ¶¶ 3, 36, 41-44, 51-53, 56.]  In concluding that "ample documentary evidence" supports the conclusion that PlusFunds "authorized" and/or "ratified" the sweeps of SMFF's excess cash, however, Mr. Leitner, like Mr. Greenberger, renders an impermissible legal opinion. [See, e.g., id. at ¶¶ 3, 11, 51-52, 56.]  Mr. Leitner's conclusion that the transfer of SMFF's excess cash to Refco complied with applicable CEA and CFTC regulations similarly constitutes an improper opinion on an ultimate legal issue. [See, e.g., id. at ¶¶ 3, 36, 56.]  As does Mr. Leitner's statement that "no statutory or regulatory impediment" prevented the specific "cash sweep practices" that form the predicate for this litigation. [Id. at ¶ 36.]

Indeed, in these respects, Mr. Leitner largely echoes the impermissible legal opinions discussed by Mr. Greenberger, and counsel for Defendants has now specifically conceded that no expert, including Mr. Leitner, should offer an opinion

24

concerning any party's compliance with, or violation of,
applicable law.  (See Hr'g Tr. at 18:11-17.)  As a result, Mr.
Leitner will, like Mr. Greenberger, be barred from offering any
legal conclusions, particularly as to whether any Defendant
acted in compliance with legal duties and/or violated any
segregation requirements.[16]

Nevertheless, the Court has little doubt that Mr. Leitner's
testimony on industry customs and practices with respect to
segregation and cash sweeps will prove helpful to the jury under
Rule 702.  Indeed, Mr. Leitner's testimony on these issues will
allow the jury to contextualize the transactions at issue in
this litigation, and will further provide helpful comparative
information concerning industry standards relevant to this
litigation. [See, e.g., id. at ¶¶ 11, 40-46, 52-53.]  For all of
these reasons, the Court will not exclude provide background
testimony relevant to the futures' industry, and specifically

---

[16] The Court need not reach those areas of Mr. Leitner's Report
in which he contradicts Mr. Greenberger's interpretations of law
and fact. [See Docket Item 585-3 at ¶¶ 11, 33-54.]  Indeed,
those portions of Mr. Leitner's Report served only to rebut Mr.
Greenberger's testimony in the event the Court allowed him to
testify "unencumbered in offering all of his legal conclusions."
(Hr'g Tr. At 18:14-17.) For the reasons stated above, however,
Mr. Greenberger will not be permitted to offer these
conclusions, rendering Mr. Leitner's impermissible assertions in
rebuttal unnecessary.

concerning the customs and business practices with regard to issues of segregation.[17]

Plaintiffs' motion will, accordingly, be granted in part and denied in part, without prejudice to Plaintiffs' right to voice any appropriate objections (on relevance grounds or otherwise) during Mr. Leitner's testimony.

**B. The Parties' Experts on Damages/Valuation Issues**

In this action, Plaintiffs seek damages for the loss of $263 million in excess cash, the loss of equity or "enterprise value" caused by the collapse of PlusFunds, the loss of PlusFunds' license to use the Standards & Poor's brand "to create and market" investment products, and the additional fees and expenses prompted by Defendants' alleged breaches.  (Joint Final Pretrial Order at 20, 73.)

As relevant here, the parties' experts, Dr. Joan A. Lipton and Avram S. Tucker, have both produced experts' reports concerning the "enterprise value" of PlusFunds, and the manner in which to assess and/or discount that value based upon various conditions.  In now challenging these experts' determinations, the critical inquiry concerns whether their assessments of PlusFunds' value properly "fits" this action, by offering a

_____

[17] Plaintiffs do not specifically challenge Mr. Leitner's qualifications, nor does the Court find any arguable basis to do so, given his lengthy industry experience before, during, and after the time frame relevant to this litigation. [See generally Docket Item 585-3 at ¶¶ 12-25.]

relevant financial assessment given the circumstances presented. Therefore, the Court turns to the specific nature of each expert's conclusions.

### 1. Defendants' Motion to Strike Joan A. Lipton, CPA/ABV/CFF, Ph.D.

Dr. Lipton, a Partner in the forensic, litigation, and valuation services group of ParenteBeard, LLC, produced an expert report on June 28, 2012, concerning the fair market value of PlusFunds as of September 30, 2005. [See generally Docket Item 583-3.] As relevant here, Dr. Lipton specifically asserted her opinion that PlusFunds had, to "a reasonable degree of certainty," a fair market value of $196 million as of September 30, 2005, the month-end immediately prior to the revelation of Refco's widespread financial fraud. [Id. at 41.]

In moving to exclude Dr. Lipton, Defendants argue that her Report fails to fit the damages issues implicated in this litigation, because her calculation of PlusFunds' "value" fails to account for the fact that "Defendants' alleged wrongful conduct—allowing the [SMFF cash] sweeps to occur—directly (and positively) impacted PlusFunds' [assets under management] through its relationship with Refco."[18]  [Docket Item 583-1 at 10

---

[18] In their opening submissions, Defendants did not challenge Dr. Lipton's qualifications, nor the methodology imbedded within her valuation. [See generally Docket Item 583-1.] Rather, in response to Plaintiffs' assertions that Defendants have waived any challenge to Dr. Lipton on these bases, Defendants assert in

(emphasis in original).]  In other words, Defendants assert that

Dr. Lipton's Report fails to answer the critical question "of

the value of PlusFunds had there never been sweeps of SMFF's

excess cash" to Refco.  [Docket Item 652 at 3-4.]  Defendants

therefore argue that presentation of this inflated and

"extraordinarily high" valuation will serve only to confuse the

jury, because it bears no relationship to the damage analysis

ultimately tasked to the jury.  [Id. at 1, 4-6.]

Plaintiffs counter, however, that Dr. Lipton did not

reach "any conclusions as to damages or causation," because

Plaintiffs only retained her "for the limited purpose of

---

the concluding page of their reply that they "list a variety of
objections to Dr. Lipton's methodology through the report and
proposed testimony of Avram S. Tucker, and in their opposition
to the Tucker Motion, which should be read in conjunction with
this motion." [Docket Item 652 at 7.] Defendants, however, may
not raise new arguments in a reply. See Laborers' Int'l Union of
N. Am., AFL-CIO v. Foster Wheeler Energy Corp., 26 F.3d 375, 398
(3d Cir. 1994) (citation omitted) ("An issue is waived unless a
party raises it in its opening brief, and for those purposes 'a
passing reference to an issue ... will not suffice to bring that
issue before this court.'"). Nor may Defendants challenge Dr.
Lipton through incorporating b reference their briefing on a
distinct expert. The Court will, accordingly deem arguments made
for the first time in reply waived. See, e.g., Am. Home
Mortgage Corp. v. First Am. Title Ins. Co., No. 07-1257, 2007 WL
3349320, at *3 n.8 (D.N.J. Nov. 9, 2008) (finding arguments made
for the first time in reply waived). Moreover, even upon
consideration of Defendants' arguments, the Court has no doubt
that Dr. Lipton utilized a reliable and indeed prevailing
valuation methodology. Indeed, several courts have expressly
approved the "'destruction of business'" approach utilized by
Dr. Lipton. MacDermid Printing Solutions, Inc. v. Cortron
Corp., No. 08-1649, 2014 WL 2616836, at *4 (D. Conn. June 12,
2014) (quoting Indu Craft v. Bank of Baroda, 47 F.3d 490 (2d
Cir. 1995)).

calculating the value of PlusFunds as of September 30, 2005."
[Docket Item 635 at 7.]  Nevertheless, that omission alone
purportedly proves insufficient to provide "a basis for
excluding [Dr. Lipton's Report] from consideration by the jury,"
because "the valuation of PlusFunds immediately prior to its
destruction provides a critical starting" or reference point
"that the jury may use to calculate the damages attributable to
Defendants' wrongdoing, whatever those damages may be."  [Id. at
8-9.]

Despite the parties' lengthy positions, they critically
agree on the appropriate measure of damages in the event
PlusFunds ultimately prevails on the issue of liability.
Indeed, the parties consistently assert that the proper measure
of PlusFunds' purported damages (assuming a determination of
liability) amount to the difference between (i) PlusFunds'
hypothetical value in the absence of Defendants' allegedly
wrongful conduct, and (ii) the actual financial position of
PlusFunds.  [See Docket Item 583-1 at 1; Docket Item 635 at 8;
Docket Item 652 at 2.]  In other words, Plaintiffs seek damages
equivalent to the value of PlusFunds had there never been sweeps
of SMFF's excess cash to Refco for placement into unsegregated
accounts.  [Docket Item 635 at 8; Docket Item 652 at 2.]

Here, there is no dispute that PlusFunds has a present
value of zero.  The critical question posited to the jury on the

29

issue of damages therefore becomes the damages, if any, attributable to Defendants' alleged conduct.  Nevertheless, Dr. Lipton "does not purport to offer an opinion on damages," nor to reach any conclusions as to what portion, if any, of her $196 million valuation arguably constitutes these damages.  [Docket Item 635 at 10.]  Rather, Dr. Lipton narrowly addressed only PlusFunds' value as of September 30, 2005.  [See generally Docket Item 583-8.]  For that reason, Defendants take the position that Dr. Lipton's evaluation will not assist the jury in reaching a determination on the fundamental question it will face relative to damages, namely, the value of PlusFunds in the absence of the disputed sweeps of SMFF's excess cash to Refco.

Nevertheless, the Court emphasizes that Dr. Lipton's Report discloses, on its face, that it concerns only a valuation as of a date certain, and based upon clearly disclosed circumstances. [See generally Docket Item 583-8.] In that respect, Defendants' challenges to Dr. Lipton's Report principally rest upon an effort to recalibrate Dr. Lipton's testimony in a manner that Dr. Lipton herself expressly disclaims.  Indeed, Dr. Lipton could not be clearer in expressing that her Report only relates to valuation, and not damages. [See generally id.]  And, based upon the expressed nature of Dr. Lipton's Report, the Court will permit her to testify on her valuation opinion, but will not permit Dr. Lipton to testify on the issue of damages, nor will

the Court permit her conclusions to be construed as an opinion on damages.  Her testimony will instead be limited to the contours of her Report, and will be contextualized and explained to the jury based upon the Report's intended purpose as a valuation, and not as a projection of Plaintiffs' potential recovery.[19]

Moreover, the Court finds that Defendants' challenges to the underlying bases for Dr. Lipton's Report go to weight, not admissibility, and therefore constitute challenges properly presented through cross-examination, and not through exclusion of her otherwise reliable and relevant valuation work.  See Stecyk, 295 F.3d at 414 (noting that "Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination").  The factual narrative that underpins her conclusions is based on evidence that is disputed but provable at trial, as outlined at length by Plaintiffs' counsel at oral argument.  Whether such evidence is adopted by the jury is not determined in this Daubert motion.  It suffices that Lipton propounds a reasonable factual basis that resonates with Plaintiffs' view of the evidence.

For all of these reasons, Defendants' motion to exclude Dr. Lipton on admissibility grounds under Federal Rule of Evidence

---

[19] The Court will also reinforce this through jury instructions.

31

702 will be denied, without prejudice to Defendants' right to voice appropriate objections during Dr. Lipton's testimony at trial.  The Court therefore turns to Plaintiffs' challenges to Defendants' damages expert.

### 2. Plaintiffs' Motion to Strike Avram S. Tucker

Mr. Tucker, the Chief Executive Officer of TM Financial Forensics, LLC, produced an expert report on August 17, 2012, concerning the "appropriateness of Plaintiffs' claimed damages of $263 million relating to losses alleged suffered by SMFF" as a result of the excess cash on deposit with Refco, and concerning Dr. Lipton's opinion on the fair market value of PlusFunds as of September 30, 2005.  [Docket Item 586-3 at 2-3.] In assessing these issues, Mr. Tucker essentially concluded: (1) that Plaintiffs have failed to demonstrate a causal connection between Defendants' alleged misconduct and the losses claimed as damages; (2) that Dr. Lipton failed, for a variety of reasons, to perform a proper valuation of PlusFunds; and (3) that Plaintiffs' SMFF damages claim failed to account for the conduct of SMFF that occurred after "the disclosure of the Refco fraud."[20]   [Id. at 6-9.]

In moving to exclude Mr. Tucker, Plaintiffs argue that Mr. Tucker cannot opine on PlusFunds' value based upon events

_____

[20] Defendants, however, have conceded that Mr. Tucker would not testify about contingent liabilities, nor PlusFunds' alleged fault for the SMFF transfers.

subsequent to PlusFunds' collapse, namely, financial market conditions between 2008-2009, and that Mr. Tucker lacks the qualifications and support necessary for his opinions that SPhinX could have obtained a greater recovery from Refco through pursuit of a claim within the Refco bankruptcy proceeding, rather than through a private settlement.[21]  [Docket Item 656 at 2-6.]  The Court, however, finds Plaintiffs' arguments without merit.

Critically, Plaintiffs take the position in this litigation that Defendants' allegedly wrongful conduct with respect to SMFF's excess cash resulted in PlusFunds' ultimate destruction. (See Joint Final Pretrial Order at 73.)  In that respect, and as stated above, the parties agree that the measure of damages relative to this claim amounts, in essence, to PlusFunds' hypothetical value in the absence of the alleged conduct. Defendants, in turn, take the plausible position—supported in part by Mr. Tucker's opinion—that the calamities Plaintiffs attribute to Defendants' conduct may ultimately have occurred even in its absence.  As a result, Mr. Tucker's opinion goes not to the issue of PlusFunds' value as of Plaintiffs' designated

---

[21] Plaintiffs initially moved to exclude Mr. Tucker on an array of additional bases. [See Docket Item 586-1.]  In opposition, however, Defendants conceded that Mr. Tucker would not be relied upon for many of these purposes [see Docket Item 633], and Plaintiffs have, accordingly, acknowledged that Defendants' "several concessions ... narrow the issues" before the Court. [Docket Item 656 at 1.]

valuation date (September 30, 2005), but instead amounts, in essence, to a different and supported conclusion based upon the same data.  See In re Fosamax Prods. Liab. Litig., 645 F. Supp. 2d 164, 209 (S.D.N.Y. 2009) (denying motions to preclude expert testimony where the parties simply drew "different conclusions from the same data").  Moreover, even if they did not, the Court cannot conclude that events that occurred after 2005 have no relevance to the potential calculation of damages in this lawsuit, see Legier & Materne v. Great Plains Software, Inc., No. 03-0278, 2005 WL 2037346 (E.D La. Aug. 3, 2005) (denying a motion to strike based upon an economic expert's consideration of subsequent events), nor that these subsequent events would, under no circumstances, have been reasonably foreseeable to a hypothetical willing buyer as of the valuation date.  Therefore, the Court finds that Mr. Tucker's consideration of subsequent events does not render his opinion unreliable or otherwise inadmissible under Federal Rule of Evidence 702.

Nor can the Court conclude that Mr. Tucker lacks the expertise or support necessary for his opinion concerning the potential recovery Plaintiffs would have received by pursuing a bankruptcy claim against Refco.

Critically, Mr. Tucker's Resume specifically states that his experience includes consulting in the area of "bankruptcy (including solvency, fraudulent conveyance and valuation)," and

discloses that he has provided expert deposition and trial testimony before at least one Bankruptcy Court. [Docket Item 586-3.] Indeed, counsel for Plaintiffs conceded on the oral argument record that Mr. Tucker has "testified in bankruptcy cases" and "evaluated the solvency of companies." (Hr'g Tr. At 55:2-4.)

Nevertheless, in arguing that Mr. Tucker's limited testimony impermissibly places him in the role of "a bankruptcy lawyer," Plaintiffs' fundamentally mischaracterize the nature and scope of Mr. Tucker's conclusions. (Hr'g Tr. At 55:3-6.) Indeed, despite Plaintiffs' position, Mr. Tucker does not opine on issues "regarding the bankruptcy claim administration and adjudication process." [Docket Item 656 at 4.] Rather, Mr. Tucker assumes that SMFF "could have filed a claim" against Refco's bankruptcy estate in the amount of $312 million and that SMFF's "claim would have been allowed and treated as a Class 3" unsecured claim under Refco's Chapter 11 Plan. [Docket Item 586-3 at 39.] Based upon these assumptions, Mr. Tucker then proceeds to discuss the potential valuation of the hypothetical bankruptcy claim in light of publicly-available information concerning the distributions made to unsecured creditors in the Refco bankruptcy. [Id. at 39-43.] Even if bankruptcy falls within the penumbra of Mr. Tucker's overall expertise, Plaintiffs cannot dispute that his quantitative expertise as a

35

Certified Public Account and Certified Financial Forensic expert renders him acutely qualified to make these sorts of narrow conclusions.  For these reasons, the Court finds Mr. Tucker amply qualified to render an opinion regarding SMFF's hypothetical bankruptcy claim.

Therefore, the Court turns to Plaintiffs' related position that Mr. Tucker's "unsupported analysis" concerning SMFF's potential bankruptcy claim proves "too speculative to be offered as expert testimony." [Docket Item 586-1 at 14.]  Plaintiffs, in particular, take issue with Mr. Tucker's opinion to the extent he "conducts no analysis," nor expresses any independent opinion of this hypothetical claim, and instead "simply parrots statements and assumptions made by certain of Plaintiffs' experts." [Docket Item 656 at 6.]  Nevertheless, the Court need not belabor Plaintiffs' position, because Mr. Tucker's assumptions primarily concern <u>basic</u> issues regarding the filing and allowance of bankruptcy claims [<u>see</u> <u>generally</u> Docket Item 586-3 at 39-43], and his conclusions largely recapitulate assumptions relied upon and supported by Plaintiffs' own experts.[22]

---

[22] The conclusions of an arbitration panel in a related litigation concerning certain of these experts' helpfulness has no impact on this Court's determination of these experts' admissibility under Federal Rule of Evidence 702. [<u>See</u> Docket Item 656 at 6; <u>see</u> <u>also</u> Docket Item 656-2.]

These assumptions therefore have sufficient foundation within the record, see Stecyk, 295 F.3d at 414 (citation omitted) (generally noting that an expert's assumptions must have some foundation in the record in order to be admissible), and Plaintiffs' criticism of these assumptions goes to the weight to be afforded his testimony, but not to its admissibility.  See, e.g., Bruno v. Bozzuto's, Inc., No. 09-874, 2015 WL 1862990, at *10 (D.N.J. Apr. 23, 2015) (finding the reliability of the numbers relied upon in the expert's conclusion an issue concerning the weight to be afforded the expert testimony, rather than its admissibility); Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc., 546 F. Supp. 2d 155, 169 (D.N.J. 2008) (citing Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997)) ("Whether [Plaintiff's expert witness] should have more diligently researched the underlying facts given to him by Plaintiff, in the Court's view, is a question of weight, not admissibility"); Burke v. TransAm Trucking, Inc., 617 F. Supp. 2d 327, 335 (M.D. Pa. 2009) (citation omitted) ("Mere weakness in the factual basis of an opinion bears on the weight of the evidence, not its admissibility").  These perceived weaknesses can, in turn, be addressed through cross-examination, but do not present a basis for exclusion.  See Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999) (noting that "vigorous cross-examination" and

"presentation of contrary evidence" are the "traditional and appropriate means of attacking" potentially flawed evidence).

For all these reasons, Plaintiffs' motion to exclude Mr. Tucker, as narrowed by Defendants' concessions, will be denied.

## C. The Parties' Experts on Industry Practices

### 1. Defendants' Motion to Exclude Peter U. Vinella

On June 29, 2012, Mr. Vinella, a Director at the Berkeley Research Group, an expert services and advisory firm, produced a 137-page expert report, purporting to offer an "opinion concerning pertinent regulations and generally accepted industry customs and practices concerning the administration of" hedge funds, particularly "those domiciled in the Cayman Islands," and "the extent to which Defendants complied with [relevant] standards of care." [Docket Item 582-3 at 5.] As relevant here, Mr. Vinella specifically rendered the following 8 opinions:

1. The Losses suffered by Plaintiffs were the direct result of Defendants' gross and willful negligence to perform their duties as an independent fund administrator and as an independent director and their willful failure to take necessary and sufficient action to protect assets belonging to the SPhinX Funds as they were obligated to do by contract, as a fiduciary, and by regulation;

2. Defendants acknowledge that the OM sets forth that that SMFF Excess Cash Balances must be held in Segregated Customer Accounts at all times and that such provisions protected said cash from seizure in the event of the default of the custodian/depository;

38

3. Defendants <u>willfully</u> failed in their duty to
   determine and ensure that the SMFF Excess Cash
   Balance funds would be held in Segregated Customer
   Accounts at RCM prior to any transfer of such funds
   directed, authorized, or facilitated by DPM/DPM
   Cayman;

4. Moreover, Defendants <u>willfully</u> failed in their duty
   to determine that said funds, in fact, would be held
   in Segregated Customer Accounts at RCM subsequent to
   any transfer of such funds directed, authorized, or
   facilitated by DPM/DPM Cayman;

5. Further, DPM/DPM Cayman <u>willfully</u> failed in their
   duty to properly invest SMFF Excess Cash Balances
   (i.e. the RCM Sweep Program) in a manner consistent
   with the governing agreements and industry
   practices, but which essentially constituted
   unsecured loans to RCM;

6. DPM/DPM Cayman <u>knowingly and willfully</u> delivered
   reports and financial statements to the SMFF
   Investment Manager, the board of SMFF SPC, the
   external auditor, and investors which contained
   information that Defendants knew at the time was
   factually incorrect and which materially
   misrepresented the state of SPhinX Funds'
   investments and their associated risks;

7. Additionally, Defendants <u>willfully</u> failed to report
   suspicious activity and other factors that might
   materially impact the SPhinX Funds to the
   appropriate parties as they were obligated to do by
   regulation; and

8. Defendants also <u>willfully</u> failed to perform their
   contracted duties and responsibilities in a timely
   and professional manner and willfully failed to
   correct these material deficiencies despite multiple
   warnings and notices.

[<u>Id.</u> at 7-8 (emphases added).]  Based upon these opinions, Mr.

Vinella ultimately concluded that the losses Plaintiffs suffered

"would have been altogether avoided," if Defendants had

"performed their duties and responsibilities in a manner generally consistent with those set forth in governing agreements, relevant regulations, and accepted industry standards of care."  [Id.]

Defendants now move to exclude Mr. Vinella to the extent he opines on Defendants' state of mind, questions of law, and ultimate issues of fact, all issues beyond the ken of expert witnesses.[23]  [Docket Item 582-1 at 16-26.]  Defendants further challenge Mr. Vinella's qualifications to opine on industry practices, based upon his purported lack of "specific hedge fund experience."  [Id. at 24.]

Plaintiffs counter, however, that Mr. Vinella "was not asked, nor did he intend, to opine" on Defendants' subjective intentions or motivations.  [Docket Item 637 at 20.]  Rather, Plaintiffs argue that his opinions concern "industry standards—that is, what Defendants *should* have known" or would be "*expected*" to understand under the circumstances.  [Id. (emphasis in original).]  Plaintiffs further submit his "25

---

[23] Defendants further challenge Mr. Vinella's Report on the basis that he mischaracterized certain "facts" and/or relied upon some "hotly contested point[s]" in reaching his various conclusions. [Docket Item 582-1 at 19-22; see also Docket Item 654 at 4-6.] As stated above, however, an expert may, in reaching an opinion, rely upon disputed issues of fact, and the Court finds Defendants' challenges better address through cross-examination, not exclusion. See Stecyk, 295 F.3d at 414.  The Court further notes that the foundational facts laid out by counsel for Plaintiffs seem to be plausible and rooted in evidence Plaintiffs intend to present at trial.

years" of "practical, hands-on experience with hedge funds and hedge funds administration" render him amply qualified.  [Id. at 2-8.]

The Court notes, at the outset, that experts may not provide testimony concerning "the state of mind" or "culpability" of Defendants.  Wolfe v. McNeil-PPC, Inc., 881 F. Supp. 2d 650, 661-62 (E.D. Pa. 2012); see also Deutsche v. Novartis Pharms. Corp., 768 F. Supp. 2d 420, 448 (S.D.N.Y. 2011) (precluding an expert witness from testifying on the defendant's "intent, motivations or state of mind).  Indeed, the question of intent constitutes a "'classic[al] jury question and not one for experts.'"  Robinson v. Hartzell Propeller, Inc., 326 F. Supp. 2d 631, 648 (E.D. Pa. 2004) (citations omitted) (noting that "intent" fails to constitute "a proper subject for expert testimony); In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (excluding expert testimony regarding "the intent, motives or states of mind of corporations, regulatory agencies and others").  Likewise, "[a]lthough Federal Rule of Evidence 704 permits an expert witness to give expert testimony that embraces an ultimate issue to be decided by the trier of fact," an expert witness may not, as described above, "render[] a legal opinion." Berckeley Inv. Grp., Ltd., 455 F.3d at 217; see Wolfe, 881 F. Supp. 2d at 662 (noting that only a

jury, not an expert, can determine whether a defendant behaved negligently).

Here, however, Mr. Vinella plainly reaches conclusions that exceed these bounds.[24]   Critically, in reaching each of the ultimate opinions set forth above, Mr. Vinella invariably relies upon his "25 years of experience" in order to opine on what an entities and individuals with backgrounds similar to Defendants should have known, or should have done, under various circumstances.[25]   [Id. at 59-74.]   Nevertheless, in stating his belief on what industry practice would have dictated, and in suggesting that Defendants' actions failed to comport with these practices, Mr. Vinella then explicitly reaches an ultimate legal conclusion concerning the severity and extent of Defendants' alleged deficiency.

For example, Mr. Vinella opines that, based upon his experience, "it is impossible that anyone with the experience of [Defendants] could have believed that these transfers to" Refco constitute "truly [cash] [s]weeps in the generally accepted use of the term without significant doubt."   [Id. at 59.]   As result of this opinion, Mr. Vinella states that, "Defendants willfully

---

[24] Indeed, counsel for Plaintiffs acknowledged on the oral argument record that Mr. Vinella's Report would require revisions.  (See Hr'g Tr. at 81:9-12.)
[25] All parties appeared to agree on the oral argument record that testimony by a qualified expert concerning what should have occurred or been known rests squarely within the province of an expert.

neglected their fiduciary duty and contractual duty to positively affirm" that these transfers amounted "in fact, [to] Sweep." [Id. (emphasis added).]  Similarly, Mr. Vinella opines that he would have expected Defendants' "document retention program to archive all critical records in regard to the books-and-records, operations, and administration of funds in a readily available format" for at least "five years." [Id. at 66.]  Based upon his review of available evidence, however, Mr. Vinella found that many of these records "do no exist" in Defendants' files, and/or "are incomplete and difficult to find." [Id. at 68.]  As a result of this alleged failure, Mr. Vinella concludes that Defendants "willfully failed in their duty to properly maintain records and communication pertaining" to the operation of SMFF. [Id. at 66 (emphasis added).]  This testimony amounts, on its face, to an opinion concerning Defendants' state of mind and/or subjective intent, and must be excluded.  See Wolfe, 881 F. Supp. 2d at 661-62 (excluding expert testimony concerning the defendants' state of mind and culpability).

Mr. Vinella's testimony likewise will be excluded to the extent he concludes that Defendants' conduct breached certain legal or contractual duties, because this testimony reaches beyond merely addressing an ultimate issue, and instead constitutes an inadmissible legal opinion.  See Berckeley Inv.

43

Grp., 455 F.3d at 218 (finding that an expert could not testify
concerning whether the plaintiff "complied with legal duties"
under the securities law); see also Wolfe, 881 F. Supp. 2d at
661-62 (excluding expert testimony concerning whether the
defendant acted negligent on the grounds that such testimony
amounted to an impermissible legal opinion).

The Court, however, finds no support for Defendants'
position that Mr. Vinella lacks sufficient qualifications and
experience to testify on industry practices relevant to this
litigation.  Indeed, in challenging Mr. Vinella's credentials,
Defendants rely, almost entirely, upon Mr. Vinella's lack of
formal training and/or "relevant" specialized expertise.
[Docket Item 582-1 at 23-24 (arguing that Mr. Vinella "is not a
CPA ... has no professional designations in accounting ... holds
no professional licenses" and lacks experience "relevant to SMFF
or a Cayman Island hedge fund").]

Critically, however, although Rule 702 requires an expert
witness to have specialized knowledge regarding the area of
testimony, the basis of this specialized knowledge need not be
comprised of formal academic training and professional
credentials.  See Elcock, 233 F.3d at 742 (quoting Waldorf v.
Shuta, 142 F.3d 601, 625 (3d Cir. 1998)).  Rather, the
specialized knowledge requirement "'liberally'" extends to
"'practical experience,'" and requires that the proffered expert

44

witness possess, at a minimum, "'skill or knowledge greater than the average layman.'" Id. (citation omitted).

Here, although Mr. Vinella lacks any formal academic training in an area relevant to the securities area, he does have decades of experience advising and consulting on "capital market issues concerning trading, risk management, operations, and technology" across "global capital markets businesses." [Docket Item 582-3 at Ex. A.]  During this time, Mr. Vinella also authored various publications and presentations on topics regarding the international financial industry, and participated in an array of professional associations, including the "Securities Industry and Financial Markets Association." [Id.] Moreover, in connection with his Report, Mr. Vinella reviewed literature specifically concerning the management of Cayman Islands' funds.  [Docket Item 582-3 at Ex. C.]

Thus, even if his qualifications remain somewhat thin, the Court must acknowledge that his practical training (through work, publications, presentations, and review of relevant literature), reflects that he possesses more knowledge than an average lay person regarding "generally accepted industry customs and practices" in the administration of hedge funds. [Docket Item 582-3 at 5.]  Therefore, the Court finds that Mr. Vinella possesses the minimum qualifications necessary to testify concerning the industry practices discussed in his

Report.  See Pineda, 520 F.3d at 244 ("'[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'") (citation omitted); Elcock, 233 F.3d at 744 (finding that an expert without formal training nevertheless qualified as an expert, based upon degree in a "tangentially related field" and his review of "relevant literature in the field").

For all of these reasons, Defendants' motion will be granted to the extent it seeks to exclude Mr. Vinella's testimony concerning Defendants' state of mind (by, for example, testifying that Defendants acted "willfully" or "knowingly") and to the extent his testimony constitutes a legal opinion (by, for example, testifying that any Defendant breached an applicable duty), but denied to the extent it seeks to bar Mr. Vinella's testimony in its entirety.  Plaintiffs shall make redactions to Mr. Vinella's proposed Report consistent with this Opinion and counsel's concessions.

### 2. Plaintiffs' Motion to Exclude Certain Testimony by Raymond O'Neill

On August 31, 2012, Mr. O'Neill produced an expert report on the general practices of hedge fund administrators, and specifically concerning:

1. DPM's role as an administrator and whether its actions were consistent with the standard of care in the hedge fund industry at the time;

2. The market practice of transferring money from prime brokers to offshore accounts;

3. The SPhinX directors' role in the opening of accounts at Refco;

4. The role of DPM around the movement of cash at the prime broker;

5. The alleged inadequacies of the accounting for and reporting on the SPhinX hedge funds and the alleged nondisclosure of excess cash held at RCM; and

6. The conclusions reached by certain of Plaintiffs' experts.

[Docket Item 584-3 at 2.]

In moving to narrow the scope of Mr. O'Neill's potential trial testimony,[26] Plaintiffs argue that Mr. O'Neill's Report reaches "improper findings of facts and conclusions of law." [Docket Item 584-1 at 4.]  Plaintiffs therefore argue that Mr. O'Neill should be precluded "from stating legal conclusions or testifying as to the facts of the case without a foundation of personal knowledge, and that his testimony should instead be limited to the standard practices of accountants and hedge fund administrators.  [Id. at 4-5.]  Despite Plaintiffs' position,

---

[26] Plaintiffs moved to preclude certain testimony of Raymond O'Neill and Anthony Travers in a single submission. [See Docket Item 584-1; Docket Item 657.] Nevertheless, because the experts opine on distinct topics, the Court will address Plaintiffs' motion separately as to each witness.

the Court finds exclusion of any of Mr. O'Neill's testimony unwarranted at this time.

As explained above, it is clear that an expert's testimony may, if otherwise qualified under Rule 702, reach an ultimate issue in a case, but may not provide an ultimate legal opinion. See Berckeley Inv. Grp., Ltd., 455 F.3d at 217; see also Lynch v. J.P. Stevens & Co., 758 F. Supp. 976, 1014 (D.N.J. 1991) ("[l]egal conclusions are not within the ambit of expert testimony permitted under Rule 703 of the Federal Rules of Evidence").  Moreover, as with all witness testimony, an "expert's testimony must be accompanied by a sufficient factual foundation."  Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983).  In other words, "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on record evidence."  Highland Capital Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

Here, however, Plaintiffs mischaracterize the conclusions set forth in O'Neill's Report.  Indeed, in arguing that "legal" and "unsupported" conclusions plague Mr. O'Neill's Report [Docket Item 584-1 at 4-6], Plaintiffs rely entirely upon statements in the "Executive Summary" of Mr. O'Neill's Report—a section that provides little more than an abbreviated overview of his conclusion and constitutes a mere fraction of Mr. O'Neill's (7 pages) of Mr. O'Neill's lengthy and otherwise well-

48

supported Report.   In the substantive portions of Mr. O'Neill's Report, he then proceeds to provide an in-depth analysis of the bases for his opinions (including detailed record citations), and specifically couches his testimony upon his perceptions of industry understandings and practices.  [See Docket Item 584-3 at 85.]   In that respect, the Court cannot conclude that Mr. O'Neill's Report exceeds "the purview of experts."   [Docket Item 584-1 at 4.]  Rather, the report, when viewed as a whole, bears adequate indicia of reliability for purposes of admissibility.  See Pineda, 520 F.3d at 247 (citation omitted) (noting that the standard "'of reliability is lower than the merits standard of correctness'").

For all of these reasons, Plaintiffs' motion as to Mr. O'Neill will be denied, without prejudice to Plaintiffs' right to voice any objections at the time of trial in the event Mr. O'Neill's actual testimony reflects an impermissible legal conclusion.  Moreover, to the extent Plaintiffs have a basis at trial to challenge Mr. O'Neill's underlying factual assumptions, Plaintiffs, of course, retain the right to cross-examine him on this and any related issues. See Stecyk, 295 F.3d at 414.

**D. Defendants' Motion to Exclude R. David Wallace, CPA, CFF**

On June 29, 2012, Mr. Wallace produced an expert report specifically for the purposes of companion litigation before the MDL District Court regarding professional services rendered to

Refco, namely, "the 'audit' services" provided by Grant Thornton LLP, and the "professional 'advisory' services provided by the public accounting firm of PricewaterhouseCoopers" LLP.[27]  [Docket Item 581-8 at 5.]

   In that capacity, Mr. Wallace generally opined that Grant Thornton LLP and PricewaterhouseCoopers LLP "substantially assisted Refco in perpetrating and continuing the Refco fraud," by drafting financial statements that "misrepresented and concealed" Refco's "true financial condition," and by issuing "'clean'" audition opinions on the financial statements.  [Id. at 10-15.]  As specifically relevant here, however, Mr. Wallace concluded that PricewaterhouseCoopers LLP's audited financial statements of SMFF for the years 2003 and 2004 failed to "disclose" that Refco held SMFF's excess cash in non-segregated accounts.  [Id. at 15.]

   In moving to exclude Mr. Wallace's testimony, Defendants argue that Mr. Wallace should be precluded from testifying concerning any alleged deficiencies in any of the SMFF financial statements discussed by Mr. Wallace, because Defendants "*did not prepare those statements, let alone the footnotes that*

_____

[27] On September 6, 2011, Mr. Wallace produced a pre-Report Affidavit, which provided, in essence, a preview of the lengthier opinions ultimately set forth in Mr. Wallace's Report. [See Docket Item 581-5.]

50

*Plaintiffs (and Mr. Wallace) find objectionable.*"[28]  [Docket Item 653 at 4 (emphasis in original).]  In the alternative, Defendants take the position that Mr. Wallace should, at a minimum, be precluded from offering any testimony concerning SMFF's 2002 financial statement, because it exceeds what Mr. Wallace included in his Affidavit and Report.  [Id. at 10.]

Because Mr. Wallace's report contains no reference to SMFF's 2002 financial statement, the Court will, at the outset, preclude Mr. Wallace's testimony about the 2002 financial statement.  Critically, though an expert is not strictly limited to the precise words contained within the expert report, it is axiomatic that an expert may not present new opinions on topics not timely included or otherwise disclosed in the expert's report.  See Fed. R. Civ. P. 26(a)(2)(B) (providing that an expert report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore"); see also Pritchard v. Dow Agro Sciences, 263 F.R.D. 277, 284 (W.D. Pa. 2009) (citation omitted) (generally noting that expert testimony "should be stricken if it contains new opinions or

---

[28] In their opening brief, Defendants challenged Mr. Wallace's Report on an array of additional bases, all of which principally concerned the fact that Mr. Wallace did not render any opinions with respect to Defendants.  [See Docket Item 581-1.]  In opposition, however, Plaintiffs asserted that Mr. Wallace's testimony would extend no further than a discussion of alleged misstatements in SMFF's 2002, 2003, and 2004 financial statements. [See Docket Item 636 at 1-2.]

information" other than that "set forth in the expert report");

Bowers v. Nat'l Collegiate Athletic Ass'n, 564 F. Supp. 2d 322
(D.N.J. 2008) (exclusion of expert testimony relating to
information not included in draft expert reports that were
belatedly disclosed was proper discovery sanction). Indeed,
such an untimely inclusion deprives the adversary of adequate
notice, and the ability to assess the underpinnings of the
opinion in connection with that expert's deposition,
particularly where, as here, the intention to rely upon the
expert for an undisclosed topic only becomes apparent on the eve
of trial. Therefore, the Court will preclude Mr. Wallace from
providing testimony concerning SMFF's 2002 financial statements.

With to SMFF's 2003 and 2004 financial statements, however,
the Court will not exclude Mr. Wallace's limited testimony
(which would, necessarily, be substantially similar to the 6
relevant paragraphs of his expert report).[29] Critically, Mr.
Wallace's Report in this narrow respect concerns his opinion
that an industry professional would understand SMFF's financial
statements "to mean that SMFF's customers assets were, in fact,
segregated, and therefore insulated, i.e., protected, from the
claims of creditors of the custodians of those assets." [Docket
Item 581-8 at 169.] In other words, he concludes that SMFF's

---

[29] At oral argument, counsel for Defendants stated that their
challenge to this portion of Mr. Wallace's Report amounted to
only a "nominal" objection.

financial statements contained "false" disclosures.  [Id. at 169-70.]

This case will hinge, in large part, upon the jury's determination concerning the parties with knowledge and responsibility for the failure to maintain SMFF's excess cash within segregated accounts.  In that respect, Mr. Wallace's testimony concerning any industry professional's interpretation of SMFF's financial statements may prove helpful to the jury in determining the cause of Plaintiffs' claimed losses.  Nor can the Court find that any significant jury confusion will result from the introduction of this limited testimony.  Finally, Defendants' undisputed position that they "*did not prepare*" the financial statements can be fully aired through cross-examination, and therefore does not provide a basis for exclusion of this otherwise limited testimony.[30]  [Docket Item 653 at 4 (emphasis in original).]

For all of these reasons, Defendants' motion to exclude Mr. Wallace, as narrowed by Plaintiffs' concessions, will be granted

---

[30] Defendants initially argued that the MDL District Court had striken at least portions of Mr. Wallace's pre-Report Affidavit in connection with a motion to dismiss in the companion litigation before the MDL District Court. [See Docket Item 581-1 at 2-3.] In response to Plaintiffs' concessions in opposition, Defendants no longer pursue this issue.  The Court nevertheless notes that it is clear and undisputed based upon the parties' submissions that neither the Special Master, nor the MDL District Court, ever struck Mr. Wallace's Report, or expressed any doubt concerning the narrow aspects of Mr. Wallace's Report implicated in connection with the pending motion.

with respect to Mr. Wallace's anticipated testimony on SMFF's 2002 financial statements, but denied with respect to testimony concerning SMFF's 2003 and 2004 financial statements.

## V.   REDACTIONS TO EXPERTS' REPORTS

As a result of the Court's decision on the parties' various motions to exclude, the expert reports will require revisions consistent with this Opinion and the parties' various concessions concerning the scope of each expert's testimony. Therefore, the Court will direct counsel to revise the proposed expert reports and to provide copies to the adversaries' counsel by no later than June 19, 2015.

The Court further reminds counsel that, as discussed at oral argument, the revised reports provide only the outline and scope of the anticipated expert testimony, but are not themselves admissible, nor will they be shown directly to the jury.  It is, of course, the duty of counsel to clearly advise their experts of any limitations placed on their testimony.

## VI.  CONCLUSION

An accompanying Order will be entered.


**June 12, 2015**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge